Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

# UNITED STATES DISTRICT COURT

for the

District of Columbia

Civil Division

Case: 1:25−cv−02314
Assigned To : Upadhyaya, Moxila A.
Assign. Date : 7/17/2025
Description: Employ. Discrim. (H−DECK)

Case No. _____

*(to be filled in by the Clerk's Office)*

MARGUERITE PRIDGEN, pro se

_____

*Plaintiff(s)*
*(Write the full name of each plaintiff who is filing this complaint.*
*If the names of all the plaintiffs cannot fit in the space above,*
*please write "see attached" in the space and attach an additional*
*page with the full list of names.)*

Jury Trial: *(check one)* ☐ Yes ☒ No

**–v–**

RUSSELL T. VOUGHT, DIRECTOR
OFFICE OF MANAGEMENT AND BUDGET

_____

*Defendant(s)*
*(Write the full name of each defendant who is being sued. If the*
*names of all the defendants cannot fit in the space above, please*
*write "see attached" in the space and attach an additional page*
*with the full list of names.)*

## COMPLAINT FOR A CIVIL CASE

**I.    The Parties to This Complaint**

**A.    The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | Marguerite Pridgen |
| Street Address | 3881 Newark Street, NW F480 |
| City and County | Washington, DC |
| State and Zip Code | 20016 |
| Telephone Number | (202) 450-9010 |
| E-mail Address | mep@onebox.com |



**RECEIVED**

JUL 17 2025

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

B.    **The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title *(if known)*.  Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Russell T. Vought |
| Job or Title *(if known)* | Director, Office of Management and Budget |
| Street Address | 1600 Pennsylvania Avenue NW |
| City and County | Washington, DC |
| State and Zip Code | 20503 |
| Telephone Number | (202) 456-1111 |
| E-mail Address *(if known)* | |

Defendant No. 2

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 3

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 4

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

E-mail Address *(if known)* _____

## II.      Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power).  Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties.  Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case.  Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case.  In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☒ Federal question                 ☐ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.      If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; the Rehabilitation Act of 1973, 29 U.S.C. § 791 et seq.; the Whistleblower Protection Act of 1989 (WPA), 5 U.S.C. § 2302(b)(8), and the Whistleblower Protection Enhancement Act (WPEA), Whistleblower Protection Enhancement Act of 2012, Pub. L. No. 112-199, 126 Stat. 1465 (2012)

### B.      If the Basis for Jurisdiction Is Diversity of Citizenship

1.      The Plaintiff(s)

   a.      If the plaintiff is an individual

   The plaintiff, *(name)* _____ , is a citizen of the State of *(name)* _____ .

   b.      If the plaintiff is a corporation

   The plaintiff, *(name)* _____ , is incorporated under the laws of the State of *(name)* _____ , and has its principal place of business in the State of *(name)* _____ .

   *(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.      The Defendant(s)

   a.      If the defendant is an individual

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

The defendant, *(name)* _____ , is a citizen of

the State of *(name)* _____ . Or is a citizen of

*(foreign nation)* _____ .

b.      If the defendant is a corporation

The defendant, *(name)* _____ , is incorporated under

the laws of the State of *(name)* _____ , and has its

principal place of business in the State of *(name)* _____ .

Or is incorporated under the laws of *(foreign nation)* _____ ,

and has its principal place of business in *(name)* _____ .

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.      The Amount in Controversy

The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:

_____

## III.    Statement of Claim

Write a short and plain statement of the claim.  Do not make legal arguments.  State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought.  State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

See attachment.

## IV.    Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

The Plaintiff was traumatized by the removal. The Plaintiff entered the Federal workforce as a teen and continued working for almost 30 years when she was suddenly terminated. She had never had a break in employment except to attend school. The Plaintiff routinely worked 50 -70 hours per week even when pursuing her master's degree at night. When she was sick, she went to work. When she was too sick to work, she begrudgingly used leave and still worked from home. Plaintiff spent most of her Federal career working on grants and financial assistance matters, and by 2007, Federal managers throughout the Executive Branch considered her an expert in Federal grants and cooperative agreements. This is why managers at OMB encouraged her to apply for a senior policy analyst position at the Agency. The Agency hired the Plaintiff in 2007, and she received good performance ratings and performance awards until she began requesting disability accommodations and engaging in protected activity. The retaliatory treatment became progressively worse after she made other protected disclosures. During this time, she was cared financially and personally for a parent who was in the early stages of a terminal disease, and yet, the Plaintiff was still able to balance her professional responsibilities with her caregiver duties. Instead of offering support, the Plaintiff's supervisor mocked the Plaintiff's caregiving status and denied her leave under the Family and Medical Leave Act. This marginalization spiraled into progressively harsher retaliation by the Agency as the Plaintiff continued to deliver high quality work. On July 1, 2013, the Agency stopped paying the Plaintiff on the same day her supervisor placed her on the PIP. This was followed by the government shutdown which extended the period the Plaintiff was without her pay which was needed to cover living expenses for herself and for her sick parent. The Plaintiff had already been diagnosed with anxiety disorder, adjustment disorder, and disabling conditions and now because of the Agency was experiencing great emotional distress and health issues due to months without receiving income while having to work. She felt like and was being treated like an indentured servant. The Plaintiff's health issues went untreated due to the loss of Federal health insurance after the removal. As a career civil servant, being fired from the Federal government after decades of service caused the Plaintiff significant stigma and harm to her personal and professional reputation. The removal was public as the Plaintiff was escorted out of the building with nothing but the clothes on her back in front of her co-workers. Even after the Board returned a decision in favor of the Plaintiff, the Board's use of search engine optimization technology caused the Plaintiff's MSPB case history to appear in the top results of a name search in perpetuity. This easy online access to the 2022 decision of MSPB in particular was essentially a billboard informing prospective employers that Plaintiff was an older disabled adult whistleblower who was fired, revelations that negatively impacted her competitiveness in a job market that favors young able-bodied candidates. Other career damage includes loss of 10 years of case law and regulation relevant to the Plaintiff's specialty area and developmental assignments leading to senior level positions. The Plaintiff will always be 10 years behind others in these areas. She lost her contract officer representative certification, a recognized and transferrable certification required to manage Federal contract work.  Per a 2022 MSPB order, the Plaintiff is again employed by the Agency, and is now facing potential backlash for the removal action and related legal activity under new  Federal personnel policy. For the foregoing reasons, Plaintiff respectfully requests that this Court: (1) Reverse the Final Decision on remanded claims, (2) Find that the Agency failed to meet its burden under 5 U.S.C. § 1221(e)(2), (3) Award compensatory damages for emotional distress ($1,000,000), career rehabilitation ($30,000), and (4) attorney and court fees to be submitted separately, and (5) Grant such other relief as the Court deems just and proper.

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

**V.      Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

**A.      For Parties Without an Attorney**

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:     07/17/2025

Signature of Plaintiff

Printed Name of Plaintiff     Marguerite Pridgen

**B.      For Attorneys**

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

Complaint for a Civil Case (cont'd)                    Civil Action No. _____

<u>STATEMENT OF CLAIM</u>

Plaintiff Marguerite Pridgen, pro se, brings this action pursuant to 5 U.S.C. § 7703(b)(2) to seek review of the Merit Systems Protection Board ("MSPB" or "Board") decision on June 18, 2025 affirming the basis for her removal from federal service.  MSPB Docket No. DC-0432-14-0557-B-1.  Plaintiff asserts that her removal, purportedly for unacceptable performance, was in fact the product of unlawful discrimination based on race, color, and disability, and retaliation for protected disclosures and EEO activity, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; the Rehabilitation Act of 1973, 29 U.S.C. § 791 et seq.; the Whistleblower Protection Act of 1989 (WPA), 5 U.S.C. § 2302(b)(8), and the Whistleblower Protection Enhancement Act of 2012, Pub. L. No. 112-199, 126 Stat. 1465 (2012).

1. Plaintiff was hired by the Agency (Defendant) in 2007 as a GS-15 Policy Analyst, to lead the Federal grants management policy portfolio. Plaintiff had almost 30 years of federal service and was considered an expert in Federal grants. She had received good performance during her tenure at the Agency prior to making protected disclosures.

2. Beginning in 2010, Plaintiff engaged in protected EEO activity by filing complaints regarding denial of disability accommodation and reprisal. She also made protected disclosures to the Government Accountability Office (GAO) concerning agency failure to implement grant reform and the Federal Awardee Performance and Integrity Information System (FAPIIS).

3. In 2012, Plaintiff notified her first-line supervisor Karen Lee of protected disclosures to the Department of Justice (DOJ) regarding undue delays in implementing Public

Complaint for a Civil Case (cont'd)                    Civil Action No. _____

Law 110-417 and the grant fraud rule and filed a complaint with the Office of Special

Counsel (OSC) concerning reprisal for whistleblowing.

4. Plaintiff's first-line supervisor was aware of Plaintiff's 2010 and 2012 EEO filings and

filed an affidavit in response to claims in March 2012.

5. The Agency collective, including human resources managers and legal counsel

involved in the decision to terminate Plaintiff, was aware of all Plaintiff's protected

disclosures and EEO activities.

6. Lee deemed Plaintiff's performance unsatisfactory in May 2012, less than two months

after filing an affidavit in the Plaintiff's EEO case while Plaintiff was on

administrative leave with no performance goals or plan in place.

7. The Agency maintained a list of Asian employees for special consideration in the

workplace after President Obama issued an Executive Order 13515 on improving

career and business opportunities for Asian-Americans and Pacific Islanders.

8. Plaintiff's Asian-American comparator, Hai (Gil) Tran (also a GS-15), received

significantly more favorable treatment. His performance plan included lax generic

requirements, allowing him to make mistakes and miss deadlines, while Plaintiff's

plan imposed specific, rigid deliverables and perfection standards using subjective

terms like 'thorough' and 'high-quality'.

9. The Agency routinely extended or ignored deadlines for Tran without attributing

delays to performance deficiencies but denied extensions to Plaintiff and blamed her

for delays not within her control.

10. The Agency assigned Tran to a private office based on his grade (GS-15) but

repeatedly assigned Plaintiff (also GS-15) to shared offices, including one with five

loquacious IT staff, which exacerbated her diagnosed Generalized Anxiety Disorder and Adjustment Disorder, a condition known to the agency since 2012.

11. The Agency routinely contested the legitimacy of Plaintiff's disabilities, made its own medical assessments, and insisted on work that aggravated her condition, rather than providing reasonable accommodation.

12. After learning of Plaintiff's EEO activity, the Agency placed Plaintiff on a second 90-day performance plan resembling a Performance Improvement Plan (PIP) in lieu of a standard 12-month performance plan, unlike for Tran. The agency began 'constructive removal' by reassigning her work, excluding her from communications and meetings.

13. During the entire 2013 PIP period, the Agency withheld the Plaintiff's paycheck, placing her under severe duress.

14. In 2014, the Agency removed Plaintiff from her position, citing a sole charge of unacceptable performance in a critical element. This removal action was preceded by a series of events indicative of discriminatory and retaliatory animus.

15. After removing the Plaintiff from federal service, the Agency falsely reported to the DC Department of Employment Services that the Plaintiff was terminated for misconduct, making her ineligible for unemployment benefits.

16. In 2022, the MSPB correctly reversed the Plaintiff's removal on the basis that removal was not based on a critical performance element and remanded the Plaintiff's claims of race, color and disability discrimination and retaliation to the MSPB Regional Office.

17. In 2025, the MSPB affirmed the agency's basis for removal, improperly crediting post-disclosure performance justifications from the Agency and disregarding its own

Complaint for a Civil Case (cont'd)                    Civil Action No. _____

legal standard under 5 U.S.C. § 1221(e) and controlling precedent, while explicitly

stating that the Plaintiff's supervisors (Karen Lee and Norman Dong) "likely had

motive to retaliate... and Lee had strong motive." (See Exhibit A12, p.41.)

18. Plaintiff asserts that the Board's Final Decision on remand claims is arbitrary and

capricious because it failed to reconcile the Defendant's burden with the factual

record. Evidence shows retaliation was collective, sustained, and motivated by

protected disclosures, EEO complaints, and Plaintiff's race, color, and disability.

| Exhibit | Description | Reason for Including |
|---------|-------------|----------------------|
| A1 | Plaintiff and Comparator 2012–2013 performance plan comparison | Evidence of disparate treatment between Plaintiff and Comparator |
| A2 | Comparator and Plaintiff Workspace Assignments After EEO disclosures | Evidence of disparate treatment between Plaintiff and Comparator |
| A3 | Denial of Unemployment Benefits Due to Agency Misinformation | Evidence of Agency retaliatory motive |
| A4 | Plaintiff's Pleading to MSPB on Remand Claims | Supporting information on Plaintiff claims |
| A5 | MSPB Final Decision on Remand Claims | Decision being appealed |
| A6 | Paycheck Withheld During PIP Period 2013 | Evidence of Agency retaliatory motive |

Exhibit A2
Comparator and Plaintiff Workspace Assignments After EEO disclosures

Plaintiff workspace (cubicle in shared office with 5 people)



Tran Workspace (private office)



Exhibit A1 Plaintiff and Comparator Performance Plan Comparison

| OMB Strategic Plan goal | Appellant | Comparator | Appellant Analysis |
|---|---|---|---|
| Improve effectiveness and efficiency of government rules and mandates. | Develops thorough project plans with appropriate milestones for internal and external coordination, review, and issuance of policies related to grants fraud and accountability (e.g., proposed grants fraud rule, and FAPIIS final rule). Identifies strategy and guidance, as necessary, to bring together efforts under DNP with FPAIIS to reduce any duplication of efforts. **Proposed fraud rule is issued by December 2012. Final FAPIIS rule issued by December 2012.** | Collaborates to educate, garner support, and to solicit input and feedback on OFFM and OMB initiatives. Collaborates with the appropriate organizations and at the appropriate level within the organizations. Results of collaboration and analysis will be reported to senior management on a regular basis. Communicates, written and verbally, analysis that is clear, concise, relevant and timely. | Appellant is assigned multiple deadlines not within her control because they involve the complex and lengthy process of rulemaking. Comparator isn't assigned clear deliverables or any specific deadlines. |
| Improve effectiveness and efficiency of government rules and mandates. | Develops thorough project plan with appropriate milestones for internal and external coordination, review, and issuance of policies related to **addressing GAO recommendations on undisbursed grant balances by August 2012.** Drafts accurate, complete, coordinated, appropriate, and high-quality OMB response and ensures timely transmittal of OMB response to GAO recommendations. Drafts | Analyzes, using cost-benefit analysis, and any other appropriate analytical methods, recommended options and provides other viable options for improving grants management policies to better target waste, fraud, and abuse, reduce administrative burden on recipients, and improve performance & results. Makes recommendations to senior management on changes to government-wide policies | Appellant is assigned multiple deadlines not within her control because they involve internal clearance and compliance by other agencies. Comparator isn't assigned clear deliverables but the work he is assigned is within his control. |

EXHIBIT 2

| OMB Strategic Plan goal | Appellant | Comparator | Appellant Analysis |
|---|---|---|---|
|  | Controller's Alert. **70% of all grant-making agencies have developed internal controls and processes** to reduce the amount of undisbursed grant balances in expired accounts. | based on this analyses and evaluation. Develops and revises policies through guidance or other instrumentalities to further support Administration goals by March 2013. Identifies opportunities to integrate other EOP efforts into grant reform work. |  |
| Improve effectiveness and efficiency of government programs. | Based on clear and cogent analysis, drafts **effective data quality guidance that enhances the timeliness, accuracy, and completeness of USAspending.gov data**, while balancing agency resource constraints, in coordination with Federal agencies through the Council on Financial Assistance Reform (COFAR) and relevant OMB offices (e.g., OFPP, e-Gov, PPM) by September 2012. Provides accurate, thorough, and high-quality analysis and recommendations to inform other inquiries. Identifies any inconsistencies or needs for clarification in current policies and drafts recommendation to address these area. Identifies timeframe for review of | Identify a baseline of outstanding audit findings and develop a mechanism to continue to identify progress in closing out open audit findings by March 2013. Work with the COFAR to identify what specific risk strategies could be established to more effectively close out high-risk audit findings by March 2013. | Appellant is assigned multiple deadlines not within her control because they involve other agencies. Assignment to draft guidance that results in timeliness, accuracy and completeness of a data system is illogical and nonsensical. Comparator isn't assigned clear deliverables. |

EXHIBIT 2

| OMB Strategic Plan goal | Appellant | Comparator | Appellant Analysis |
|---|---|---|---|
| | documents for OMB clearance and manages process to ensue efficient and timely review and clearance. **Guidance is issued by December 2012.** | | |
| Improve effectiveness and efficiency of government programs. | Develops thorough project plans with appropriate milestones for oversight. By 2013, **100% of agencies** have identified a process to certify reliability. | Analyzes, using cost-benefit analysis, and any other appropriate analytical methods, recommended options and provides other viable options for improving grants management policies to better target waste, fraud, and abuse, reduce administrative burden on recipients, and improve performance & results. Makes recommendations to senior management on changes to government-wide policies based on this analyses and evaluation. Develops and revises policies through guidance or other instrumentalities to further support Administration goals. | Appellant is assigned deadline not within her control because it requires compliance by other agencies. Comparator isn't assigned clear deliverables or any specific deadlines |
| Ensure agencies develop, express and implement policies in accordance with the President's budget. | Identify 1-2 policy priorities and provide specific recommendations, timeline, implementation plans. Develops and revises policies | Based clear and cogent analysis, develops and drafts a strategy and guidance in coordination with Federal agencies, for use of Single | |

EXHIBIT 2

| OMB Strategic Plan goal | Appellant | Comparator | Appellant Analysis |
|---|---|---|---|
| | thorough guidance and other instrumentalities to further support Administration goals. | Audit findings to reduce administrative burden to recipients, and improve performance results by 2013 | |
| Ensure agencies develop, express and implement policies in accordance with the President's budget. | Ensures that **all** existing, government-wide grants OMB approved forms have continuing approval by OIRA. Recommends and issues specific policy changes designed to reduce reporting burden. | Not applicable | |
| | | | |

EXHIBIT 2

Exhibit A3 Denial of unemployment benefits due to
agency misinformation

# DEPARTMENT OF EMPLOYMENT SERVICES
## CENTRAL ADJUDICATION BRANCH
### P.O. BOX 23794
### WASHINGTON, D.C.  20026

## DETERMINATION BY CLAIMS EXAMINER

**CLAIMANT:**

MARGUERITE PRIDGEN
3881 NEWARK ST NW APT F480
WASHINGTON, DC - 20016-3029

**EMPLOYER:**

OFF OF MGMT & BUDGET--FINANCIA
725 17TH ST NW
WASHINGTON, DC - 20503

---

Do not edit above this line

Fold here

---

**SOCIAL SECURITY NUMBER: XXX-XX-7100**

**ISSUE**:  Discharge for Misconduct

**REASON FOR DETERMINATION:**
The claimant was discharged for unsatisfactory work performance.  The claimant denies the employer allegations, and states that she was never warned that her performance was unsatisfactory.

The District of Columbia Unemployment Compensation Act in D.C. Code, Title 51-110(b)(1), provides that an individual shall be disqualified from receiving benefits if it is found that he/she was discharged from his/her most recent employer for misconduct occurring in the course of the work.

The employer has the responsibility to provide evidence of this misconduct.  In this case the employer has not provided sufficient evidence to support a finding of misconduct.  Therefore, work related misconduct on the part of the claimant has not been established.

**DECISION:**

**Therefore the claimant listed herein is determined eligible for unemployment benefits effective 03/09/2014.**

I certify that a copy of this document was mailed to the employer and to the claimant named herein at the above addresses on x/xx/xxxx.

CURTIS< ALISHIA
Claims Examiner

**SEE THE ENCLOSED D.C. CODE & NOTICE OF APPEAL RIGHTS**

Exhibit A4_ Plaintiffs's Pleading on remand claims

**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**
**WASHINGTON REGIONAL BOARD**

| | |
|---|---|
| **MARGUERITE PRIDGEN,**<br><br>        **Appellant,**<br><br>**v.**<br><br>**OFFICE OF MANAGEMENT AND**<br>**BUDGET,**<br><br>        **Agency.** | **DOCKET NUMBER**<br>**DC-0432-14-0557-B-1** |

<u>**APPELLANT'S BRIEF ON REMAND CLAIMS**</u>

Appellant Marguerite Pridgen, pro se, submits this brief on the remand claims in response to the Administrative Judge's "Summary of Status Conference and Order Closing the Record" dated January 30, 2024 and "Order Granting Extension of Time" dated February 21, 2024. *See* Remand Appeal File (RAF), Tabs 20 and 23.

The Board reversed the agency's sole charge of performance-based removal, and the agency offered no other basis for removing the appellant from the Federal service. Petition for Review (PFR) File, Tab 3. The Board posed certain matters for the Administrative Judge or AJ to re-assess on remand. The AJ presented those matters in the "Summary of Status Conference and Order Closing the Record" (RAF Tab 20) which in summary includes (1) whether the appellant met her burden to prove her Performance Improvement Plan or "PIP" assignments were the result of race, color, and disability discrimination taking into consideration the similarly situated employee and any other probative evidence, (2) whether the agency would have removed the appellant regardless of the discriminatory assignments, and (3) whether any of the appellant's

1

protected activities were a contributing or motivating factor in the agency's decision to remove her. In her initial filing through counsel and subsequent petition for review submitted pro se, the appellant presented affirmative defenses in support of her claims that the agency's basis for her removal was unrelated to her performance, and instead, was an act of reprisal for the appellant's protected disclosures that wouldn't have been taken but for her by race, color, and disability status. This brief provides arguments and evidence in support of the appellant's claims. When taken collectively, the evidence shows that the agency used the performance system to cloak its efforts to punish the appellant for protected activity, and if not for her protected activity, race, color, and disability status, the agency wouldn't have even taken a removal action. The appellant attests that the unlawful removal had an extremely adverse impact on her emotional health and professional identity and on the standard of living for herself and the terminally ill parent under her care, justifying precedential equitable relief by the Board including $1,000,000 in damages for emotional distress, humiliation and reputational harm, $30,000 for training needed to regain the certification for contractor officer representative lost and makeup for developmental training opportunities missed during the last ten years due to the removal, and actual attorney's fees to be requested under a separate petition.

**FACTUAL BACKGROUND**

The appellant adopts the Procedural History set forth in the AJ's status summary (RAF, Tab 28) and the factual information provided in her petition for review (*see* PFR FILE, Tab 3 at 9-13), previous filings and the following timeline organized to show the proximity of agency actions to the appellant's protected activities:

2007-2010 - The agency deemed appellant to have met performance standards.

2010 – The agency denied appellant's initial requests for disability accommodation.

2010 – The appellant filed an EEO complaint regarding denial of disability accommodation.

2010 – The agency reassigned several of appellant's key work duties without her input.

2010-2011 – The agency managers provided affidavits in response to the appellant's 2010 EEO complaint.

2011 – The appellant filed a new EEO complaint regarding discrimination and reprisal for 2010 protected activity that included a disclosure she made to GAO regarding GAO over agency failure to implement grant reform per Public Law 106-107 and FAPIIS per Public Law

110-417.

2011 - The agency alleged the appellant made written threats and placed the appellant on administrative leave.

2011-2012 - The agency managers filed affidavits in response to 2012 EEO complaint.

2011 - The agency changed the appellant's leave status to sick leave and annual leave without notifying the appellant and then notified her through a human resources manager from another organizational component that there would be "dire consequences" if she didn't provide documentation to justify the leave use and assure she was fit for duty.

2012 - The appellant provided the agency with a statement from a medical practitioner describing her diagnosis of Generalized Anxiety Disorder and Adjustment Disorder, confirming that she was fit for duty.

2012 - The agency directed the appellant to report to work on a specified day.

2012 - The appellant informed agency human resources and personnel security managers that the Federal Protective Service prevented her from entering the building because she was on the "Do Not Admit" list.

2012 - The agency for the second time directed the appellant to report to work on a specified day.

2012 - The appellant informed agency human resources and personnel security managers that the Federal Protective Service prevented her from entering building again because she was on the "Do Not Admit" list.

2012 -The agency for the third time directed the appellant to return to her office on a specified day.

2012 - The appellant, who was traumatized and in fear for her safety because of the previous two incidents with the Federal Protective Service, gained access to her office only to find that her work area was trashed and entrance to her specific workspace was blockaded.

2012 - The appellant's supervisor (Lee) filed an affidavit in response to appellant's 2012 EEO claims.

2012 - The appellant's supervisor refused to develop a 2011-2012 performance plan for appellant but established a plan and evaluation for that period for Tran.

2012 - The appellant filed an MSPB appeal alleging agency refused to provide her with a 2011-2012 performance plan and placed her under an invalid 90-day PIP like performance plan for 2012-2013.

2012 - The appellant notified her supervisor (Lee) of her disclosure to DOJ's Offices of Inspector General and Attorney General regarding how the agency was unduly delaying implementation of Public Law 110-417 and the grant fraud rule.

2012 - The agency placed the appellant on a second 90-day performance plan resembling a PIP in lieu of a 12-month performance plan.

2012 - The appellant filed an appeal with the Board regarding agency refusal to provide her with a 2011-2012 performance plan and placing her under an invalid 90-day performance plan for 2012-2013.

2012 - The appellant filed a complaint with the Office of Special Counsel (OSC) regarding reprisal for whistleblowing related to failure of agency to implement Public Law 100-417

2012 - The agency issued a performance counseling memo to the appellant citing poor performance.

2013 - OSC notified agency of appellant's 2012 complaint.

2013 - The agency denied the appellant's request for an adequate accommodation for carpal tunnel after the dictation software wasn't working for database entry and her symptoms were worsening.

2013 – The appellant's supervisor insisted that she continue doing data entry work that aggravated her disability.

2013 - The appellant made disclosures to OSC regarding agency's continued failure to implement Public Law 110-417 and directing agencies to underreport undisbursed balances in

expiring grant accounts. The appellant's disclosure describes management's role in trying to cover up the issue.

2013 - The agency gave appellant an unsatisfactory performance rating.

2013 - The appellant appealed the unsatisfactory performance rating.

2013 - The agency rejected the appellant's appeal of unsatisfactory rating and appellant responded to Dong and his supervisor regarding the agency's continuing reprisal for protected activity.

2013 - The agency placed the appellant under a 90-day Performance Improvement Plan or PIP.

2013 - The agency withheld the appellant's paycheck during the entire 2013 PIP period.

2013 - The agency gave the appellant an unsuccessful performance rating.

2013 - The agency gave the appellant a Notice of Proposed Removal memo without supporting information, confiscated appellant's building pass, and escorted her out of the building.

2014 - The agency removed the appellant from the federal service based on performance.

2014 - The appellant filed an initial appeal of the removal action with the Board.

2014 - The agency reported to DC Department of Employment Services that appellant was terminated for misconduct making her ineligible for unemployment benefits.

2014 -The appellant learned about the agency's false report to the DC Department of Employment Services after she was denied unemployment benefits and appealed the denial.

2014 - The agency reaffirmed with DC Department of Employment Services that the appellant's termination was for misconduct but appellant won denial of benefits appeal when the agency was unable to provide documentation supporting the misconduct-based termination.

2022 - The agency informed the appellant that it would not comply with the Board's order dated September 12, 2022 after the appellant expressed indifference with returning to the agency.

2022 - The agency didn't cancel the appellant's removal and restore her by the Board ordered deadline.[1]

2024 - The appellant applied for the SES Career Development Program, and the agency denied the appellant access to scores, rater's comments, and other information pertaining to her application.

## I.    **<u>Legal Standards</u>**

As stated in the AJ's "Summary of Status Conference and Order Closing the Record" dated January 30, 2024, an appellant may receive injunctive, forward-looking relief if she shows that discrimination based on one or more of the identified bases (i.e. race, religion, age, and disability) was a "motivating factor" in her removal. *Pridgen*, 2022 MSPB 31. To obtain the full relief, including status quo ante relief, compensatory damages, or other forms of relief related to the result of an employment decision, she must show that such discrimination was a "but-for"

---

[1] The agency initially claimed through counsel it didn't have sufficient financial information to meet the board's order despite the appellant providing massive amounts of financial and tax information to them. The agency then claimed a suitability determination was required although the appellant confirmed no suitability determination was necessary for cancelling the appellant's removal. There is no evidence that agency even initiated the suitability determination process until after the appellant retained counsel.

cause of the employment outcome. *Id*. The "but-for" causation standard does not require discrimination to be the sole cause of the contested action, only a necessary one. *Id*., ¶¶ 22, 42. There may be more than one but-for cause of a single employment action. *Id*.  An appellant may prove discrimination under these different standards of proof by various methods. *Id*., ¶¶ 23, 42. "An employee may prevail even when the employer acted with mixed motives, i.e., when there is evidence that discrimination was one of the multiple motivating factors for an employment action such that the employer acted on the bases of both lawful and unlawful reasons." 24 MSPB 3.  No one method is the exclusive path to a finding of liability. *Id*. The methods by which an appellant may prove a claim of disability disparate treatment discrimination are (1) direct evidence; (2) circumstantial evidence, which may include (a) evidence of "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn," also known as "convincing mosaic"; (b) comparator evidence, consisting of evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic on which an employer is forbidden to base a difference in treatment received systematically better treatment; (c) evidence that the agency's stated reason for its action is "unworthy of belief, a mere pretext for discrimination" (i.e., the burden-shifting standard under *McDonnell Douglas Corp. Green*, 411 U.S. 792, 802-04 (1973)); and (3) some combination of direct and indirect evidence. *Id.* at ¶¶ 24, 42. Not all of the above types of evidence, i.e., direct, "convincing mosaic," comparator, or pretext, will be needed in every case.

To establish her claim of whistleblower reprisal, the appellant must prove by preponderant evidence that: (1) she made a protected disclosure under 5 U.S.C. § 2302(b)(8) or engaged in activity protected by 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D); and (2) that the

whistleblowing was a contributing factor in the personnel action being appealed. The Board already determined that the appellant engaged in protected activity. Pridgen v. Office of Management and Budget, 2022 MSPB 31, ¶¶54-66. Therefore, the appellant must prove her protected activity was a contributing factor to her removal. An appellant may prove whistleblowing was a contributing factor to a personnel action by establishing the "knowledge/timing test" – i.e., that the official taking the action knew of the disclosures and thereafter took the personnel action within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action. *See, e.g., Strader v. Department of Agriculture*, 475 Fed. Appx. 316, 321 (Fed. Cir. 2012). The Board has held that actions taken within two years of an official's knowledge of the protected disclosure/activity is sufficient to meet the "knowledge/timing test." If the appellant fails to satisfy the knowledge/timing test, the administrative judge shall consider whether the appellant proved contributing factor through other evidence, such as that pertaining to the strength or weakness of the agency's reasons for taking the personnel action, whether the whistleblowing or protected activity was personally directed at the proposing or deciding officials or directed more broadly at the agency, and whether agency officials connected or disconnected from the removal action had a desire or motive to retaliate against the appellant. *Garilynn Smith v. Department of the Army*, 2022 MSPB 4, Opinion and Order, ¶¶28-29.  In Smith v. Army, the Board held that although none of the relevant officials were directly implicated in the appellant's disclosures, they had a motive to retaliate because the appellant's disclosures cast the agency as a whole in a negative light and jeopardized the agency's funding. The AJ in evaluating the remand claims under *Pridgen*, 2022 MSPB 31 should apply this broader view of retaliatory motive as the court has

found that an official may have a retaliatory motive even if she is not directly involved in the work at issue in an employee's disclosure.  2022 MSPB 4, Opinion and Order, ¶¶29.

## II.    <u>Race, Color, and Disability Discrimination</u>

The Board determined that the appellant's coworker Hai (Gil) Tran was similarly situated to her and directed the AJ to determine whether the appellant met her burden of proving her PIP assignments were the result of discrimination, taking into consideration the similarly situated employee "and any other probative evidence." The Board further directed the AJ to determine whether the agency would have removed the appellant regardless of the discriminatory assignments. The appellant is providing the following in defense of her claims that her comparator received more favorable treatment in workplace assignments because he was Asian and that the agency wouldn't have removed the appellant had she been Asian.

<u>The agency showed preferential treatment toward Asians in the workplace</u>. On October 14, 2009, President Obama issued "Executive Order 13515-Asian American and Pacific Islander Community," which among other actions, required a plan to "identify ways to foster the recruitment, career development, and advancement of AAPIs [Asian Americans and Pacific Islanders] in the Federal Government." See E.O. 13515, Section 3.d. In response to E.O. 13515, the Agency developed and maintained a list of Asian employees to receive special consideration in career and employment activities. The list was referred to by some Asian employees as the "yellow list"[2] and the agency used the list in implementing race-conscious policies and practices

---

[2] Asian employees such as Bing Bradshaw referred to the list as the "yellow list" and encouraged Asian employees to make sure they were on the list. The appellant had seen a version of the with Tran's name.

that unfairly boosted opportunities for Asian Americans and Pacific Islanders to ascend higher graded positions while negatively impacting African-American employees.[3] Exhibit 1.

    <u>The agency treated the appellant's comparator more favorably due to race under the performance management process</u>. The appellant's comparator Hai (Gil) Tran was on the list of AAPI employees. The first and second level supervisors of the comparator and the appellant were both members of the AAPI community due to their Asian ancestry. The appellant's supervisors treated Tran more favorably than her in several noticeable ways. During the hearing, the appellant's first line supervisor (Lee) emphasized that there were differences between the performance plans of Tran and the appellant and primarily because of their different work assignments. Hearing Transcript (HT) Day 2, p.88, ¶¶4-14. However, Lee didn't mention the key difference was that she included lax generic requirements in the comparator's plan, allowing him to make mistakes, miss or self-extend deadlines, and still meet his performance goals. Conversely, the appellant's supervisor included very specific and rigid deliverables and deadlines in the appellant's performance plan, leaving little slack for the appellant to make a mistake or miss a deadline and still meet her goals. In the appellant's 2012-2013 performance plan, the appellant's supervisor routinely used highly subjective terms such as "thorough" and "high-quality" and established perfection standards which required the appellant to "ensure" certain actions would occur or achieve "100%" completion to meet the performance standards. The appellant's comparator had no perfection standards in his performance plan. The appellant's plan included performance requirements

---

[3] Between 2009 to 2015, the percentage of AAPI employees at the GS-15 level increased in the agency workforce while the percentage of GS-15 African American employees decreased with the agency' implementation of E.O. 13515. *See* Fedscope.gov data by ethnicity and Exhibit 3. This suggests that the agency's E.O. implementation had a disparate impact on the African American workforce.

that were highly dependent on processes and timing of activities not within her control including federal rulemaking, governmentwide compliance, and agency clearance. Conversely, the performance elements in the comparator's plan included mostly broadly stated self-directed work assignments with loose standards involving collaboration, making recommendations, and identifying progress within unspecified deadlines. During Tran's performance period, his performance expectations remained static. Conversely, the appellant's supervisor repeatedly redefined and changed key elements of the appellant's assignments during their discussions making it unclear what the expectations were during the performance (PIP) period. PFR, Tab 3. In addition to differences in performance plans, there were differences in how the appellant and her comparator were treated in the workplace. The agency assigned the comparator to a private office on the basis of his grade (GS-15) and repeatedly assigned the appellant (GS-15) to shared offices. The last shared office assigned to the appellant was occupied by five loquacious information technology staff who made it difficult for the appellant to concentrate because of her anxiety disorder which was known to the agency since 2012. HT Day 2, Tab 25 at 52, 18-22; at 205, 13-22; at 206, 1-4; and at 213, 15-22. After learning that 2011-2012 performance plans weren't established for Tran and the appellant, the agency established a 12-month plan for Tran and Lee gave him a positive performance rating but established a 90-day plan resembling a PIP for the appellant and subsequently gave her no performance rating followed by a negative performance rating. The agency gave Tran authority to hire interns and approve appellant's timecards but didn't extend these authorities to the appellant who was the same grade (GS-15) but unlike her comparator had formal supervisory experience.[4] The agency regularly gave Tran timely contract

---

[4] Prior to 2010, the agency asked the appellant to participate in selection panels for interns and vacant positions and asked to serve in the roles of acting branch chief and acting deputy controller.

resources to complete routine work including the annual update of the single audit compliance supplement but refused to grant a request for special project funding (grants workforce development) made by the appellant until the late in the appellant's PIP period. PFR File, Tab 3 at Exhibit G4. Contrary to Lee's testimony, the agency routinely extended or ignored deadlines for Tran without attributing delays in his work to a performance deficiency and routinely denied extensions to the appellant and attributed delays not within her control to poor performance and poor communication.[5] The agency allowed Tran to work compensatory time but typically denied such requests from the appellant. On the few occasions the appellant's compensatory time requests were approved, Lee characterized the appellant's need for compensatory time as a reflection of her poor planning and time management. PFR File, Tab 3. The agency allowed Tran to maintain his core assignments and choose additional work assignments but denied the appellant the opportunity to do so. Instead, the agency allowed other staff to routinely cherry pick work from the appellant's assignments. *Id.* [6] The agency allowed Tran to work independently but routinely interfered with the appellant's planning and delivery of her assignments. The appellant was blamed for the mistakes her supervisor made in editing work products while Tran was not. PFR FILE, Tab 3.  Of note, several times after the appellant would request 'use-or-lose' annual leave, Lee told her she had to come in the office to edit memos and therefore needed to cancel her leave. When the appellant came into the office, Lee would ask her to add punctuation marks and change the article in the sentence such as change "the" to "a." The appellant questioned why she had to

---

[5] Lee testified that she didn't have to extend performance goal deadlines for Tran, but Tran had very few deadlines in his plan. *See* HT Day 2, Tab 25 at 85, 5-9 and Exhibit 2.

[6] The appellant's 90-day PIP assignments related to grants workforce development and data reliability in USAspending.gov remain unfinished 10 years after the appellant's removal despite still being considered high priority by the agency.

change her leave for something so minor and Lee's response was typically that had the appellant used her leave earlier in the year she wouldn't have so much expiring leave days.

> The agency made it difficult for employees to get accessible workplaces under the Americans with Disabilities Act. The appellant struggled with getting the agency to take her disability accommodations requests seriously. Her initial requests were denied or dismissed, and consequently, she felt compelled to file a claim with the EEOC. The agency's 2023 Federal Employee Viewpoint Survey (FEVS) reaffirms similar issues the appellant faced in her previous tenure at the agency. The FEVS reveals that most employees in the agency's Office of Federal Financial Management found it difficult to request accessibility accommodations and the agency didn't respond to their accessibility needs in a timely manner. Exhibit 5[7].

> The agency treated the appellant adversely because of her disabilities. The agency took a series of actions and made statements that demonstrated hostility toward the appellant due to her disability status. In 2011, the agency placed the appellant on administrative leave and then placed her on sick leave and annual leave without informing her. Soon after, the appellant received calls from a human resources manager who explained that the agency threatened dire consequences that could include placing the appellant on AWOL status or removal if no medical note was provided for extended leave the agency was charging without her knowledge.[8] The agency then questioned the legitimacy of the appellant's disabilities and made its own medical assessments of the appellant's disabilities. HT Day 2, Tab 25 at 213,

---

[7] See employee responses to Questions 83 and 84.

[8] The agency placed the appellant on administrative leave in 2011 without a return to work date. In 2012, Carrie Croak from the Executive Office of the President, Office of Administration, informed the appellant by voice mail that the agency was making threats to take adverse personnel actions if she didn't justify her sick leave and annual leave that she was unaware was being charged to her account. HT Day 2, Tab 25 at 371, 8-15.

15-22 and at 214, 1-5. The terminating official (Dong) stated that he and other agency managers questioned whether her disabilities were legitimate. *Id.* The agency contested that the appellant's difficulty with concentration and noisy work environments was related to her diagnosis of generalized anxiety disorder (GAD) and adjustment disorder (AD) despite the fact that these are common symptoms associated with these disorders: "To the extent that the appellant may argue that noises in her work area disturbed her due to a disabling condition, OMB will contest the allegation and argue that appellant did not have disabling condition as defined by the Americans with Disabilities Amendments Act of 2008 (ADAAA)." *See Pridgen v. Office of Management and Budget,* MSPB Docket No. DC-0432-14-0557-I-1, IAF, Tab 40 at 5, 11 The terminating official (Dong) stated in his testimony that "there was some discussion about whether the requests were legitimate requests for accommodation" and that he and the appellant's first line supervisor (Lee) believed that the appellant's accommodations requests were excuses for not meeting performance expectations HT Day 2, Tab 25 at 252, 18-22, at 253-260. Exhibit 9 at 74; at 76; at 99 14-19 . The agency was basing its assessment of the legitimacy of the appellant's requests on whether other employees in the same space were able to function without an accommodation. HT Day 2, Tab 25 at 259, 22 and at 260-261. Exhibit 9 at 69, 20; at 70, at 71, 9. It was discriminatory for the agency to assess the need for accommodation based on the abilities of other employees.

The agency's Office of Federal Financial Management showed preference for white and light complected employees in career advancements. No individual of the appellant's color or darker was ever promoted in the Office of Federal Financial Management to a career GS-15 or senior executive service position during the period 2007 to 2024. The Office received applications from many people of color some of whom had graduated from the SES

CDP program or were already in SES positions and none was selected for senior executive positions and GS-15 positions in the office. Although it is possible for more than 17-years to pass with no person of dark color to be selected, it is more likely that than not that the Office is color conscious when determining ascensions to higher graded positions and senior executive positions. This behavior not only violates the fundamental principles of equality and fairness but also constitutes a clear violation of anti-discrimination laws.

The agency's Office of Federal Financial Management enabled racial-tinged sexual harassment of female African American employees by white male employees. The Office directed the appellant to work with a white male branch chief (Wetklow) from Virginia after he told a female African American employee around the appellant's complexion that he'd take her to the woodshed if she misbehaved. There is no evidence that he ever said this to white or light complected males or females in the Office or the agency. Regardless, a white male supervisor saying this to a black female subordinate in a workplace is beyond inappropriate and disturbing as it has overtones of both racial and sexual harassment. Even more disturbing is that the there is no evidence that the branch chief was reprimanded for his behavior, suggesting the agency either condoned the behavior or acquiesced because it involved a black female. The agency's dismissive approach to this incident was evidence that they were willing to allow racial-tinged sexual harassment of female African American employees by white male employees without recourse. With this awareness, the appellant's working environment became more stressful as her supervisor (Lee) repeatedly directed her to work with the branch chief on a PIP assignment.

## III.  **Whistleblowing and Other Protected Activity**

The Board in its September 12, 2022 Opinion and Order took issue with the appellant's argument that the timing of the 2010 protected activity was relevant to the removal action. PFR File, Tab 48. The appellant would like to add context that explains that the 2010 EEO complaint didn't end with the agency dismissal of the complaint in 2011 and instead continued with the processing of the 2012 complaint which addressed agency reprisal taken in response to the 2010 complaint and other claims. From 2010-2012, the agency took affidavits from the appellant's supervisors and coworkers and issued two reports of investigation, the last one issued on May 1, 2012. Essentially, the appellant's 2010 EEO complaint was the impetus for the 2012 complaint, and therefore, the 2010 EEO activity would be considered "other evidence" in re-assessing relevance of this protected activity to the removal action.

The Board already determined that the appellant engaged in other protected activity within two years of the removal action. *Pridgen,* 2022 MSPB 31, ¶¶54-66. Therefore, the appellant must prove her whistleblowing was a contributing factor to her removal. After the agency became aware of the appellant's EEO activity in 2010, the appellant was treated adversely and the agency began to constructively remove her from her job.  Soon after learning of the appellant's disclosures, the agency began constructive removal of the appellant by reassigning her work, leaving her out of communications and meetings related to her work, placing her on illegal PIPs, and withholding her pay during the 2013 PIP period. The agency continued taking adverse actions against the appellant after her removal from federal service in 2014 including attempting to prevent her from securing unemployment benefits and not providing access to personnel records she requested pursuant the Privacy Act claiming they no longer had them. Exhibits 7 and 8.  Several of the appellant's disclosures were again discussed in her 2013 appeal to Dong regarding her negative performance evaluation. Exhibit 4. The

17

terminating official, human resources manager, and other managers testified that the agency collectively informed the decision to terminate rather than demotion or reassignment without clear justification. HT Day 2, Tab 25 at 70, 2-8; at 74, 10-21; at 269, 4-22.

The agency collective was aware of all of the appellant's disclosures. The appellant's first line supervisor (Lee), who recommended the appellant's removal, filed an affidavit on March 30, 2012 in which she acknowledged awareness of the appellant's 2010 EEO filing and responded to questions regarding her role in reprisal and discriminatory treatment that was the subject of the 2012 EEO claim. IAP, Tab 10 at 309-338. Less than two months later, in May 2012, Lee deemed the appellant's performance to be unsatisfactory even though the appellant had been on administrative leave until May 2012 and had no performance goals or plan in place. HT Day 2 at 189, 3-10. Lee subsequently established performance goals for the appellant in a series of plans resembling PIPs even though she hadn't done this for Tran. PFR File, Tab 3. This is evidence of Lee's awareness of the 2010 and 2012 EEO activity and evidence of her suspiciously timed misuse of the performance management shortly after filing her affidavit.

The Report of Investigation for the appellant's 2012 EEO complaint included a copy of the appellant's protected disclosure to the Government Accountability Office (GAO) over agency failure to implement grant reform per Public Law 106-107 and FAPIIS per Public Law 110-417 from the EEO counselor. This is evidence that the agency was aware of the appellant's protected disclosures to GAO. Lee was aware of the disclosures to DOJ. HT Day 1, Tab 24 at 35, 10-22 and at 35-36. The argument of whether the appellant's supervisors (Lee and Dong) were aware of all of the appellant's disclosures would be irrelevant because the agency collective was aware, and the agency collective was involved with the decision to

18

remove the appellant. The agency was the defendant in the appellant's protected disclosures to EEO, GAO, OSC, and DOJ. The agency had motive to retaliate against the appellant because the appellant's disclosures regarding failure to implement statutes and misinforming GAO and Congress implicated the agency's effectiveness as an oversight agency. Dong in his oral and written testimony explained that managers from human resources and legal counsel were deeply involved with planning some adverse action against the appellant and ultimately decided on taking the removal action. HT Day 3, Tab 25 at 9-14. It was inconsequential that some agency managers who were cognizant of the appellant's protected disclosures were not action officials in the removal or not identified by name in the appellant's protected disclosures. The cognizant managers were part of the agency's management team and could surmise the negative impact the disclosures would have on the agency's role as the standard bearer of Executive Branch management practices. The cognizant managers didn't intervene and prevent the appellant's removal or investigate to rule out pretext for the removal.  Instead, the agency collectively and surreptitiously used the performance management system to strategize the appellant's removal, deeming her to be suddenly incompetent after three years. HT Day 2, at 266, 2-12.  A responsible person with this context would recognize the agency's removal action for what it was: a racially motivated, reprisal fueled gaslighting. A reasonable person would conclude that the disclosures were a contributing factor in the removal. See, e.g., Strader v. Department of Agriculture, 475 Fed. Appx. 316, 321 (Fed. Cir. 2012).

The agency treated the appellant adversely after becoming aware of her EEO complaints. The agency's adverse treatment of the appellant occurred after learning of her protected disclosures and continued after her termination.  The evidence clearly demonstrates that the

appellant acted in good faith to expose wrongdoing of the agency managers. The appellant diligently collected evidence of the misconduct, risking her own career and livelihood to protect public funds from mismanagement, waste and fraud. The appellant's acts aligned with the spirit of whistleblower protections, which aimed to encourage individuals to come forward and disclose wrongdoing for the greater good. HT Day 1, Tab 24 at 34, 8-22. The retaliation suffered by the appellant, including the actions to constructively remove her from her position and officially remove her from the federal service, further underscored the agency's disregard for ethical standards and the importance of whistleblower protection laws. It was only reinforced by the 2013 employee viewpoint survey where employees in OMB's Office of Federal Financial Management disproportionately reported fear of reprisal for protected disclosures compared to the agency and the federal government overall. Exhibit 5.

The Agency Took Harsher Action with Appellant Than it Did With Non African American Employees Deemed to be Poor Performers. The agency had a predominately Caucasian and Asian workforce when it terminated the appellant in 2014. During the hearing, the agency human resources managers testified that other employees who were deemed to be having performance issues. HT Day 2, Tab 25 at 4-7. However, the agency presented no evidence that these employees were removed because of their performance issues, and none of the employees were identified by race suggesting they weren't African American. The agency stated in its termination letter dated March 14, 2014 that poor performance was the sole basis for removing the appellant from federal service. IAF, Tab 10 at 37-40. Now that the board has reversed the agency's removal action, a reasonable person would need to consider other evidence supporting the agency's removal action. The agency claimed that removal was the only option for the appellant. HT Day 2, Tab 25 at 264, 19-22 and at 265, 1-

11.[9] This would suggest that the agency determined that the appellant couldn't perform any job at the agency below GS-15 or couldn't work in another office performing different work. This is countered by the fact that the agency had already deemed the appellant capable of performing as a GS-15 policy analyst in past performance cycles, awarding her cash awards and commendations for her work. For argument's sake, even if there were a performance issue, a reasonable person would question why the agency didn't choose to take a less extreme action than removal such as reassignment or transfer given the appellant's almost 30-year tenure in the federal government and good past performance. A reasonable person would question how the appellant was suddenly so incompetent that she couldn't do the same work she had performed successfully in years prior.  A reasonable person would question why the agency was discussing her removal prior to the PIP period if they were sincerely attempting to help her improve her performance.[10] A reasonable person would question why the agency stopped paying the appellant at the beginning of the PIP period, placing her under even greater duress, if they were sincerely attempting to create an environment that would help her improve her performance.[11]  PFR File, Tab 3 at Exhibit P4.

In considering the evidence together, a reasonable person would conclude that the removal action itself was merely discrimination and reprisal thinly veiled as a performance-based removal. The agency took the removal action in response to the appellant's protected disclosures and to punish the appellant for making formal complaints.

---

[9] At the time of the appellant's removal, the agency had XX position vacancies ranging from at the . Fedscope.opm.gov

[10] In his original deposition taken September 24, 2014 for the Initial Appeal, Dong stated that he, Lee and other managers had been discussing the appellant's removal <u>before</u> establishing the PIP which shows pretext.

[11] The agency didn't extend the PIP period to include a period when the appellant was receiving her pay which shows the agency didn't care about supporting the appellant in performance of her work.

## IV.  <u>Precedent and Legislative Intent</u>

The appellant was traumatized by the removal.  The appellant had entered the federal workforce as a teen and continued working for almost 30 years and was suddenly terminated. She had never had a break in employment except to attend school. The appellant routinely worked 50 -70 hours per week even when pursuing her master's degree at night. When she was sick, she went to work. When she was too sick to work, she begrudgingly used leave and still worked from home. The appellant spent most of her federal career working on grants and financial assistance matters, and by 2007, federal managers throughout the Executive Branch considered her an expert in federal grants and cooperative agreements. This is why managers at OMB encouraged her to apply for a senior policy analyst position at the agency. The agency hired the appellant in 2007, and she received good performance ratings and performance awards until she began requesting disability accommodations and engaging in protected activity. The retaliatory treatment became progressively worse after she made other protected disclosures. During this time, she was responsible for caring for a parent who was in the early stages of a progressive terminal disease, and yet, the appellant was still able to balance her professional responsibilities with her caregiver duties. Instead of offering support, the appellant's supervisor mocked the appellant's caregiving status and denied her leave under the Family and Medical Leave Act. This marginalization spiraled into progressively harsher retaliation by the agency as the appellant continued to deliver high quality work. On July 1, 2013, the agency stopped paying the appellant on the same day her supervisor placed her on the PIP. This was followed by the government shutdown which extended the period the appellant was without her pay which was needed to cover living expenses for herself and for her sick parent. The appellant had already been diagnosed with anxiety disorder, adjustment disorder, and disabling conditions and now because of the agency

was experiencing great emotional distress and health issues due to months without receiving income while having to work. She felt like and was being treated like an indentured servant. The appellant's health issues went untreated due to the loss of federal health insurance after the removal.

As a career civil servant, being fired from the federal government after decades of service caused the appellant significant stigma and harm to her personal and professional reputation. The removal was public as the appellant was escorted out of the building with the nothing but the clothes on her back in front of her co-workers. Even after the Board returned a decision in favor of the appellant, the Board's use of search engine optimization technology caused the appellant's MSPB case history to appear in the top results of a name search in perpetuity.  This easy online access to the 2022 decision of MSPB in particular was essentially a billboard informing prospective employers that appellant was an older disabled adult whistleblower who was fired, revelations that negatively impacted her competitiveness in a job market that favors young able-bodied candidates. Exhibit 3.[12] Other career damage includes loss of 10 years of case law and regulation relevant to the appellant's specialty area and developmental assignments leading to senior level positions. The appellant will always be 10 years behind others in these areas. She lost her contract officer representative certification, a recognized and transferrable certification required to manage federal contract work.

In consideration of the facts of the case, the appellant is seeking damages incurred and future relief as follows:

---

[12]Also, the 2022 online record was not cleansed of details regarding the appellant's medical conditions before it was posted to the world wide web. EEOC recommends that to improve equal employment opportunities for workers with disabilities the Federal sector federal agencies should act to increase the number of employees disclosing their disability status by "ensuring the confidentiality of disclosure." *See* https://www.eeoc.gov/federal-sector/reports/eeo-status-workers-disabilities-federal-sector.

(1)    Emotional pain, suffering, mental anguish ($1,000,000). The agency's actions had a negative impact on the appellant's health and wellness, increasing her anxiety and sleeplessness, putting her at increased risk for Alzheimer's disease which runs in her family. Exhibit 6. The amount represents past damages for past pain, suffering, and mental anguish and future expenses to address the emotional and psychological impact of reprisal (trauma informed therapy and treatment).

(2)    Certification training and career development training ($30,000). Estimated at $2,000 for restoring contracting officer certification and annual training estimated at $3,000/year for 10 years.

(3)    Actual attorney's fees to be requested under a separate petition if the appellant is the prevailing party.

## V.    <u>Conclusion</u>

The mosaic of evidence proves that the agency held animosity toward the appellant because of her disability status, decided to punish her for making protected disclosures, and wouldn't have removed her had she not been African American. Although only one agency management official signed the removal letter, agency officials including human resources managers, legal counsel, and others were aware of the appellant's disclosures and decided collectively to support the removal action. The fact that the appellant was a good performer was irrelevant once the agency wanted her gone. The agency had motive to protect its reputation and standing with Congress and had knowledge of the appellant's protected activities.  It is beyond belief that the agency would have removed an Asian or Caucasian employee of the appellant's tenure and past performance under similar circumstances. Instead, the agency decided on the most severe personnel action because the appellant was statistically irrelevant to the workforce

which was predominately Caucasian and Asian.  The agency realized that terminating a disabled

black woman wouldn't matter.

.

Dated: April 5, 2024                                     Respectfully

                                                        submitted, Marguerite

                                                        Pridgen

                                                        By  /s/ Marguerite Pridgen
                                                        Appellant, pro se
                                                        3881 Newark St NW
                                                        Washington, D.C. 20016
                                                        Tel: (202) 656-9370
                                                        *mep@onebox.com*

### **CERTIFICATE OF SERVICE**

        I hereby certify that I caused a copy of the foregoing Appellant's Brief on Remand

Claims to be served by facsimile to the MSPB Washington Regional Office and by email

filing on the Defendant on this 5th day of April, 2024.


                            */s/ Marguerite Pridgen*

                            Marguerite Pridgen

AAPI GS-15s increased on average by 1% while African American GS-15s decreased by -.7% at OMB.

| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| Asian | 19 | 19 | 19 | 21 | 19 | 17 | 20 |
| Afr-Amer | 10 | 11 | 9 | 8 | 8 | 8 | 6 |
| All | 144 | 147 | 155 | 158 | 158 | 146 | 162 |

There is a statistical significance in increase of GS-15 AAPIs relative to GS-15 African American decrease at the agency:

**AAPI  and AA (2009-2015)**

| | | |
|---|---|---|
| T alpha 95% conf interval | 2.446912 | |
| Mean difference | 10.57143 | Employees |
| Std deviation of difference | 2.225395 | Employees |
| Std error of difference | 0.84112 | Employees |
| Lower confidence level | 8.513282 | Employees |
| Upper conf level | 12.62958 | Employees |

(Data source – Fedscope.gov)

EXHIBIT 1

Exhibit A6 Plaintiff and Comparator Performance Plan Comparison

| OMB Strategic Plan goal | Appellant | Comparator | Appellant Analysis |
|---|---|---|---|
| Improve effectiveness and efficiency of government rules and mandates. | Develops thorough project plans with appropriate milestones for internal and external coordination, review, and issuance of policies related to grants fraud and accountability (e.g., proposed grants fraud rule, and FAPIIS final rule). Identifies strategy and guidance, as necessary, to bring together efforts under DNP with FPAIIS to reduce any duplication of efforts. **Proposed fraud rule is issued by December 2012. Final FAPIIS rule issued by December 2012.** | Collaborates to educate, garner support, and to solicit input and feedback on OFFM and OMB initiatives. Collaborates with the appropriate organizations and at the appropriate level within the organizations. Results of collaboration and analysis will be reported to senior management on a regular basis. Communicates, written and verbally, analysis that is clear, concise, relevant and timely. | Appellant is assigned multiple deadlines not within her control because they involve the complex and lengthy process of rulemaking. Comparator isn't assigned clear deliverables or any specific deadlines. |
| Improve effectiveness and efficiency of government rules and mandates. | Develops thorough project plan with appropriate milestones for internal and external coordination, review, and issuance of policies related to **addressing GAO recommendations on undisbursed grant balances by August 2012.** Drafts accurate, complete, coordinated, appropriate, and high-quality OMB response and ensures timely transmittal of OMB response to GAO recommendations. Drafts | Analyzes, using cost-benefit analysis, and any other appropriate analytical methods, recommended options and provides other viable options for improving grants management policies to better target waste, fraud, and abuse, reduce administrative burden on recipients, and improve performance & results. Makes recommendations to senior management on changes to government-wide policies | Appellant is assigned multiple deadlines not within her control because they involve internal clearance and compliance by other agencies. Comparator isn't assigned clear deliverables but the work he is assigned is within his control. |

EXHIBIT 2

| OMB Strategic Plan goal | Appellant | Comparator | Appellant Analysis |
|---|---|---|---|
| | Controller's Alert. **70% of all grant-making agencies have developed internal controls and processes** to reduce the amount of undisbursed grant balances in expired accounts. | based on this analyses and evaluation. Develops and revises policies through guidance or other instrumentalities to further support Administration goals by March 2013. Identifies opportunities to integrate other EOP efforts into grant reform work. | |
| Improve effectiveness and efficiency of government programs. | Based on clear and cogent analysis, drafts **effective data quality guidance that enhances the timeliness, accuracy, and completeness of USAspending.gov data**, while balancing agency resource constraints, in coordination with Federal agencies through the Council on Financial Assistance Reform (COFAR) and relevant OMB offices (e.g., OFPP, e-Gov, PPM) by September 2012. Provides accurate, thorough, and high-quality analysis and recommendations to inform other inquiries. Identifies any inconsistencies or needs for clarification in current policies and drafts recommendation to address these area. Identifies timeframe for review of | Identify a baseline of outstanding audit findings and develop a mechanism to continue to identify progress in closing out open audit findings by March 2013. Work with the COFAR to identify what specific risk strategies could be established to more effectively close out high-risk audit findings by March 2013. | Appellant is assigned multiple deadlines not within her control because they involve other agencies. Assignment to draft guidance that results in timeliness, accuracy and completeness of a data system is illogical and nonsensical. Comparator isn't assigned clear deliverables. |

EXHIBIT 2

| OMB Strategic Plan goal | Appellant | Comparator | Appellant Analysis |
|---|---|---|---|
| | documents for OMB clearance and manages process to ensue efficient and timely review and clearance. **Guidance is issued by December 2012.** | | |
| Improve effectiveness and efficiency of government programs. | Develops thorough project plans with appropriate milestones for oversight. By 2013, **100% of agencies** have identified a process to certify reliability. | Analyzes, using cost-benefit analysis, and any other appropriate analytical methods, recommended options and provides other viable options for improving grants management policies to better target waste, fraud, and abuse, reduce administrative burden on recipients, and improve performance & results. Makes recommendations to senior management on changes to government-wide policies based on this analyses and evaluation. Develops and revises policies through guidance or other instrumentalities to further support Administration goals. | Appellant is assigned deadline not within her control because it requires compliance by other agencies. Comparator isn't assigned clear deliverables or any specific deadlines |
| Ensure agencies develop, express and implement policies in accordance with the President's budget. | Identify 1-2 policy priorities and provide specific recommendations, timeline, implementation plans. Develops and revises policies | Based clear and cogent analysis, develops and drafts a strategy and guidance in coordination with Federal agencies, for use of Single | |

EXHIBIT 2

| OMB Strategic Plan goal | Appellant | Comparator | Appellant Analysis |
|---|---|---|---|
| | thorough guidance and other instrumentalities to further support Administration goals. | Audit findings to reduce administrative burden to recipients, and improve performance results by 2013 | |
| Ensure agencies develop, express and implement policies in accordance with the President's budget. | Ensures that **all** existing, government-wide grants OMB approved forms have continuing approval by OIRA. Recommends and issues specific policy changes designed to reduce reporting burden. | Not applicable | |
| | | | |

EXHIBIT 2

**AARP** Join Renew   Membership & Benefits / What We Do   ★ AARP Rewards   Register | Login

th   Money   **Work & Jobs**   Social Security   Medicare   Caregiving   Games   Travel   More...   AARP EN ESPAÑOL   Help

Join   Renew

**WORK & JOBS**

# Workplace Age Discrimination Still Flourishes in America

It's time to step up and stop the last acceptable bias

By Joe Kita    💬 91 Comments

Published December 30, 2019   •   EN ESPAÑOL



AARP

About 35 percent of the U.S. population is now age 50 or older. Yet, in 2018, the Equal Employment Opportunity Commission — the nation's workforce watchdog — issued a damning special report on age discrimination against older Americans. It concluded that even though 50 years had passed since Congress outlawed the practice, "age discrimination remains a significant and costly problem for workers, their families and our economy."

Victoria Lipnic, the EEOC's acting chair at the time, went so far as to compare it to harassment: "Everyone knows it happens every day to workers in all kinds of jobs, but few speak up. It's an open secret."



**AARP Membership— $12 for** 
**Automatic Renewal**

Get instant access to members-only pro
subscription to AARP the Magazine.

Join Now ›


AI Assistant

That same year, an [AARP survey found](#) that:

- Nearly 1 in 4 workers age 45 and older have been subjected to negative comments about their age from supervisors or coworkers.
- About 3 in 5 older workers have seen or experienced age discrimination in the workplace.
- 76 percent of these older workers see age discrimination as a hurdle to finding a new job; another report found that more than half of these older workers are prematurely pushed out of longtime jobs and 90 percent of them never earn as much again.

Diane Huth's story is not unusual. "I am 69 years old, and that means I am unemployable," says Huth, who lives in San Antonio. "I worked in corporate America for more than 40 years with big-name companies in branding. But I cannot get a job, the same job I rocked 15 years ago. I cannot even get an interview for that job because of all the screening mechanisms. I'm just too old; nobody takes me seriously for a job at my age, even in things I had excelled at."

That rampant discrimination has a huge ripple effect:

- 29 percent of U.S. households headed by someone age 55 or older have no retirement savings or pension, meaning they'll have to continue working or rely on Social Security to survive. But if the only job that remains open to them is unskilled and minimum wage, what does their future hold?
- Older people who don't feel useful are three times more likely to develop a disability and four times more likely to die prematurely, compared with counterparts who do feel useful, according to a 2007 study published in the *Journals of Gerontology.* If 30-plus years as a professional are suddenly thoroughly discounted by the business world, the effect on your health and longevity is undeniable.

Paradoxically, what most companies do not seem to understand is that older workers possess a depth of knowledge and experience that's worth paying for, is not easily replaced and can be tapped in many different ways.

"People walk out of companies now with an enormous amount of intellectual property in their heads," says Paul Rupert, the founder and CEO of Respectful Exits, a nonprofit consulting firm that's raising corporate awareness about age discrimination. "They know things that are essential to the company's success, and if that knowledge is not captured and transmitted to the next generation, that company is losing a tremendous chunk of capital and it'll eventually pay a price."

How did we get to this point? And how can we combat such widespread age discrimination?

To answer these questions, the *AARP Bulletin* asked me to independently examine ageism in the workplace to determine why it is so prevalent and what can be done about it, to provide both a snapshot and a primer on the state of age discrimination in America. Here's what I've learned.



AARP

## AARP Is fighting age discrimination

AARP is strongly committed to protecting older workers from age-related bias and pushing for stronger laws and policies that guard your rights. And we offer lots of programs to support people fighting discrimination or trying to stay in the workplace after age 50. Here's some of what we do — and some links you can use to get help.

**Defending your rights.** AARP Foundation attorneys are protecting older adults against age discrimination in courts throughout the nation, including the U.S. Supreme Court. Cases are selected especially when they are expected to establish significant legal precedents. AARP Foundation also files briefs in many important age-related cases.

**Fighting for better laws.** AARP's policy team has been pushing hard to pass legislation that would fix a 2009 Supreme Court decision that made it much harder to win an age discrimination case.

**Helping change state laws.** AARP is championing bills in several states to stem the tide of workplace age discrimination. Get news and alerts about AARP's efforts with state lawmakers.

**Working with employers.** Through its Employers Pledge Program (EPP), AARP works with companies to help them understand the value of older, experienced workers. More than 1,000 employers have signed a pledge publicly affirming that they are committed to fighting age discrimination.

**Finding a job.** AARP's Job Board is designed to help older workers find employers committed to fighting age bias. The Job Board includes work postings from companies that have taken AARP's Employer Pledge.

**Back to Work 50+.** This AARP Foundation program provides the training and tools older adults need to compete for today's in-demand jobs. Visit aarp.org/BackToWork50Plus or call 855-850-2525 to register for a workshop.

**Résumé retooling.** Résumés can be tailored to make it harder for prospective employers to ignore you based on age. AARP Resume Advisor, powered by TopResume, offers a free résumé review for everyone and custom professional writing packages at a discount for AARP members.

**Find out more.** Go to aarp.org/AgeDiscrimination for more practical advice and resources to help workers age 50-plus deal with age discrimination.

## Ageism: An accepted bias

If you haven't felt the pinch of ageism yet, trust us, you will. If you apply for a job online, there's a good chance that a screening algorithm will automatically disqualify you because of your age. If you're an older employee, it's likely you'll bear your share of age-related comments and jokes. And if you're gunning for a promotion or heading into a job interview, you may feel compelled to touch up the gray, dress a bit younger and act like technology is your best friend.

That's because ageism in the workplace occurs every day across America, and it is tolerated or — even worse — unrecognized for what it truly is: discrimination, plain and simple.

"Age discrimination is so pervasive that people don't even recognize it's illegal," asserts Kristin Alden, an attorney specializing in employee rights at the Alden Law Group in Washington, D.C.

What immediately became apparent in my reporting is that, like other biases and discriminatory practices, ageism takes many forms. In the workplace, we found illegal age discrimination in three main areas:

- **Recruitment and hiring**, when younger applicants are shown favor simply because of their age.
- **On-the-job bias**, when older workers receive fewer training opportunities, promotions and rewards, harassed.
- **Termination**, when a company "freshens" its workforce or trims budget by targeting senior employees for layoffs or encouraging them to retire.

4

Paul Rupert, of Respectful Exits, suggests — persuasively — that the problem emanates from our free-enterprise roots. The predominant business model in this country is still an industrial one where companies view employees as "human capital," he says. "It's a sad phrase, but companies view their workforce the same way they view their capital equipment. You buy it, you assume it has a certain shelf life, and then you get rid of it and replace it with a new model."

Stories like these are typical:

"I became aware of ageism when it happened to a couple of people I cared about," says Patti Temple Rocks, who has spent 38 years in communications and is the author of *I'm Not Done: It's Time to Talk About Ageism in the Workplace.* "My first reaction was, *I'm not going to let this happen to me. I'm going to be completely in touch with when I'm no longer relevant.* I read everything I could about reinventing myself. But when it did happen, I realized everything I had been thinking was wrong. I was still on my game, but I was being moved into a nonessential role to make room for someone younger. I wasn't ready for my second act because I was still well into my first."

"I learned to structure my résumé in ways so it's not obvious how old I am," says an engineering executive in his late 50s, who asked to remain anonymous. "I would get calls, the phone screens would go really well, but then when I went for interviews — sometimes flown in by corporate jet — I'd never hear back or be told someone else got the job. Eventually, I realized what they were thinking when I walked in: *This guy isn't a spring chicken.*

These tales are as easy to find as, well, spring chickens. Between 1997 and 2018, approximately 423,000 U.S. workers filed age discrimination claims with the EEOC. That's roughly 19,200 per year and 22 percent of all workplace discrimination claims. But here's something important to keep in mind: An AARP survey found that only 3 percent of older employees have ever made a formal complaint of age discrimination to a government agency or someone in the workplace, which means there are probably hundreds of thousands more who simply accept the job rejections, shrug off the denials for promotion, withstand the workplace harassment or take the offer of early retirement.

## ADEA and flawed laws

One reason ageism remains an issue is simply our American culture. We live in a youth-obsessed world that spent an estimated $53 billion on antiaging goods and services in 2019. Is it any wonder that our resistance to growing old is shared by the companies that employ us? Meanwhile, the rise of technologies that didn't even exist until many older people were already well into their careers has led to hiring biases in which many organizations assume (often wrongly) that younger workers will be more tech savvy. And we, as older workers, sometimes unwittingly reinforce these prejudices. If you joke about having "senior moments" or complain out loud about kids using social media rather than the telephone, then you're guilty of fanning a perception that the mindsets and capabilities of old vs. young are different.



**5**

**HEALTH & WELLNESS**

### AARP® Dental Insurance Plan administered by Delta Dental Insurance Company

Dental insurance plans for members and their families

**View Details ›**                                                                 **See All Benefits ›**

Dwarfing these societal factors, however, is the fact that the nation's key federal law, the Age Discrimination in Employment Act of 1967 (ADEA), was essentially defanged by the U.S. Supreme Court in 2009.

The history of the legislation goes back to the creation and passage of the Civil Rights Act of 1964 and specifically Title VII, which made it illegal for employers to discriminate based on race, color, religion, sex and national origin.

Notice anything missing from that last sentence?

An amendment to include age discrimination as one of the protected categories in Title VII failed. Instead, Congress created a commission to study the issue of age discrimination, and that commission determined — without question — that workplace discrimination was rampant at the time (mid-1960s), with 50 percent of employers using age limits to deny jobs to workers 45 and older. That report led to passage of ADEA in 1967. It sought to "promote employment of older persons based on their ability rather than age [and] prohibit arbitrary age discrimination…."

When he signed ADEA into law, on Dec. 15, 1967, President Lyndon B. Johnson remarked: "This act does not compel employers and labor unions and employment agencies to choose a person aged 40 to 65 over another person. It does require that one simple question be answered fairly: Who has the best qualifications for the job?"

Fifty-two years later, that question remains: Are today's jobs going to, and being performed by, the best-qualified workers, regardless of age? Unfortunately, in many cases the answer is no. Part of the problem is the law itself. Although ADEA was supposed to serve as an age-based equivalent of the Civil Rights Act, it never granted age the same level of legislative respect as race, gender or religion, and that's why, in part, its idealistic goals have never been achieved.

Two key factors rendered it, from its inception, weaker than Title VII.

**Lack of damages**: Even if you win an age discrimination suit against an employer — and even if you prove the discrimination was intentional — the most you can be awarded is twice your lost back pay plus attorney fees if you prevail. Nothing for pain and suffering. So unless a company is facing a large class action suit, it has little to lose. In fact, many attorneys won't even take on individual age-bias complaints for this reason. "This is not the situation for other types of discrimination," explains attorney Alden. "For race, sex, national origin, disability and all the others, the employee, if successful, is entitled to compensatory damages and attorney fees."

**"Reasonable factors" are considered in employer's defense**: ADEA established two types of age discrimination: intentional ("disparate treatment") and unintentional ("disparate impact"). The latter is defined as an employment policy that seems neutral but adversely affects older workers. An example might be a company deciding to lay off all its vice presidents. Nothing wrong with that on the surface, but since VPs are usually senior people, older workers would be hardest hit. Under ADEA, disparate impact discrimination is permitted if it's based on "reasonable factors other than age." So all a company would have to do to sidestep ageism claims is prove the layoffs were financially necessary.

That all said, although imperfect the ADEA did afford older employees in the U.S. protections against age discrimination.

But then the law came under review by the Supreme Court, and its rulings further weakened the protections it granted to older workers. First the court upheld and even widened the damages and reasonable-factors loopholes. In 1993 it ruled that the Hazen Paper Co. did not discriminate against 62-year-old Walter Biggins when it fired him a few months before he became vested in its pension plan. The company argued that his dismissal was based on cost savings, not age, and the court agreed. Since then the *Hazen* decision has been relied on to narrow ADEA's reach and to permit arbitrary actions based on inaccurate or stigmatizing stereotypes of age.

6

Then, in 2009, came *Gross v. FBL Financial Services Inc.*, in which the Supreme Court essentially gutted ADEA. four-year-old Jack Gross was reassigned in 2003 from his position as a claims administration director at FBL. His replacement was in her early 40s. The following year, he sued for age discrimination and the case ended up at the Supreme Court. It ruled that in order to prove age discrimination, one must show that age was the determining factor. In other words, even if you proved that your employer intentionally discriminated against you because of your age, if it was not the most important factor in the actions it took, you do not have a case. In addition, the *Gross* decision placed the burden of proof entirely on the plaintiff, as opposed to putting the burden on the organization to prove it didn't discriminate, creating yet one more hurdle for older workers to overcome.

The rulings in *Gross* and other cases have not escaped the attention of corporate America. One Wall Street recruiter told the *AARP Bulletin* that age discrimination is increasing in the financial sector. "If companies know they can get away with something, they'll do it," he says. "It's like an episode of *The Simpsons* where Mr. Burns is rubbing his hands together with glee and saying, 'We're going to get rid of these senior people and save lots of money!' "

Other companies seem to discriminate against senior people in their hiring practices. AARP Foundation, which files age discrimination suits expected to establish significant legal precedents, is pursuing a case against PricewaterhouseCoopers, the accounting firm. The plaintiff, Steve Rabin, then 50, was rebuffed in his effort to obtain an associate position at PwC. At the time, he had an MBA and more than 10 years of experience in accounting services. The complaint asserts that a PwC manager asked Rabin whether he'd be able to "fit in" with younger employees and made other somewhat derogatory age-related comments. More than 3,000 other plaintiffs have joined Rabin in a class action suit against PwC. The company denies any wrongdoing, arguing that the plaintiffs have failed to offer "some reliable and verifiable way to identify who met the minimum qualifications."

It should be noted that most states also have laws against age discrimination — some are stronger than federal law; some weaker. California, for example, unlike ADEA, allows for both compensatory and punitive damages, and New Jersey explicitly permits employment discrimination against employees over age 70. The former may be why, in some years, California has seen nearly three times as many complaints of age discrimination than its residents report to the EEOC. Some states have lower burdens of proof, and state laws usually cover employers that the federal law does not, such as businesses with fewer than 20 employees. AARP is actively trying to improve state age discrimination laws, most recently in Connecticut, Oregon and New Jersey.

## The company perspective on age bias

Frank Cania, president of HR Compliance Experts, believes that ageism is often considered by human resource departments as being on par with other types of workplace discrimination but that HR personnel are not as aware of it as they should be. Although a number of states have recently passed laws requiring employers to provide annual sexual harassment training, he says there's no similar legislation or mandated programs that exclusively target ageism. "The average HR person would say, 'Oh, yeah, that's definitely a problem; it needs to be addressed,' " he explains. "But then they may place a job ad using terms like 'fast-paced environment, energetic, technology ninja' or 'We work hard and party harder.' "

Unsurprisingly, tech companies are some of the biggest age discriminators. With Facebook CEO Mark Zuckerberg famously declaring in 2007 that "young people are just smarter," Silicon Valley has become a poster child for the youth work culture. According to a 2016 report by Statista, the average median employee age at 17 top tech companies was 32, compared with 42 for the total U.S. workforce. That doesn't appear to be a coincidence. In 2019, Google agreed to pay $11 million to settle the claims of more than 200 job applicants who said they were discriminated against because of their age.

Older tech companies are not immune to the problem. A 2018 ProPublica investigation alleges that IBM deliberately engineered the dismissal of an estimated 20,000 employees over age 40 in a five-year period. "In making these cuts, IBM has flouted or outflanked U.S. laws and regulations intended to protect later-career workers from age discrimination," the article asserts.

**7**

The EEOC is looking into these charges, and a class action suit has been filed. But whether the company will be held accountable remains to be seen. One workplace consultant who requested anonymity told the *AARP Bulletin* that IBM's strategy was "brilliant," explaining that its supervisors and attorneys were exquisitely aware of how difficult it is to successfully prosecute age discrimination, and they took full advantage of that. Last year, in response to the allegations in that suit and several individual suits, IBM told Bloomberg: "We have reinvented IBM in the past five years to target higher value opportunities for our clients. The company hires 50,000 employees each year."

## EEOC: A watchdog loses its bark

The EEOC is supposed to be our police force in all this. Its job is to enforce federal laws that protect employees or job applicants from all types of workplace discrimination. Its mandate is also one of leadership: It's charged with initiating investigations when warranted and being the overall champion of worker rights.

But when it comes to age discrimination, the EEOC is struggling to keep up, and to bear down. An analysis by the *Washington Post* found that of 205,355 total age discrimination complaints filed with the agency from 2010 to 2017, just 1 percent resulted in a finding of discrimination. That alone is not dispositive: It's possible that the vast majority of these complaints are not actionable.

ARTICLE CONTINUES AFTER ADVERTISEMENT

But the numbers seem to tilt toward a finding that the EEOC has not been offering enough help in this realm. Indeed, according to the organization's own data, it brought only 10 age discrimination suits in 2018. That's a minute number compared with the disability (84) and sexual harassment (41) discrimination cases it brought that year. When one considers how difficult it is for an individual to file a complaint, the 8 months, on average, it takes for any sort of resolution, and the paltriness of the compensation (if any), you have to wonder whether the hassle is even worth it.

Cathy Ventrell-Monsees is an attorney and senior adviser at the EEOC. She acknowledges the numbers but explains that the agency is trying to be strategic. This means emphasizing tools such as mediation and settlements and bringing to court only those cases with the greatest potential impact. "For example, hiring is a big priority for us right now," she explains. "Our researchers are looking at online hiring systems and algorithms that can incorporate biases in the job-selection criteria."

But critics of the EEOC say there's more at work than simple strategy. An investigation by the online publication *Vox* found a critical lack of resources at the EEOC. "It has a smaller budget today than it did in 1980, adjusted for inflation, and 42 percent less staff," the article stated. "At the same time, the country's labor force increased about 50 percent, to 160 million. … The EEOC, in short, can't come close to fulfilling the mission Congress gave it."

Ventrell-Monsees concedes that "age discrimination issues have become more visible as older workers remain in the workforce longer" but counters that the EEOC has "significantly elevated the attention the agency gives to age discrimination issues." She cites a public commission meeting in 2017 focused on the ADEA@50, a web page of resources on ADEA, and the 2018 "State of Age Discrimination" report.

While the EEOC is to be applauded for these efforts, it still handles an anemic caseload in the area and has said little of substance about its plans to alleviate what it identified as a "significant and costly problem" for older workers.

Gary Gilbert, a former EEOC chief administrative judge who now heads Gilbert Employment Law in Silver Spring, Maryland, puts it more succinctly: "The commission is just not appreciating the degree of societal bias we have against older workers at this time."

That bias can even be found within the federal government, which is the largest employer in the U.S., with 4.2 million workers, including uniformed military and postal employees. For one, it encourages bias with mandatory retirement ages for many classes of employees. For example, federally employed law enforcement officers must retire at age 57, and air traffic controllers at 56. The assumption is that physical and mental depart at those ages. In fact, in many cases there's no science to support such specificity; these age limits are largely arbitrary.

8

"Such regulations were designed to meet the need for, and I quote from the law, 'a young and vigorous workforce,' " says John Grobe, president of Federal Career Experts, a consulting firm that advises government agencies and their employees about retirement. "But, hell, some people might lose a step at 55, and some might still be sharp as a tack when they're 70."

AARP Foundation is actively fighting discriminatory practices within the federal government. Last fall, Foundation attorneys filed an amicus brief in the Supreme Court case *Babb* v. *Wilkie*, arguing that the lower court, by requiring an extremely high standard of proof from federal employees making age discrimination claims, has not complied with the letter or spirit of ADEA.

"Even a single incidence of age discrimination in government is worrisome," says Dara Smith, a senior attorney at AARP Foundation. "Private-sector employers see that and say, 'Well, if the federal government can get away with it, maybe we can, too.' They should be held to a higher standard."

MEMORANDUM FOR THE RECORD

DATE:       Thursday, July 18, 2013

TO:         Norman Dong
            Deputy Controller (2nd level supervisor)
            Office of Federal Financial Management

FROM:       Marguerite Pridgen
            Policy Analyst
            Office of Federal Financial Management

SUBJECT:    Appeal of Performance Evaluation dated June 26, 2013 from Karen Lee, Chief,
            Management Controls and Assistance Branch

My supervisor Karen Lee rated my performance for 2012-2013 at the" Unsatisfactory" level on the
basis that she feels I failed to work independently as a GS-15 with minimal guidance in areas of
immediate responsibility; failed to submit clear, coherent, and analytically rigorous deliverables;
failed to submit deliverables on time; and failed to coordinate work with other key stakeholders. Ms.
Lee has also stated that she has not been satisfied with my performance since I returned from
extended leave in May 2012.

At the beginning of the performance period, I expressed confusion and concern over the
performance goals and expectations Ms. Lee established for me. In particular, I noted that the
performance plan included deadlines that were not under my control and was written in a way
that would allow Ms. Lee to be very subjective and easily use the performance evaluation
process to retaliate against me for previous EEO activity and other disclosures. Since May 2012,
I have repeatedly complained to Ms. Lee and her superiors that she has routinely (1)
misinterpreted direction from senior leadership regarding the scope and direction of my
initiatives, (2) drastically changed the scope of my work products as they were nearing
completion, (3) defined a standard of thoroughness for me, which cannot be humanly met and is
inconsistent with the standard she has set for other GS-15s in the branch, (4) assigned me
unnecessary tasks and deliverables that have greatly detracted from my ability to meet critical
deadlines, (5) denied me access to resources needed to complete my work, (6) treated me less
favorably than others in her branch in assigning work, (7) retaliated against me for naming her in
formal complaints, and (8) failed to address my request for accommodations for disabilities.
Ms. Lee has been unwilling to correct these problems and continues to establish barriers in my
work life which will prevent me meeting the milestones described in her Performance
Improvement Plan dated July 1, 2013 and 2013-2014 Performance Appraisal Plan. Also
noteworthy, nowhere in her evaluation did Ms. Lee mention that throughout the performance
period she required me to provide help desk support to state users of a system she was hired to
develop (FSRS). The FSRS system is practically unusable by large grantmakers such as states
because of the faulty system specifications Ms. Lee supplied to the system developer. At
different points during the performance period, state agencies were contacting me on almost a
daily basis due to their frustrations with using the system, unanswered questions regarding the
guidance Ms. Lee had previously issued, and not getting adequate follow-up action from OMB

management (Werfel and Lee). Ms. Lee was copied on many of these emails and yet didn't bother mentioning the support I had provided to the states in an effort to remediate the negative situation she created.

Ms. Lee provided summary comments with my 2012-2013 performance evaluation. In her comments, Ms. Lee cited examples supporting her rating that are both inaccurate and taken out of context. In the attachment to this memorandum, I have provided responses to some of Ms. Lee's specific examples. If you would like any additional information, please let me know.

In light of these circumstances, I do not believe Ms. Lee fairly evaluated my performance during the performance period. Based on recent history, I do not believe she is capable of evaluating my performance in a fair and objective manner in the future. Consequently, I am requesting that my rating be changed to the "Successfully Meets" level or higher for the 2012-2013 performance period and that I be allowed to report to a competent and unbiased supervisor for the 2013-2014 performance period. I would be willing to take a detail assignment to make this happen.

Attachment



# 2013

## Federal Employee Viewpoint Survey Results
Employees Influencing Change

**Office of Federal Financial Management**

**2nd Level Subagency Report**

United States Office of
Personnel Management

# Office of Management and Budget
## Office of Federal Financial Management
### *2nd Level Subagency Report*

## My Work Experience (continued)

**13. The work I do is important.**

| | N | Positive | Neutral | Negative | DNK |
|---|---|---|---|---|---|
| Governmentwide | 369,703 | 90.0% | 6.9% | 3.1% | 1,092 |
| Office of Management and Budget | 312 | 80.8% | 12.0% | 7.2% | 0 |
| Statutory Office | 49 | 86.0% | 6.4% | 7.6% | 0 |
| Office of Federal Financial Management | 11 | 86.4% | 0.0% | 13.6% | 0 |

**14. Physical conditions (for example, noise level, temperature, lighting, cleanliness in the workplace) allow employees to perform their jobs well.**

| | N | Positive | Neutral | Negative | DNK |
|---|---|---|---|---|---|
| Governmentwide | 373,712 | 66.1% | 14.3% | 19.5% | 1,514 |
| Office of Management and Budget | 313 | 55.8% | 19.6% | 24.7% | 0 |
| Statutory Office | 49 | 61.6% | 29.9% | 8.5% | 0 |
| Office of Federal Financial Management | 11 | 71.5% | 28.5% | 0.0% | 0 |

**15. My performance appraisal is a fair reflection of my performance.**

| | N | Positive | Neutral | Negative | DNK |
|---|---|---|---|---|---|
| Governmentwide | 369,528 | 68.4% | 15.2% | 16.4% | 5,283 |
| Office of Management and Budget | 300 | 68.6% | 18.7% | 12.7% | 13 |
| Statutory Office | 47 | 78.2% | 14.8% | 7.0% | 2 |
| Office of Federal Financial Management | 10 | 59.9% | 25.4% | 14.8% | 1 |

**16. I am held accountable for achieving results.**

| | N | Positive | Neutral | Negative | DNK |
|---|---|---|---|---|---|
| Governmentwide | 372,151 | 81.5% | 12.4% | 6.1% | 1,767 |
| Office of Management and Budget | 312 | 71.4% | 20.2% | 8.4% | 2 |
| Statutory Office | 48 | 71.4% | 18.2% | 10.4% | 1 |
| Office of Federal Financial Management | 11 | 79.1% | 20.9% | 0.0% | 0 |

**17. I can disclose a suspected violation of any law, rule or regulation without fear of reprisal.**

| | N | Positive | Neutral | Negative | DNK |
|---|---|---|---|---|---|
| Governmentwide | 357,689 | 61.2% | 19.4% | 19.5% | 16,155 |
| Office of Management and Budget | 275 | 70.1% | 18.4% | 11.5% | 38 |
| Statutory Office | 42 | 60.8% | 27.6% | 11.6% | 6 |
| Office of Federal Financial Management | 8 | 39.1% | 24.8% | 36.1% | 2 |

2023 Office of Personnel Management

# Federal Employee Viewpoint Survey Results

*Empowering employees. Inspiring change.*

**1st Level Subagency Report**

**Office of Management and Budget (MD) Office of Federal Financial Management**



OPM.GOV/FEVS    #FE

**Office of Management and Budget**
**(MD) Office of Federal Financial Management**
*1st Level Subagency Report*

This 2023 Federal Employee Viewpoint Survey (FEVS) Report provides summary results for the core survey, telework, and

## Diversity, Equity, Inclusion, and Accessibility (continued)

*84. My organization responds to my accessibility needs in a timely manner.*

| Organizations | N | Positive | Neutral | Negative | No Accessibility Needs (N) | NBJ (N) |
|---|---|---|---|---|---|---|
| Governmentwide | 354,146 | 66.2% | 23.1% | 10.7% | 132,481 | 111,953 |
| Office of Management and Budget | 162 | 65.2% | 24.2% | 10.6% | 143 | 141 |
| (MD) Office of Federal Financial Management | 5 | 17.8% | 40.3% | 41.9% | 1 | 5 |

Note: For confidentiality purposes, a "— <" indicates that there are fewer than 4 responses to the question, excluding 'No Accessibility Needs' and 'No Basis to Judge,' and results are therefore suppressed.

*85. My organization meets my accessibility needs.*

| Organizations | N | Positive | Neutral | Negative | No Accessibility Needs (N) | NBJ (N) |
|---|---|---|---|---|---|---|
| Governmentwide | 359,241 | 69.6% | 21.7% | 8.7% | 135,576 | 103,447 |
| Office of Management and Budget | 172 | 70.1% | 17.0% | 12.9% | 148 | 127 |
| (MD) Office of Federal Financial Management | 6 | 30.2% | 0.0% | 69.8% | 2 | 3 |

Note: For confidentiality purposes, a "— <" indicates that there are fewer than 4 responses to the question, excluding 'No Accessibility Needs' and 'No Basis to Judge,' and results are therefore suppressed.

## Employee Experience

*86. My job inspires me.*

| Organizations | N | Positive | Neutral | Negative |
|---|---|---|---|---|
| Governmentwide | 596,094 | 62.0% | 20.8% | 17.2% |
| Office of Management and Budget | 446 | 75.4% | 14.0% | 10.6% |
| (MD) Office of Federal Financial Management | 11 | 45.4% | 8.5% | 46.1% |

*87. The work I do gives me a sense of accomplishment.*

| Organizations | N | Positive | Neutral | Negative |
|---|---|---|---|---|
| Governmentwide | 595,301 | 74.6% | 13.6% | 11.8% |
| Office of Management and Budget | 446 | 84.0% | 8.4% | 7.6% |
| (MD) Office of Federal Financial Management | 11 | 63.1% | 8.5% | 28.4% |

*88. I feel a strong personal attachment to my organization.*

| Organizations | N | Positive | Neutral | Negative |
|---|---|---|---|---|
| Governmentwide | 597,272 | 60.7% | 21.7% | 17.5% |
| Office of Management and Budget | 445 | 71.6% | 16.3% | 12.1% |
| (MD) Office of Federal Financial Management | 11 | 45.4% | 16.9% | 37.7% |

*89. I identify with the mission of my organization.*

| Organizations | N | Positive | Neutral | Negative |
|---|---|---|---|---|
| Governmentwide | 5 | | | |
| Office of Management and Budget | | | | |
| (MD) Office of Federal Financial Management | 11 | 63.1% | 8.5% | 2 |

## Diversity, Equity, Inclusion, and Accessibility (continued)

### 78. Employees in my work unit make me feel I belong.

| Organizations | N | Positive | Neutral | Negative | NBJ (N) |
|---|---|---|---|---|---|
| Governmentwide | 588,459 | 78.5% | 14.0% | 7.5% | 8,428 |
| Office of Management and Budget | 442 | 86.8% | 8.5% | 4.8% | 3 |
| (MD) Office of Federal Financial Management | 10 | 59.3% | 18.7% | 22.0% | 1 |

### 79. Employees in my work unit care about me as a person.

| Organizations | N | Positive | Neutral | Negative | NBJ (N) |
|---|---|---|---|---|---|
| Governmentwide | 578,492 | 77.0% | 16.0% | 7.0% | 15,647 |
| Office of Management and Budget | 437 | 88.7% | 7.6% | 3.7% | 5 |
| (MD) Office of Federal Financial Management | 10 | 58.5% | 19.5% | 22.0% | 1 |

### 80. I am comfortable expressing opinions that are different from other employees in my work unit.

| Organizations | N | Positive | Neutral | Negative | NBJ (N) |
|---|---|---|---|---|---|
| Governmentwide | 589,040 | 74.9% | 13.1% | 12.0% | 7,632 |
| Office of Management and Budget | 443 | 86.6% | 6.3% | 7.1% | 2 |
| (MD) Office of Federal Financial Management | 11 | 45.4% | 17.7% | 36.9% | 0 |

### 81. In my work unit, people's differences are respected.

| Organizations | N | Positive | Neutral | Negative | NBJ (N) |
|---|---|---|---|---|---|
| Governmentwide | 583,167 | 76.2% | 14.6% | 9.2% | 12,653 |
| Office of Management and Budget | 439 | 85.9% | 8.5% | 5.5% | 6 |
| (MD) Office of Federal Financial Management | 9 | 42.1% | 13.1% | 44.9% | 2 |

### 82. I can be successful in my organization being myself.

| Organizations | N | Positive | Neutral | Negative | NBJ (N) |
|---|---|---|---|---|---|
| Governmentwide | 589,824 | 75.2% | 14.0% | 10.8% | 6,319 |
| Office of Management and Budget | 442 | 83.3% | 9.4% | 7.4% | 2 |
| (MD) Office of Federal Financial Management | 11 | 43.1% | 28.4% | 28.4% | 0 |

### 83. I can easily make a request of my organization to meet my accessibility needs.

| Organizations | N | Positive | Neutral | Negative | No Accessibility Needs (N) | NBJ (N) |
|---|---|---|---|---|---|---|
| Governmentwide | 377,881 | 71.6% | 18.4% | 10.0% | 130,393 | 90,868 |
| Office of Management and Budget | 190 | 72.1% | 14.0% | 13.9% | 139 | 118 |
| (MD) Office of Federal Financial Management | 6 | 49.3% | 0.0% | 50.7% | 1 | 4 |

Note: For confidentiality purposes, a "— ‹" indicates that there are fewer than 4 responses to the question, excluding 'No Accessibility Needs' and 'No Basis to Judge,' and results are therefore suppressed.

Received: 15 August 2023 | Accepted: 21 August 2023

DOI: 10.1111/jsr.14035

REVIEW ARTICLE



# The European Insomnia Guideline: An update on the diagnosis and treatment of insomnia 2023

Dieter Riemann[1,2]  | Colin A. Espie[3] | Ellemarije Altena[4] |
Erna Sif Arnardottir[5,6] | Chiara Baglioni[7] | Claudio L. A. Bassetti[8] |
Celyne Bastien[9] | Natalija Berzina[10] | Bjørn Bjorvatn[11] | Dimitris Dikeos[12] |
Leja Dolenc Groselj[13] | Jason G. Ellis[14] | Diego Garcia-Borreguero[15] |
Pierre A. Geoffroy[16] | Michaela Gjerstad[17] | Marta Gonçalves[18] |
Elisabeth Hertenstein[19] | Kerstin Hoedlmoser[20] | Tuuliki Hion[21] |
Brigitte Holzinger[22] | Karolina Janku[23] | Markus Jansson-Fröjmark[24,25] |
Heli Järnefelt[26] | Susanna Jernelöv[24,25] | Poul Jørgen Jennum[27] |
Samson Khachatryan[28] | Lukas Krone[3,8,19] | Simon D. Kyle[3] |
Jaap Lancee[29] | Damien Leger[30] | Adrian Lupusor[31] |
Daniel Ruivo Marques[32,33] | Christoph Nissen[34] | Laura Palagini[35] |
Tiina Paunio[36] | Lampros Perogamvros[34] | Dirk Pevernagie[37] |
Manuel Schabus[20] | Tamar Shochat[38] | Andras Szentkiralyi[39] |
Eus Van Someren[40,41] | Annemieke van Straten[42] | Adam Wichniak[43] |
Johan Verbraecken[44] | Kai Spiegelhalder[1]

**Correspondence**
Dieter Riemann, Department of Clinical
Psychology and Psychophysiology, Centre for
Mental Disorders, Medical Centre – University
of Freiburg, Faculty of Medicine, University of
Freiburg, Germany; Hauptstr. 5, D-79104
Freiburg, Germany.
Email: dieter.riemann@uniklinik-freiburg.de

**Summary**
Progress in the field of insomnia since 2017 necessitated this update of the European Insomnia Guideline. Recommendations for the diagnostic procedure for insomnia and its comorbidities are: clinical interview (encompassing sleep and medical history); the use of sleep questionnaires and diaries (and physical examination and additional measures where indicated) (A). Actigraphy is not recommended for the routine evaluation of insomnia (C), but may be useful for differential-diagnostic purposes (A). Polysomnography should be used to evaluate other sleep disorders if suspected (i.e. periodic limb movement disorder, sleep-related breathing disorders, etc.), treatment-resistant insomnia (A) and for other indications (B). Cognitive-behavioural therapy for insomnia is recommended as the first-line treatment for chronic insomnia in adults of any age (including patients with comorbidities), either applied in-person or digitally (A). When cognitive-behavioural therapy for insomnia is not sufficiently

For affiliations refer to page 26

This is an open access article under the terms of the Creative Commons Attribution License, which permits use, distribution and reproduction in any medium, provided the original work is properly cited.
© 2023 The Authors. *Journal of Sleep Research* published by John Wiley & Sons Ltd on behalf of European Sleep Research Society.

effective, a pharmacological intervention can be offered (A). Benzodiazepines (A), benzodiazepine receptor agonists (A), daridorexant (A) and low-dose sedating antidepressants (B) can be used for the short-term treatment of insomnia (≤ 4 weeks). Longer-term treatment with these substances may be initiated in some cases, considering advantages and disadvantages (B). Orexin receptor antagonists can be used for periods of up to 3 months or longer in some cases (A). Prolonged-release melatonin can be used for up to 3 months in patients ≥ 55 years (B). Antihistaminergic drugs, antipsychotics, fast-release melatonin, ramelteon and phytotherapeutics are not recommended for insomnia treatment (A). Light therapy and exercise interventions may be useful as adjunct therapies to cognitive-behavioural therapy

**KEYWORDS**
diagnosis, evidence-based medicine, guideline, insomnia, treatment

13653869, 2023, 6, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/jsr.14035, Wiley Online Library

## 1 | SUMMARY FOR PATIENTS

### 1.1 | What is insomnia?

### 1.3 | Who developed this guideline?

This European Insomnia Guideline 2023 was developed by a group of





# D.C. DEPARTMENT OF EMPLOYMENT SERVICES
# CENTRAL ADJUDICATION BRANCH
# P.O. BOX 23794
# WASHINGTON, D.C.  20026

## DETERMINATION BY CLAIMS EXAMINER

**CLAIMANT:**

MARGUERITE PRIDGEN
3881 NEWARK ST NW APT F480
WASHINGTON, DC - 20016-3029

**EMPLOYER:**

OFF OF MGMT & BUDGET--FINANCIA
725 17TH ST NW
WASHINGTON, DC - 20503

---

Do not edit above this line

Fold here

**SOCIAL SECURITY NUMBER: XXX-XX-7100**

**ISSUE**:  Discharge for Misconduct

**REASON FOR DETERMINATION:**
The claimant was discharged for unsatisfactory work performance.  The claimant denies the employer allegations, and states that she was never warned that her performance was unsatisfactory.

The District of Columbia Unemployment Compensation Act in D.C. Code, Title 51-110(b)(1), provides that an individual shall be disqualified from receiving benefits if it is found that he/she was discharged from his/her most recent employer for misconduct occurring in the course of the work.

The employer has the responsibility to provide evidence of this misconduct.  In this case the employer has not provided sufficient evidence to support a finding of misconduct.  Therefore, work related misconduct on the part of the claimant has not been established.

**DECISION:**

**Therefore the claimant listed herein is determined eligible for unemployment benefits effective 03/09/2014.**

I certify that a copy of this document was mailed to the employer and to the claimant named herein at the above addresses on x/xx/xxxx.

CURTIS< ALISHIA
Claims Examiner

**SEE THE ENCLOSED D.C. CODE & NOTICE OF APPEAL RIGHTS**



# Re: OMB FOIA 19-260

1 message

**Marguerite Pridgen** <margueritepridgen@gmail.com>                Thu, Oct 3, 2019 at 4:39 PM
To: MBX OMB FOIA <MBX.OMB.FOIA@omb.eop.gov>

In response to your correspondence dated September 30, 2019, I'm narrowing the scope of the subject Privacy Act request to include the following:

Subject Matter:  Marguerite Pridgen
Offices:  Office of Administration, Office of Management and Budget, White House Office
Search terms:  Marguerite, Pridgen


Sincerely,
Marguerite Pridgen

1

```
 1              UNITED STATES OF AMERICA

 2          MERIT SYSTEMS PROTECTION BOARD

 3            WASHINGTON REGIONAL OFFICE

 4  -------------------------------X

 5  MARGUERITE PRIDGEN,              :

 6              Appellant,           :

 7        v.                         :  Docket No.:

 8  OFFICE OF MANAGEMENT AND BUDGET,:  DC-0432-14-0557-I-1

 9            Respondent Agency.:

10  -------------------------------X

11

12          Deposition of NORMAN DONG

13              Washington, DC

14          Monday, August 25, 2014

15              1:42 p.m.

16

17

18

19

20  Job No.: 64987

21  Pages: 1 - 111

22  Reported by: Stephanie M. Marks, RPR
```

2

```
 1              Deposition of NORMAN DONG, held at the

 2    location of:

 3

 4

 5              THE EMPLOYMENT LAW GROUP, PC

 6              888 17th Street, NW

 7              Suite 900

 8              Washington, DC 20006

 9              (202) 261-2806

10

11

12

13              Pursuant to agreement, before Stephanie M.

14    Marks, Registered Professional Reporter and Notary

15    Public in and for the District of Columbia.

16

17

18

19

20

21

22
```

3

```
 1                    A P P E A R A N C E S

 2         ON BEHALF OF APPELLANT:

 3              SUBHASHINI BOLLINI, ESQUIRE

 4              THE EMPLOYMENT LAW GROUP, PC

 5              888 17th Street, NW

 6              Suite 900

 7              Washington, DC 20006

 8              (202) 331-3911

 9

10         ON BEHALF OF RESPONDENT AGENCY:

11              MIDE FAMUYIWA, ESQUIRE

12              U.S. DEPARTMENT OF HOMELAND SECURITY

13              FEMA, Office of Chief Counsel

14              Personnel Law Branch (West)

15              500 C. Street, SW

16              Washington, DC 20472

17              (202) 646-2500

18

19          ALSO PRESENT:

20               Marguerite Pridgen

21

22
```

4

```
 1                      C O N T E N T S

 2   EXAMINATION OF NORMAN DONG                    PAGE

 3        By Ms. Bollini                            5

 4

 5

 6

 7

 8                      E X H I B I T S

 9                     (None marked)

10

11

12

13

14

15

16

17

18

19

20

21

22
```

```
 1                    P R O C E E D I N G S

 2                         NORMAN DONG,

 3    being first duly sworn to testify to the truth, the

 4    whole truth, and nothing but the truth, was examined

 5    and testified as follows:

 6         EXAMINATION BY COUNSEL FOR THE APPELLANT

 7                    BY MS. BOLLINI:

 8         Q    Mr. Dong, my name is Suba Bollini.  I'm

 9    representing the appellant in this matter,

10    Marguerite Pridgen, and I will be taking your

11    deposition today.

12              Before we start out with substantive

13    questions, I just wanted to go over kind of the ground

14    rules of a deposition.

15         A    Okay.

16         Q    First of all, have you ever been

17    deposed before?

18         A    Yes.

19         Q    And when was the last time?

20         A    Oh, I think it was probably back in

21    2001, 2002.

22         Q    Okay.  What kind of matter were you
```

deposed for?

A It was a wrongful termination suit.

Q And where were you employed at the time?

A District of Columbia.

Q All right. Well, since it's been a few years, I'll go over all of the rules for you.

A Okay.

Q First of all, as you know, we're creating a written record of your testimony today, so it's important that you speak clearly so that the court reporter can understand your questions [sic]. That means that your questions [sic] should be verbal rather than sounds or gestures. So uh-huh, uh-uh, nodding or shaking your head cannot be transcribed accurately.

When I begin a question, you may know what I'm going to say, but I ask that you allow me to finish the question before you begin your response so that our -- we can create a clear record.

Also, your counsel may object after I ask a question. If you could allow him to get his objection on the record, that would be helpful.

1    Before you begin your response, that is.  And unless

2    he instructs you not to respond, you may respond to my

3    questions even if he does pose an objection.  That

4    just needs to be noted for the record.

5              If you don't understand a question,

6    however, please let me know.  We're going to proceed.

7    If you do answer a question, we will assume for the

8    sake of the record that you answered it because you

9    understood it.

10             A    Got it.

11             Q    We'll be discussing some terminology

12   that is specific to the work that you did at OMB

13   during the 2012/2013 time frame, maybe 2014 a little

14   bit as well.  And those are some -- there may be some

15   terms that I'm not familiar with or that I

16   inadvertently use incorrectly.  If you think that I

17   have done so, I think it would be helpful if you let

18   me know or ask a question if that's the case.  All

19   right?  Is that fair?

20             A    Yes.

21             Q    Okay.  If you need a break at any time,

22   let me know and we can take that break.  The only

8

1    thing I ask is that you not request a break between a

2    question that I ask and when you complete your

3    response to that question.

4            A    I understand.

5            Q    All right.  And during the break, I

6    also ask that you not confer with counsel about the

7    subject matter of the deposition or any of the

8    questions that you've already answered; however, if

9    you feel at any point that you do need to add

10   information to any of your earlier responses or

11   correct any of your earlier responses, I ask that you

12   do so today and get those on the record.

13           The oath that you took from the court

14   reporter is the same oath that you would take if you

15   were testifying in a court of law at the time of a

16   trial.  And the meaning of that oath is that you agree

17   to testify truthfully, to the best of your ability and

18   under the penalty of perjury.  Do you understand that

19   oath?

20           A    Yes.

21           Q    And is there any reason that you may

22   not be able to understand my questions or answer them

1    truthfully and completely today?

2          A    No.

3          Q    And during the course of the

4    deposition, I will not be asking you to disclose any

5    conversations that you had with counsel, those are

6    attorney/client privileged.  So please be aware of

7    that.

8                All right.  Could you spell your name

9    for the record, please.

10         A    Norman Dong.  N-O-R-M-A-N D-O-N-G.

11         Q    What did you do to prepare for your

12   deposition today?

13         A    I prepared with counsel.

14         Q    Other than preparations with counsel,

15   did you do anything to prepare?

16         A    I prepared with counsel.

17         Q    All right.  Did you have any

18   discussions with anyone to refresh your memory on any

19   topics that you thought might be covered during the

20   deposition today?

21         A    I prepared with counsel.

22         Q    All right.  And did you review any

1  documents to prepare for your deposition?

2          A    I prepared with counsel.

3          Q    All right.  Is that a yes or no?  Did

4  you --

5          A    I prepared with counsel.

6          Q    Okay.  Other than anything that counsel

7  gave you to review, did you prepare -- or did you

8  review any documents to prepare for today's

9  deposition?

10          A    Not outside of the preparations with

11  counsel.

12          Q    Okay.  And just so that we have the --

13  an answer on the record.

14                Did you discuss with anyone any topics

15  that you thought may be covered during the deposition

16  today other than speaking with counsel?

17          A    No.

18          Q    Just a few background questions that

19  are not meant to insult you in any way, but I have to

20  go over these.

21                Have you ever been arrested?

22          A    No.

1           Q    Have you ever been terminated from a

2    job?

3           A    No.

4           Q    Have you ever been subject to

5    disciplinary action in the course of your employment?

6           A    No.

7           Q    Have you ever been accused of

8    misconduct during the course of your employment?

9           A    No.

10          Q    I'd like to go over your educational

11   background briefly.

12               Can you explain to me what degrees you

13   have and from what institutions they were awarded?

14          A    I have a bachelor of arts in history

15   from Yale, and a master's in public policy from the John

16   F. Kennedy School of Government at Harvard.

17          Q    What is your current title and

18   position?

19          A    I'm the commissioner at the Public

20   Buildings Service at the General Services

21   Administration.

22          Q    How long have you held that position?

1               A     Since March of 2014.

2               Q     And prior to beginning your service in

3     the position at GSA, your current position, what did

4     you do?

5               A     I was at the Office of Management and

6     Budget.  I started as the deputy controller and then

7     became the interim and acting controller.

8               Q     When did you become the interim and

9     acting controller?

10              A     I became the interim controller in May

11    of 2013, and I became the acting controller in January

12    of 2014.

13              Q     When did you start serving as deputy

14    controller?

15              A     That was in April of 2012.

16              Q     Let's go backwards a ways from then.

17                    What did you do immediately prior to

18    serving as deputy controller at OMB?

19              A     I was the chief financial officer at

20    the Federal Emergency Management Agency.

21              Q     How long did you hold that position?

22              A     From October of 2008 through the end of

1    March of 2012.

2              Q    And prior to serving as chief financial

3    officer at FEMA, what did you do?

4              A    I was vice president at Affiliated

5    Computer Services.

6              Q    How long did you hold that position?

7              A    That was from 2003 to 2008.  I think it

8    was, like, February of 2003 to August of 2008.

9              Q    Immediately prior to that, what did you

10   do?

11             A    I was managing director or managing

12   partner, I forget the exact title, at Governmentum

13   [sic] Solutions.

14             Q    And when did you hold that title?

15             A    That was from some time in 2001 through

16   February of -- or until February of 2003.

17             Q    What did -- what did Governmentum

18   Solutions, what does that firm --

19             A    It was a consulting firm that had

20   public and private clients, and it was acquired by

21   Affiliated Computer Services.

22             Q    What were your job duties at

1  Governmentum Solutions?

2          A    Managing engagements.  We had a project

3  on the U.S. customs -- with the U.S. customs service

4  at the time.  We also did other projects with the

5  Conference of Mayors.  Those are the clients that I

6  remember.  To managing staff and managing engagements.

7          Q    Could you explain a little bit more

8  what "managing engagements" means?

9          A    Managing project work.  So if we were

10 contracted to do a specific project, making sure that

11 we produce the deliverables, working with the

12 customer, managing the staff.

13         Q    And did you manage projects of a

14 particular area, I guess particular types of services?

15 I guess, what were the nature of the contracts that

16 you managed for Governmentum Solutions?

17         A    We worked -- the stakeholder engagement

18 of a larger project that focused on modernizing

19 customs' Automated Commercial Environment, which was

20 a -- their major system that they use to support their

21 business.  And we were focused on the stakeholder

22 engagement of that.

```
 1              Q    Prior to working at Governmentum

 2   Solutions, what did you do?

 3              A    I was employed by the District of

 4   Columbia.  I was the city administrator and deputy

 5   mayor for operations.

 6              Q    And what years?

 7              A    Well, I started with D.C. in 1996, and

 8   there I was -- I started as the chief of staff to the

 9   chief financial officer.  And then in 1998, I became

10   the director of the Office of Grants Management and

11   Development.  And then in 1999, I assumed the role

12   working in the mayor's office.

13              Q    All right.  Prior to working for the

14   District of Columbia, what did you do?

15              A    I was with the Department of Housing

16   and Urban Development as a special assistant in the

17   Office of Policy, Development and Research.

18              Q    How long did you hold that position?

19              A    From February of 1994 to June of 1996.

20              Q    And prior to that, what did you do?

21              A    I was in the Office of the State

22   Controller in the state of Connecticut.
```

```
1               Q    And what were your job duties there?

2               A    I was a special assistant for finance

3     and accounting.  I think the actual title was

4     executive assistant of finance and accounting.

5               Q    When was the first time you held a

6     position with supervisory duties?

7               A    I'd say beginning at HUD, where I was

8     responsible for managing staff, where we had interns,

9     and we had detailees, and we had folks who were

10    employed at HUD as part of an inner-governmental

11    exchange.

12              Q    And did you review the performance of

13    any direct reports when you were at HUD?

14              A    No.  That came later in the District of

15    Columbia.

16              Q    When, during your tenure with the

17    District of Columbia, did you -- did you first hold

18    responsibility for reviewing the performance of any

19    subordinate employees?

20              A    I was chief of staff to the chief

21    financial officer.

22              Q    In your role as chief financial officer
```

1    at FEMA, did you review the performance of any

2    employees?

3            A    Yes, I did.

4            Q    How many?

5            A    All of my direct reports.

6            Q    How many direct reports?

7            A    I have to take a moment to count.

8                 At least ten.

9            Q    And at OMB, did you review the

10   performance of any employees?

11           A    Yes.

12           Q    How many?

13           A    I had three -- at least three, if not

14   four direct reports.

15           Q    Who were your direct reports during

16   your tenure at OMB?

17           A    There were two branch chiefs, there was

18   a senior advisor, and there is an executive assistant.

19           Q    Did the persons who held those titles,

20   did the employees change during your tenure where

21   different people who held those titles or was it the

22   same four?

```
1              A    I think it was the same four.

2              Q    Okay.  Can you name them, please.

3              A    Sure.  The branch chiefs were

4    Michael Wetklow and Karen Lee.  The senior advisor was

5    Regina Kearney, and the executive assistant is

6    Areletha Venson.

7              Q    I'm sorry.  Areletha, what was her last

8    name?

9              A    Venson, V-E-N-S-O-N.

10             Q    Thank you.

11                  How, if at all, were you involved in

12   the selection of Karen Lee to the position of the

13   branch chief?

14             A    I was not.

15             Q    I'd like to talk a bit about what your

16   job duties were in the positions that you held at OMB,

17   starting with deputy controller.

18                  Could you describe for me what your

19   primary job duties were as deputy controller?

20             A    My primary responsibility of deputy

21   controller is running the day-to-day operations of the

22   office.  Focused on different issues in our portfolio.
```

```
 1              Q     You said different issues in your

 2     portfolio.

 3                    Can you tell me what those issues were?

 4              A     Sure.  Financial systems, improper

 5     payments, internal controls, financial reporting,

 6     grants management, real property management.

 7              Q     Anything else?

 8              A     Those are the major ones that come to

 9     mind.

10              Q     Which of those areas that you named --

11     let me just go back, actually.

12                    Are you familiar with what Karen Lee's

13     job duties were as a branch chief?

14              A     Yes.

15              Q     Could you describe those for me,

16     please.

17              A     She was the head of the management

18     assistance and controls branch, I believe.  And the

19     issues within her portfolio included grants

20     management, spending transparency, real property.  She

21     was responsible for Recovery Act.  Those are the major

22     ones that come to mind.
```

```
 1              Q    Prior to working at OMB, did you have

 2     any experience with any of those particular areas,

 3     grants management, spending transparency, real

 4     property or Recovery Act?

 5              A    Yes.

 6              Q    Okay.  Which?

 7              A    Grants management.

 8              Q    Any others?

 9              A    I touched upon real property management

10     in my role as CFO at FEMA.  Spending transparency,

11     I was responsible for that while I was at FEMA as

12     well.  What was the other one?

13              Q    Recovery Act.

14              A    Less so.

15              Q    And prior to working at OMB, what

16     experience did you have with grants management?

17              A    As I mentioned earlier, I was the

18     director of the Office of Grants Management and

19     Development in the District of Columbia.  And as the

20     chief financial officer at FEMA, we also played a

21     significant role in that agency's grants management.

22              Q    Do you know how many employees
```

1    Karen Lee supervised in her role as branch chief?

2                        MR. FAMUYIWA:  Objection.  Can you

3    reference time frame with respect to that question?

4                        BY MS. BOLLINI:

5           Q     During your -- at any time during your

6    tenure.

7           A     I can give you an approximate number

8    that may have changed over time.  Again, I'd have to

9    go back and count.

10          Q     Okay.

11          A     I think there were at least four OMB

12   permanent staff as well as other staff who were

13   detailed in from agencies.

14          Q     Who were the four OMB permanent staff

15   that you supervised during your tenure?

16          A     There was Gil Tran, Victoria Collin,

17   Marguerite Pridgen, Aaron Joachim.  And I'm trying to

18   think if I've missed anybody.  There was also

19   Shelly Thompson who is somebody who joined us and then

20   left.  So I think there was about four to five

21   permanent staff.

22          Q     How, if at all, were you involved in

1   the supervision of those five employees that you

2   identified as being Ms. Lee's direct reports?

3          A    I'm not sure I understand your

4   question.

5          Q    Sure.

6               Were you involved in any way in

7   supervising Mr. Tran's work, Ms. Pridgen's work,

8   Ms. Collins', Mr. Joachim's or Ms. Thompson's work?

9          A    There was definitely interaction with

10  the staff, but I wouldn't consider myself their direct

11  supervisor.

12         Q    On what types of matters did you

13  interact with those individuals?

14         A    Team meetings, team discussions about

15  the various issues we were working on, the projects we

16  were working on.

17         Q    Did you review the work product of any

18  of the employees that Ms. Lee supervised?

19         A    Let me make sure I understand your

20  question.  Is your question did I see the work

21  product?

22         Q    Let's start with that.

1                  Did you see the work product of any of

2    them?

3          A    I often saw work product.

4          Q    Did you see the work product of all of

5    those five employees that you identified, Mr. Tran,

6    Ms. Pridgen, Ms. Collin, Mr. Joachim and Ms. Thompson?

7          A    Over the course of my tenure, yes.

8          Q    When, if ever, did you provide feedback

9    to anyone on the quality of the work product submitted

10   by any of those employees?

11                 MR. FAMUYIWA:  Objection.  We

12   haven't established that he provided feedback to

13   anybody.

14                 MS. BOLLINI:  My question was

15   when, if ever.

16                 BY MS. BOLLINI:

17         Q    You may answer.

18         A    When I had the opportunity -- when the

19   staff had the opportunity to share work product with

20   me, I would take the opportunity to provide feedback

21   to the staff.

22         Q    Did you say that you had more

1    interaction with any of the five employees that you

2    identified as reporting directly to Ms. Lee than you

3    had with others?  So let me rephrase that.

4              Did you work more closely with any of

5    those employees than with others?

6         A    I would say for the most part it was

7    fairly consistent based on their presence in the

8    office.

9         Q    I'd like to go back to each of those

10   employees that you identified, Mr. Tran, Ms. Pridgen,

11   Mr. Collin, Mr. Joachim, Ms. Thompson.

12        A    Sure.

13        Q    Can you tell me what their -- each

14   employee's job title was at the time that you worked

15   at OMB?

16        A    I don't recall the specific titles.  I

17   believe that they were policy analysts with different

18   degrees of experience and tenure.

19        Q    And were you familiar with the job

20   duties that each of those policy analysts performed?

21        A    Yes.

22        Q    How did you become familiar with the

1    job duties of each of those policy analysts?

2              A     When I first started working at OMB,

3    there was a series of briefings on the different

4    projects as well as the different individuals staffing

5    the projects.

6              Q     During those briefings when you first

7    started working at OMB, did any of the briefings

8    cover -- or did any of the briefings address the work

9    of Marguerite Pridgen?

10             A     There were broader discussions about

11   the work that we're doing in grants management.

12             Q     When, if ever, did Ms. Pridgen's name

13   come up in any of the briefings that you identified

14   having participated in after you began working at OMB?

15             A     I'm not sure I understand.  Can you

16   repeat the question or rephrase it?

17             Q     Sure.

18                   When was the first time you heard

19   anything about Marguerite Pridgen after you started

20   working at OMB?

21             A     I believe the first detailed

22   conversation was with Lauren Wright.

1          Q     When was that?

2          A     It was probably not long after I

3    started back in April of 2012.

4          Q     What did you and Ms. Wright talk about

5    during that conversation?

6          A     She briefed me on the situation and

7    what had happened prior to my arrival.

8          Q     What did she tell you about what had

9    happened prior to your arrival?

10         A     She mentioned that Marguerite was

11   placed on administrative leave, and then she also

12   mentioned that Marguerite would be coming back to OMB.

13         Q     Did she explain to you why -- or did

14   she describe any reasons that Ms. Pridgen had been

15   placed on administrative leave?

16         A     Yes.

17         Q     What were those?

18         A     From what I recall, there were some

19   potential security issues that were being investigated

20   by the Secret Service.

21         Q     Did Ms. Wright provide you with any

22   detail about what those security issues were?

1          A     She explained that there were some

2    potential threats articulated.

3          Q     Did she say that Ms. Pridgen had

4    articulated those threats?

5          A     Yes.

6          Q     Did she tell you what the threats were?

7          A     I don't recall the specifics.

8          Q     What do you recall?

9          A     It was potential harm -- from what I

10   recall, from what I understand, it was potential harm

11   to herself or others.

12         Q     What else, if anything, did Ms. Wright

13   tell you about the potential threats that Ms. Pridgen

14   articulated?

15         A     That's all that I recall.

16         Q     Did she tell you what the context of

17   those potential threats were?

18                    MR. FAMUYIWA:  Objection.  Asked

19   and answered.

20                    BY MS. BOLLINI:

21         Q     Go ahead.

22         A     I don't recall any more specifics.

1          Q    Did she tell you Ms. Pridgen had filed

2    an EEO complaint?

3                    MR. FAMUYIWA:  Objection.  Asked

4    and answered.

5                    MS. BOLLINI:  No, it wasn't.

6                    BY MS. BOLLINI:

7          Q    Go ahead, please.

8          A    She did mention that Ms. Pridgen had

9    filed a complaint.

10         Q    And was this in the same conversation

11   that you had with her in which she described to you

12   the potential threats that Ms. Pridgen articulated?

13         A    I'm not sure I understand that

14   question.

15         Q    Okay.  I just wanted to understand

16   whether Ms. Wright had described the potential threats

17   as having been related in any way to Ms. Pridgen's EEO

18   complaint.

19                    MR. FAMUYIWA:  Objection.  First,

20   asked and answered.  And two --

21                    MS. BOLLINI:  It was not asked and

22   answered, counsel.

```
 1                        MR. FAMUYIWA:  If I can finish my
 2    objection.
 3                        It's asked and answered, and you
 4    are misstating the testimony of the witness.
 5                   BY MS. BOLLINI:
 6            Q     Please go ahead.
 7                        MS. BOLLINI:  Could you read the
 8    question back.
 9                   (The record was read as requested.)
10                        THE WITNESS:  I don't recall that.
11                   BY MS. BOLLINI:
12            Q     Other than discussing with you the
13    potential threats that Ms. Pridgen articulated, what
14    else, if anything, did Ms. Wright tell you about
15    Ms. Pridgen during your detailed conversation --
16                        MR. FAMUYIWA:  Objection.  Asked
17    and answered.
18                   BY MS. BOLLINI:
19            Q     -- in April of 2012?
20                        MR. FAMUYIWA:  Sorry about that.
21                        Objection.  Asked and answered.
22                        MS. BOLLINI:  It was not, but
```

1    thank you.

2                          THE WITNESS:  I think the major

3    issues were the reasons why she was placed on

4    administrative detail.

5                          BY MS. BOLLINI:

6            Q    Other than the potential threat that we

7    discussed, did Ms. Wright identify any other reasons

8    for Ms. Pridgen having been placed on administrative

9    leave?

10           A    No.

11           Q    And did Ms. Wright discuss with you

12   whether -- any potential threats -- whether the agency

13   had resolved concerns about any potential threats?

14                         MR. FAMUYIWA:  Objection.  Asked

15   and answered.

16                         MS. BOLLINI:  Incorrect.

17                         BY MS. BOLLINI:

18           Q    Go ahead.

19           A    Can you repeat the question, please.

20           Q    Sure.

21                         Did Ms. Wright discuss with you whether

22   the agency had resolved any concerns it had about the

1   potential threats that Ms. Pridgen had allegedly

2   articulated?

3           A    I believe in the initial conversation

4   that was still an ongoing issue.

5           Q    Did you have more than one conversation

6   with Ms. Wright about the potential threat that

7   Ms. Pridgen had articulated?

8           A    It may have come up on more than one

9   occasion.

10          Q    You said in the initial conversation it

11  was still an ongoing issue; is that correct?

12          A    (Gesturing affirmatively.)

13          Q    What was your understanding of what the

14  agency's position was on that issue during that

15  initial conversation?

16          A    I'm not sure I understand that

17  question.

18          Q    Okay.  During the initial conversation,

19  was it your understanding -- did Ms. Wright tell you

20  that the agency or some entity was still investigating

21  the matter?

22          A    I believe she said that the Secret

1    Service was investigating the matter.

2              Q    And at some point, did Ms. Wright

3    notify you that the Secret Service had concluded its

4    investigation into the matter?

5              A    Yes, she did.

6              Q    When did she tell you that?

7              A    I'm not sure of the exact date, but I

8    think it was maybe a month or so after I started.

9              Q    Did Ms. Wright share with you what

10   the -- what conclusions, if any, the Secret Service

11   came to as a result of its investigation?

12             A    She told me that Marguerite would be

13   allowed access back into the New Executive Office

14   Building, but not the Old Executive Office Building.

15             Q    Did Ms. Wright explain to you why

16   Ms. Pridgen would be allowed access into the New

17   Executive Office Building and not the Old Executive

18   Office Building?

19             A    I don't recall the specifics.  I just

20   took it as a decision that had been made.

21             Q    Prior to Ms. Pridgen returning to the

22   OMB from administrative leave, did you discuss with

```
 1   any agency employee her performance?

 2           A    I don't recall much discussion about

 3   performance.  Most of the conversation seemed to be

 4   focused on administrative leave and the reasons for

 5   that.

 6           Q    What do you recall -- what discussions

 7   do you recall about Ms. Pridgen's performance prior to

 8   her -- or what discussions do you recall having had

 9   about Ms. Pridgen's performance prior to her returning

10   from administrative leave?

11                   MR. FAMUYIWA:  Objection.  Asked

12   and answered.

13                   MS. BOLLINI:  It was not.

14                   BY MS. BOLLINI:

15           Q    Go ahead and answer.

16           A    I believe that Lauren Wright had

17   informed me that Ms. Pridgen did not have a

18   performance plan for the current performance year.

19           Q    What discussion, if any, did you have

20   with Ms. Wright about Ms. Pridgen's performance plan

21   for the coming performance year?

22           A    We were talking about how we would
```

1    complete performance assessments for all employees

2    within the Office of Federal Financial Management, and

3    we were talking about how we would approach a

4    situation where you have an employee who never had a

5    performance plan established in that year.

6           Q    And did you and Ms. Wright arrive at

7    some conclusion as to how you would address that

8    situation?

9           A    We wanted to make sure that all

10   employees within OFFM had an opportunity to be

11   evaluated on performance expectations, and we talked

12   about potentially giving more time to Ms. Pridgen when

13   she returned back to OMB.

14          Q    Can you explain what you mean by "more

15   time"?

16          A    To allow an additional period to be

17   evaluated on performance if there was not a

18   performance plan in place or if she was not on site

19   because of being on administrative leave.

20          Q    Can you explain what that additional

21   time period was?  Did you -- did you and Ms. Wright

22   decide on what that time period would be?

1          A    I don't recall the exact number of

2     days.  I just remember conceptually there was an

3     interest in terms of having an articulated performance

4     expectation.

5          Q    I'd like to go back to the term you

6     used "more time."

7               Could you explain first what the

8     performance rating period is, the annual evaluation

9     period for OMB?

10         A    I believe for GS employees, that runs

11    through March 31st.  And for SES employees, that runs

12    through June 30th.

13         Q    To the best of your recollection, what

14    was the actual time period on the calendar that you

15    and Ms. Wright decided would be appropriate for

16    Ms. Pridgen upon her return?

17         A    I don't recall the final details, but

18    my -- from what I remember, I think there was some

19    focus on 90 days.

20                        THE WITNESS:  Can we take a break

21    in a few minutes?

22                        MR. FAMUYIWA:  Sure.

1                    MS. BOLLINI:  We can take a break

2    right now if you would like.

3                    (A brief recess was taken.)

4                    BY MS. BOLLINI:

5          Q    Before we took a break, you and I were

6    talking about discussions you had with Lauren Wright

7    about -- or that related to Ms. Pridgen prior to

8    Ms. Pridgen's returning to the OMB after she was on --

9    placed on administrative leave.  And you mentioned

10   that -- and I may not be stating your testimony

11   correctly.  But you mentioned that Ms. Wright did tell

12   you at some point that Ms. Pridgen had filed an EEO

13   complaint?

14         A    She had informed me of that.

15         Q    And just so that I understand

16   correctly, did she inform you of that in that period

17   after you -- or prior to Ms. Pridgen's return to the

18   agency?

19         A    Yes.

20         Q    What did Ms. Wright tell you about

21   Ms. Pridgen's EEO complaint?

22              A    From what I recall, it focused on

1   reasonable accommodation.

2            Q    Did she tell you anything else about

3   it?

4            A    I'm trying to remember the details.  I

5   know there was focus on reasonable accommodation, and

6   I believe that there were issues related to

7   discrimination that were being alleged.

8            Q    Did Ms. Wright tell you what the basis

9   of Ms. Pridgen's reasonable accommodation claim was?

10           A    I can't remember the specifics, because

11  I know that there were additional requests after I

12  assumed my position.  So I wouldn't be able to say

13  what was before versus what was after.

14           Q    And just so I understand correctly, do

15  you mean that Ms. Pridgen made additional requests

16  after she returned to the agency from administrative

17  leave?

18           A    I believe so.

19           Q    Other than telling you that Ms. Pridgen

20  had EEO claims based on the reasonable accommodation

21  and discrimination, what else, if anything, did she

22  tell you about Ms. Pridgen's EEO complaint?

```
 1              A    I think those are the major issues.
 2              Q    Did Ms. Wright tell you what types of
 3    discrimination Ms. Pridgen alleged in her EEO
 4    complaint?
 5              A    She may have.
 6              Q    And what's your understanding of what
 7    types of discrimination Ms. Pridgen alleged in the EEO
 8    complaint that she filed prior to being placed on
 9    administrative leave?
10              A    I believe she was alleging issues
11    related to age and race.
12              Q    Did Ms. Wright discuss with you any of
13    the underlying facts related to Ms. Pridgen's EEO
14    complaint?
15              A    I don't recall the specifics.
16              Q    Did Ms. Wright tell you anything about
17    procedurally where Ms. Pridgen's EEO complaint was at
18    the time she discussed it with you?
19              A    She may have.  Again, it was long ago,
20    and I don't recall a lot of the details.
21              Q    And what's your understanding of why
22    Ms. Wright shared with you information about
```

1    Ms. Pridgen's EEO complaint prior to Ms. Pridgen

2    returning to the agency from administrative leave?

3          A    I believe she wanted me to have the

4    entire set of facts in terms of issues.

5          Q    When you say the "entire set of facts

6    in terms of issues," can you tell me what, if any,

7    other issues Ms. Wright discussed with you about

8    Ms. Pridgen prior to Ms. Pridgen's return?

9          A    I think the conversation focused

10   largely on the reasons why she was placed on

11   administrative leave as well as any prior EEO

12   complaints.

13         Q    Was it during that same conversation

14   you had with Ms. Wright that you discussed with her

15   establishing a performance plan for Ms. Pridgen upon

16   her return?

17         A    Yes.  That was part of what we

18   discussed before in the interest of giving all

19   employees a clear set of performance expectations.

20         Q    Did you review any records relating to

21   Ms. Pridgen prior to her returning to the agency from

22   administrative leave?

1           A     What type of records?

2           Q     Any records relating to her employment,

3    her performance, otherwise?

4           A     I don't believe so.

5           Q     Just to clarify, performance

6    evaluations, for instance, did you review any of her

7    past performance evaluations?

8                 MR. FAMUYIWA:  Objection.  Asked

9    and answered.  Or maybe you want to clarify the

10   question.

11                MS. BOLLINI:  No.

12                THE WITNESS:  So who's got --

13                BY MS. BOLLINI:

14          Q     You can answer if you understood.

15          A     Would you mind rephrasing the question?

16          Q     Sure.

17                Did you review any of Ms. Pridgen's

18   past performance evaluations prior to her returning

19   from administrative leave?

20          A     I don't believe so.

21          Q     Did Ms. Wright discuss with you

22   anything relating to Ms. Pridgen's conduct in any

1    discussions you had with her prior to Ms. Pridgen

2    returning from administrative leave?

3            A    Would threats be considered part of

4    conduct in terms of the reasons for her being on

5    administrative leave?

6            Q    Let's say yes for the sake of this

7    conversation.

8                 Other than threats, did she discuss

9    anything about Ms. Pridgen's conduct?

10           A    The focus largely was on the reasons

11   for her being out on administrative leave.

12           Q    Did Ms. Wright discuss with you, again,

13   prior to Ms. Pridgen returning from administrative

14   leave, Ms. Pridgen's relationships with her

15   supervisors prior to her being placed on

16   administrative leave?

17           A    I'm not sure I understand that

18   question.  Would you mind rephrasing it?

19           Q    Sure.

20                Prior to when you and Ms. Wright had a

21   conversation about Ms. Pridgen prior to Ms. Pridgen

22   returning from administrative leave, did Ms. Wright

1   share with you any information about Ms. Pridgen's

2   professional relationship with any of her supervisors

3   in the period of time prior to her being placed on

4   administrative leave?

5                    MR. FAMUYIWA:  Objection.  Vague.

6   Can you explain what you mean by supervisor?  Are you

7   just referring to one person or all of her

8   supervisors?

9                    MS. BOLLINI:  All.  Any.

10                   MR. FAMUYIWA:  Thank you.

11                   THE WITNESS:  I guess I'm still

12   not sure what you're asking.

13                   BY MS. BOLLINI:

14        Q    Sure.

15             Did Ms. Wright share with you any

16   concerns that any of Ms. Pridgen's former supervisors

17   had voiced to her, Ms. Wright, during the period of

18   time prior to Ms. Pridgen being placed on

19   administrative leave?

20        A    I think she may have suggested that

21   previous supervisors may have had some concerns, but I

22   don't recall a lot of the specifics beyond that.

```
 1              Q    What do you recall?

 2              A    I don't recall a lot, actually.  Again,

 3   I think the conversations that I had with

 4   Lauren Wright were focused mainly on the EEO complaint

 5   that had been put forward had been about the

 6   discussion of why she was on administrative leave,

 7   given the threats that were articulated by

 8   Ms. Pridgen, and how we would approach the situation

 9   had she came back in the organization, and we wanted

10   to make sure that she had a clear performance plan,

11   just like every other OFFM employee.

12              Q    And prior to Ms. Pridgen returning from

13   administrative leave, did you discuss with anyone

14   what -- what Ms. Pridgen's portfolio of work would be

15   upon her return to the agency?

16              A    Say that again, please.

17              Q    Sure.

18                   Prior to Ms. Pridgen returning to the

19   agency, did you discuss with anyone what Ms. Pridgen's

20   portfolio of work should be when she returned to the

21   agency?

22              A    Yes.
```

1          Q     With whom did you discuss that?

2          A     I believe I spoke to Lauren Wright

3    about this, spoke to Karen Lee about this, and also

4    spoke to Danny Werfel, who is the controller.

5          Q     Did you speak with each of those

6    persons individually?

7          A     I think it was largely individually,

8    but there may have been joint discussions.

9          Q     All right.  What did you and Ms. Wright

10   discuss about Ms. Pridgen's portfolio of work prior to

11   Ms. Pridgen returning?

12         A     I think the consensus was that it

13   should focus on grants management if that had been

14   Ms. Pridgen's previous area of focus.

15         Q     What input, if any, did Ms. Wright

16   provide on the topic of what Ms. Pridgen's portfolio

17   of work should be upon her return from administrative

18   leave?

19         A     From what I recall, I think the

20   conversation was at a high level.  I don't think she

21   was involved in scoping out specific projects, but I

22   think we both agreed that the area of focus should be

1    based on where it had been previously.

2        Q    What input did Karen Lee provide to the

3    topic of -- or in the question of what portfolio of

4    work should be assigned to Ms. Pridgen upon her return

5    from administrative leave?

6        A    I think if the decision was made, that

7    Marguerite should focus on grants management.  Ms. Lee

8    was responsible for helping identify specific projects

9    within grants management that would be suitable for

10   Ms. Pridgen, given her background and expertise.

11       Q    How about Mr. Werfel, what input, if

12   any, did he provide in the question of what portfolio

13   of work should be assigned to Ms. Pridgen upon her

14   return?

15       A    I think he agreed that the focus should

16   be grants management, but beyond that, he wasn't

17   involved in the specifics.

18       Q    And did you -- did you agree that

19   Ms. Pridgen's portfolio should be focused on what she

20   had previously worked on?

21       A    I think the intent was to find a

22   portfolio that would be commensurate with her skills

1   and expertise, and if that's, you know, grants

2   management -- if her background and experience was in

3   grants management, then that's where the focus should

4   be.

5           Q   I'd like to understand what your --

6   what's your understanding of what the agency did with

7   Ms. Pridgen's portfolio of work during the period of

8   time that she was on administrative leave.

9                MR. FAMUYIWA:  Objection.  Vague.

10  Can you explain the exact time period you're talking

11  about?

12               MS. BOLLINI:  During the period of

13  time she was on administrative leave.

14               MR. FAMUYIWA:  Yeah, but the

15  problem is, Mr. --

16               MS. BOLLINI:  I asked what his

17  understanding is, so -- of what the agency did.

18               BY MS. BOLLINI:

19          Q   You may answer if you understand the

20  question.

21          A   Will you mind rephrasing the question

22  so that I totally understand it?

1          Q    Sure.  Okay.  Let's see if I can.

2               So your understanding is that Ms. Pridgen

3    had a portfolio of work that she was assigned prior to

4    the time she was placed on administrative leave; is

5    that your understanding?

6          A    Yes.

7          Q    Okay.  And do you know what the agency

8    did with the assignments that were -- or the projects

9    that were in her portfolio of work when it placed her

10   on administrative leave?

11               MR. FAMUYIWA:  Objection.  Calls

12   for speculation.

13               MS. BOLLINI:  I asked whether he

14   knows.

15               THE WITNESS:  I don't have the

16   details of what she was assigned before she was placed

17   on administrative leave, if that was your question.

18               BY MS. BOLLINI:

19          Q    Okay.

20          A    But I do know that there was a need for

21   grants management work upon her return.

22               Q    Could you explain what you mean by that

```
 1    phrase or that sentence, "there was a need for grants

 2    management work upon her return"?

 3              A    I think there were important projects

 4    that needed to get done.

 5              Q    And what were those projects, if you

 6    can recall?

 7              A    One example was grants workforce

 8    training and development to make sure that all grants

 9    management professionals with responsibility for

10    administering or supporting grants programs in the

11    federal government had a certain set of skills and

12    competencies.

13              Q    And what's your understanding of -- let

14    me rephrase that.

15                   Did the agency assign Ms. Pridgen any

16    work related to grants workforce training and

17    development upon her return from administrative leave?

18              A    Yes.

19              Q    What's your understanding as to what

20    Ms. Pridgen's assignment was in that particular area?

21              A    From what I recall, she was charged

22    with coming up with an overall -- developing an
```

1    overall strategy and plan for improving the federal

2    grants workforce.

3          Q    I'd like to go back for a moment to the

4    topics related to training that you participated in.

5                Did OMB provide you any training on EEO

6    policies and procedures?

7          A    I believe in the course of my career,

8    I've had training on EEO policies and procedures,

9    including my time at FEMA.

10         Q    Do you recall having had any training

11   that was provided by OMB or during your tenure at OMB?

12         A    I don't recall specific training

13   provided while I was at OMB.

14         Q    During your tenure at OMB, did you

15   participate in any training on the No FEAR Act?

16         A    Not during my time at OMB, but I have

17   been part of training of No FEAR.

18         Q    During your tenure at OMB, did you

19   participate in any training on conducting employee

20   performance evaluations?

21         A    I've had significant experience on the

22   question of employee performance evaluations, and

1    during the -- my time at OMB, I believe we had some

2    more focused discussions with the managers about the

3    mechanics of doing that in terms of the annual

4    performance evaluation cycle.

5              Q    When did you have those discussions

6    with managers?

7              A    I don't recall the specifics.  I think

8    it was -- it was around the evaluation cycle and what

9    needed to be submitted when.

10             Q    Do you know whether Ms. Karen Lee was

11   involved in any of those discussions on performance

12   evaluation cycle at OMB?

13             A    There may have been discussions with

14   branch chiefs.  I'm not sure.  But I knew that -- I do

15   know that Karen Lee had significant discussions with

16   HR on the question of performance evaluation and how

17   to approach it.

18             Q    How do you know that Ms. Lee had

19   significant discussions with HR on performance

20   evaluations?

21             A    Because I know that she was talking to

22   Lauren Wright about how to -- how to evaluate all of

1    her employees, and I believe that Mike Wetklow was as

2    well.  And that's something that I encouraged my

3    branch chiefs to do in terms of working with HR to

4    make sure that we followed proper protocol and

5    procedure.

6              Q    How do you know that Ms. Lee was

7    talking to Lauren Wright about conducting performance

8    evaluations?

9              A    I was aware of a lot of things that my

10   branch chiefs were doing.

11             Q    Do you know what the period of time is

12   that Ms. Lee talked to -- or let's see.

13             Do you know when Ms. Lee had

14   discussions with Lauren Wright about conducting

15   performance evaluations?

16             A    I think it was on multiple occasions.

17   Again, we had several opportunities during the cycle.

18             Q    All right.  I'd like to talk to you

19   about Ms. Pridgen's returning to the agency from

20   administrative leave.

21             A    Okay.

22             Q    What was the first interaction, if any,

1    that you had with Ms. Pridgen upon her return from

2    administrative leave?

3            A    I don't recall a lot of the specifics.

4    I think it was a general hello, either in a meeting or

5    in the hallway.

6            Q    Okay.  Going back for a moment, I'd

7    like to talk about your experience with EEO matters.

8                 When, if ever, were you named as a

9    discriminator or retaliator in an EEO complaint?

10           A    A discriminator or a retaliator?

11           Q    Retaliator, yes.

12           A    I don't believe ever.  There was a case

13   in the District of Columbia where Anthony Williams was

14   named in a lawsuit, and I think I was named as a -- I

15   forget the technical term, but a party of interest or

16   something.

17           Q    You've never had an employee allege

18   that you've discriminated or retaliated against them

19   under any EEO law?

20           A    I don't believe so.  There was a

21   performance issue with the deputy CFO at FEMA, which

22   we were addressing while I was there.

1          Q    When, if ever, did you have to -- or

2    when, if ever, did you respond to a request for a

3    reasonable accommodation for an employee?

4          A    I think one example is at FEMA where we

5    had a -- an employee with a physical disability where

6    we had to modify the entrance to the restroom.

7          Q    And how, if at all, were you involved

8    in responding to that request for reasonable

9    accommodation?

10          A    My director of business operations came

11    to me and told me that it was an issue, and I approved

12    the funding to address that issue.

13          Q    And when, if ever, did you have any

14    involvement in responding to a request for a

15    reasonable accommodation from an employee at OMB?

16          A    I believe Ms. Pridgen had made some

17    requests during my tenure.

18          Q    Do you recall what those requests were?

19          A    I think one issue was proximity to the

20    restroom, which we accommodated.  I believe another

21    issue was something related to having to accommodate

22    an ability -- an inability to type for long periods of

1    time or to use the keyboard, and I believe that there

2    was some software that we acquired, Dragon Speak, I

3    forget the specifics of it, that was also provided.

4              Ms. Wright informed me that there was

5    also a request for an air purifier, which I believe

6    was also accommodated.  There was also a request for

7    quieter space, which I believe also was accommodated.

8         Q    Are you aware of any others for

9    Ms. Pridgen?

10        A    There may have been others.  Those are

11   the four that I can recall.

12        Q    When, if ever, did you deny any of the

13   requests for reasonable accommodation that you just

14   identified?

15             MR. FAMUYIWA:  Objection.

16   Misstates the testimony of the witness.

17             MS. BOLLINI:  It doesn't.

18             BY MS. BOLLINI:

19        Q    You may answer.

20        A    I'm not sure I understand that.

21        Q    Sure.

22             Did you deny any of those requests for

1  reasonable accommodation before they were granted?

2          A    Again, I'm not sure I understand the

3  question, if they were granted.

4          Q    Okay.  At any point, are you aware of

5  whether any of Ms. Pridgen's requests for reasonable

6  accommodation were denied?

7                  MR. FAMUYIWA:  Objection.  Asked

8  and answered.  Unless you're asking about other

9  supervisors denying it.

10                 MS. BOLLINI:  This is a totally

11  different question.

12                 BY MS. BOLLINI:

13         Q    Are you aware of any having been

14  denied?

15                 MR. FAMUYIWA:  Objection.  Vague.

16  Maybe you can clarify the question.  I'm not sure that

17  I understand it myself, honestly.

18                 THE WITNESS:  Yeah.  Again, I'm

19  having trouble following this question, if they were

20  granted.

21                 BY MS. BOLLINI:

22         Q    Sure.

1                When, if ever, did you -- what input,

2    if any, did you have into Ms. Pridgen's request for a

3    quieter work space?

4            A    I wanted to make sure that all of our

5    employees had an environment where they could succeed

6    and perform.

7            Q    What input, if any, did you have into

8    Ms. Pridgen's request, and -- what input, if any, did

9    you have into the agency's response to Ms. Pridgen's

10   request for quieter work space?

11               MR. FAMUYIWA:  Objection.  Vague.

12   Maybe you can explain what you mean by "input."  And

13   objection.  Asked and answered.

14               BY MS. BOLLINI:

15           Q    You may answer if you understand.

16           A    HR came to me and recommended that we

17   provide quieter space for Ms. Pridgen, and we granted

18   that request.

19           Q    Are you aware of whether the agency

20   denied Ms. Pridgen's request for a quieter work space

21   at any time before it granted that request?

22               MR. FAMUYIWA:  Objection.

1    Speculation and asked and answered.

2                    MS. BOLLINI:  Incorrect.

3                    BY MS. BOLLINI:

4         Q    You may answer.

5         A    Can you rephrase it?

6         Q    I don't know if I can rephrase it.

7              The question was whether you're aware

8    of whether the agency had, at any time, denied

9    Ms. Pridgen's request for a quieter work space prior

10   to its granting that request.

11                   MR. FAMUYIWA:  Objection.  Vague,

12   and it calls for two different answers.  I don't know

13   if you're referring to him or somebody else --

14                   MS. BOLLINI:  No, it does not.

15                   MR. FAMUYIWA:  -- denying the

16   request.

17                   MS. BOLLINI:  It does not.

18                   BY MS. BOLLINI:

19        Q    But you may answer.

20                   MR. FAMUYIWA:  Shall she repeat

21   the question?

22                   THE WITNESS:  Yeah.

1                    MS. BOLLINI:  Do you mind reading

2    that back?

3                         (The record was read as requested.)

4                    THE WITNESS:  I think there was a

5    focus on wanting to ensure that it was a legitimate

6    request.

7                    MS. BOLLINI:  Could you read the

8    question again?  I'm not sure that you answered the

9    question.

10                        (The record was read as requested.)

11                   MR. FAMUYIWA:  Yeah.  The Agency

12   objects.  I think that you need to explain -- and I

13   think I know where you're going.  I think you need to

14   explain the question to him for him to understand it,

15   otherwise the response will probably ...

16                   MS. BOLLINI:  Okay.  Thank you for

17   your objection.

18                   BY MS. BOLLINI:

19        Q    But are you aware of the agency ever

20   having denied Ms. Pridgen's request for a quieter work

21   space?

22                   A    I think if there were conversations, it

1    was about wanting to make sure that the request was

2    reasonable and legitimate.

3              Q    But are you aware of the agency having

4    denied Ms. Pridgen's request at any time?

5                        MR. FAMUYIWA:  Objection.  Asked

6    and answered.  And the question is vague.

7                        MS. BOLLINI:  It was not answered,

8    counsel.

9                        MR. FAMUYIWA:  Okay.

10                       THE WITNESS:  I think, as I said

11    before, there were conversations about wanting to make

12    sure that it was a reasonable and legitimate request.

13                  BY MS. BOLLINI:

14             Q    Are you aware -- I'm sorry I have to

15    repeat the question, because I don't understand

16    whether you are aware or not.

17                  Are you aware of the agency having

18    denied Ms. Pridgen's request for a quieter work space

19    at any time?

20                       MR. FAMUYIWA:  Objection.  Asked

21    and answered.  The question is vague.  If you want to

22    explain what you mean when you say that the agency

1    denied her request.

2                    THE WITNESS:  Because the request

3    was granted.

4                    BY MS. BOLLINI:

5        Q    At any time, are you aware of the

6    request having been denied prior to its being granted?

7                    MR. FAMUYIWA:  Objection.  Asked

8    and answered.  The question is vague.  You may want to

9    explain what you mean when you say that the request

10   was originally denied.

11                   BY MS. BOLLINI:

12       Q    You may answer.

13       A    I think my counsel has raised a

14   question.

15       Q    Do you understand the question, sir,

16   actually?

17       A    And I've responded.

18       Q    But I think the question calls for a

19   yes or no.

20                   Are you aware if the request had been

21   denied at any time prior to the agency's granting it?

22       A    I'm not sure what constitutes a formal

1    denial, especially since the request was accommodated.

2              Q    Are you aware of the agency having,

3    formally or informally, denied the request for a

4    quieter work space prior to its having granted that?

5                        MR. FAMUYIWA:  Objection.  Asked

6    and answered.  The question is vague.  You may want to

7    explain what you mean when you say the agency denied

8    the request before it was granted.

9                        MS. BOLLINI:  Counsel, you stated

10   your speaking objection several times, and you're

11   misstating my question.  So, again, I think we're

12   getting somewhere.

13                       MR. FAMUYIWA:  I'm not misstating

14   the question.  I think I have a right to respond.  I'm

15   not misstating the question.  I have explained it to

16   you.  I have a right to object.  You can repeat the

17   question, I have the right to object to that question,

18   and if he can respond, he responds.

19                       MS. BOLLINI:  If your objections

20   are improper repeatedly, you do not have a right to

21   repeatedly state them.

22                       MR. FAMUYIWA:  My objections are

1   not improper.  They are not.

2              BY MS. BOLLINI:

3         Q    You may --

4              MS. BOLLINI:  Do you mind reading

5   back the question?

6              (The record was read as requested.)

7              THE WITNESS:  As I said before, I

8   think there was some discussion about whether the

9   requests were legitimate requests for accommodation.

10  The request for accommodation was ultimately granted.

11             BY MS. BOLLINI:

12        Q    Do you know when Ms. Pridgen first

13  requested a quieter work space?

14        A    I think it was several months after --

15  or I forget the exact -- it was after she came back in

16  May of 2013.  I don't know exactly when.

17        Q    Do you know how long after Ms. Pridgen

18  requested a quieter work space the agency granted that

19  request?

20        A    I think it was several months, but I

21  think part of the issue was that work space was

22  provided to accommodate an earlier request in terms of

1    proximity to the restroom.

2         Q    What, if anything, did the agency do to

3    determine whether Ms. Pridgen's request for a quieter

4    work space was a legitimate request?

5              MR. FAMUYIWA:  Objection.  Can you

6    reference a time frame?

7              MS. BOLLINI:  No.  Thank you.

8              MR. FAMUYIWA:  Okay.  Objection.

9    Vague.

10             THE WITNESS:  Can you restate

11    that, please.

12             BY MS. BOLLINI:

13        Q    Sure.

14             Are you aware what, if anything, the

15    agency did to determine whether Ms. Pridgen's request

16    for a quieter work space was a legitimate request for

17    an accommodation?

18        A    I think the first issue was satisfying

19    the prior request for proximity to the washroom.  The

20    second issue was to examine who else was in that -- or

21    to understand, I should say, who else was in that work

22    space and to look at their productivity -- or let me

1    back up.

2                   To consider how they would be able

3    to -- how other employees would be able to function in

4    that same space.

5         Q    How, if at all, were you involved in

6    responding to Ms. Pridgen's request for a work space

7    closer to the bathroom?

8                   MR. FAMUYIWA:  Objection.  Asked

9    and answered.

10                   MS. BOLLINI:  It's not.

11                   THE WITNESS:  I'm not sure I

12    understand the time frame that you're referring to.

13                   BY MS. BOLLINI:

14         Q    Sure.

15                   At any time, how, if at all, were you

16    involved in responding to Ms. Pridgen's request to

17    have a work space closer to the bathroom?

18         A    We supported that request.

19         Q    And what input, if any, did you provide

20    into the agency's response or the agency's

21    consideration of the request for accommodation?

22                   MR. FAMUYIWA:  Objection.  Vague.

```
1   Can you explain what "input" means?

2                   MS. BOLLINI:  Standard definition.

3                   MR. FAMUYIWA:  Okay.

4                   THE WITNESS:  I'm not sure when

5   the decision was made to grant her work space closer

6   to the restroom, but we supported it.

7                   BY MS. BOLLINI:

8       Q    Were you involved at all in responding

9   to Ms. Pridgen's request for a work space closer to

10  the bathroom?

11                  MR. FAMUYIWA:  Objection.  Asked

12  and answered.

13                  THE WITNESS:  I'm with him on this

14  one.

15                  BY MS. BOLLINI:

16      Q    Okay.  I don't know if you were

17  involved at all in responding to that request.

18      A    We supported it.  I -- you know, HR and

19  MOD got involved in the specifics.  We granted the

20  request.

21      Q    But I wanted to know you, as deputy

22  controller or whatever role you were playing, did you
```

1  have any input into responding to Ms. Pridgen's

2  request to have a work space closer to the bathroom?

3                    MR. FAMUYIWA:  Objection.  Asked

4  and answered.  Do you want him to explain what he

5  means when he says "we supported it"?  Is that what

6  you want him to explain?

7                    MS. BOLLINI:  My original question

8  actually stands.

9                    MR. FAMUYIWA:  Okay.  Objection.

10  Asked and answered.

11                    THE WITNESS:  I'm having trouble

12  following it.

13                    BY MS. BOLLINI:

14          Q    Sure.

15          A    Again, we granted the request.  I am

16  not sure what you're asking beyond that.

17          Q    Sure.

18                    Did anybody ever ask you whether or not

19  the agency should grant that request?

20          A    I believe that HR recommended that we

21  grant the request, and we accepted the recommendation.

22          Q    When you say "we," who are you

1    referring to?

2           A    I believe it was myself, perhaps the

3    branch chief.

4           Q    And would that be Karen Lee?

5           A    Yes.

6           Q    And did you have the authority to deny

7    the request for -- Ms. Pridgen's request for a work

8    space closer to the bathroom?

9           A    I'm not sure, quite frankly.  Again, on

10   issues like that, I would defer to HR and the

11   management and operations division.

12          Q    I'd like to go back to Ms. Pridgen's

13   request for a quieter work space.

14                 How did that request come to your

15   attention?

16          A    I believe I was informed by either

17   Karen Lee and/or Lauren Wright.

18          Q    What does -- what was the first

19   discussion, if any, you had with Karen Lee,

20   Lauren Wright or anyone after you first learned about

21   Ms. Pridgen's request for a quieter work space?

22          A    I think it came down to how do you balance

1    multiple requests, where first there was a request to

2    be near the restroom, but then there was also a

3    request to have quiet, individual space.  And our

4    options -- or if you look at the footprint of the New

5    Executive Office Building on the sixth floor, the

6    options are quite limited.

7            Q    What discussions did you have with

8    anyone about how to balance those multiple requests

9    for Ms. Pridgen?

10           A    From what I recall, I think the

11   conversation focused on making sure that the employee

12   had an environment in which she could succeed.

13   Ultimately the decision was made to retrofit another

14   space to be able to accommodate the employee.  I don't

15   believe a space was being used as office space before,

16   maybe it was a conference room or something.  I don't

17   remember the specifics.  But there was a significant

18   effort made on the part of OMB to accommodate the

19   employee.  But it wasn't easy in terms of mechanics of

20   having to do that -- of doing that.

21           Q    I'd like to go back to the issue of the

22   agency's question of whether Ms. Pridgen's request for

1    a quieter work space was a legitimate request for an

2    accommodation.

3              You mentioned that the agency had to

4    consider how other employees were able to function in

5    the same space; is that accurate?

6         A    Uh-huh.

7         Q    Can you explain what you mean by that?

8         A    There were other employees in that

9    suite.

10        Q    And is this the suite that Ms. Pridgen

11   did not find to be quiet enough?  Is that your

12   understanding?

13        A    Yes.

14        Q    How did the agency consider whether

15   other employees were able to -- or how did the agency

16   determine whether other employees were able to

17   function in the same space?

18        A    I think it was looking to see if there

19   were similar complaints from other employees.

20        Q    How did the agency determine whether

21   there were similar complaints from other employees in

22   the same work space?

1          A    I think that they would have heard from

2    their supervisors.

3          Q    Do you know whether there were similar

4    complaints from other employees in the same work

5    space?

6          A    I do not believe that was the case.

7          Q    And why was it relevant to the agency

8    whether other employees in the same work space had

9    lodged similar complaints?  I mean, how was it

10   relevant to the agency's determination of whether

11   Ms. Pridgen's request for quieter work space was

12   legitimate?

13         A    If we were hearing from multiple

14   employees that there was a problem in that suite, that

15   would have reinforced the request, the legitimacy of

16   the request.

17         Q    Are you aware of what job duties the

18   other employees in the -- in that work space

19   performed?

20         A    I believe they were in the budget

21   review division of OMB.

22         Q    Do you know whether those were GS-15

1    employees?

2              A    I do not know their grade level.

3              Q    Are you aware of what type of work

4    space Ms. Pridgen worked in prior to her being in the

5    shared work space that was not quiet enough for her?

6              A    I don't know the specifics of what

7    office Ms. Pridgen occupied.  I am familiar in general

8    in terms of OFFM employees and the office space that

9    they occupy.

10             Q    And can you describe what type of

11   office space other GS-15 policy analysts in OFFM

12   worked in?

13             A    I believe it either would be single

14   offices or shared space, particularly if they were on

15   detail, but if the request was to have proximity to

16   the restroom, then that suite was what was available

17   in terms of work space.

18             Q    Did Ms. Pridgen ever identify any

19   alternative work space that she thought would have

20   been appropriate as a reasonable accommodation when

21   she was seeking a quieter work space?

22             A    She may have.

1          Q    Are you aware of any?

2          A    Not aware of a lot of the specifics,

3     but she may have identified other potential space.

4          Q    Other than considering how other

5     employees were able to function in that shared work

6     space, what else, if anything, are you aware of the

7     agency having done to determine whether Ms. Pridgen's

8     request for a quieter work space was a legitimate

9     request for reasonable accommodation?

10          A    Can you repeat that?

11          Q    Sure.

12               MS. BOLLINI:  Could you read that

13     back, please.

14               (The record was read as requested.)

15               THE WITNESS:  I think it comes

16     back to what I said before, and that is you had

17     multiple requests for accommodation, and one of which

18     is proximity to the restroom, and that limited your

19     options in terms of what you would be able to do.

20               BY MS. BOLLINI:

21          Q    I'd like to go back to the question of

22     legitimacy of request for a reasonable accommodation.

1          Can you describe to me what -- why

2    there was a question of whether Ms. Pridgen's request

3    for a quieter work space was a legitimate request or

4    not?

5          A    I think any time you get a request you

6    have to do your due diligence to understand whether

7    it's a legitimate request regardless of who's posing

8    that request.

9          Q    Were there any reasons that you -- that

10   you're aware of that the agency thought the --

11   Ms. Pridgen's request was not a legitimate request for

12   a reasonable accommodation?

13          MR. FAMUYIWA:  Objection.  You're

14   mischaracterizing the statement of the witness.

15          BY MS. BOLLINI:

16          Q    You may answer.

17          A    Again, as I said before, any time you

18   get a request for an accommodation, it's the

19   responsibility of management to make sure it's a

20   reasonable request.

21          Q    Sure.

22          A    And that there is a need.

```
1              Q     Did anyone ever discuss with you -- or

2   did anyone ever tell you that they thought

3   Ms. Pridgen's request for a quieter work space was not

4   a legitimate request for reasonable accommodation?

5              A     I'm not sure I understandthe question.

6   Can you rephrase it, please?

7              Q     I don't know that I can rephrase it.

8                    MS. BOLLINI:  Could you read that,

9   please.

10                   (The record was read as requested.).

11                   BY MS. BOLLINI:

12             Q     I can rephrase it just by saying did

13  anyone ever tell you they thought Ms. Pridgen's

14  request for a quieter work space was not a legitimate

15  request for a reasonable accommodation?

16             A     I think there was a concern about the

17  multitude of requests.

18             Q     Who had that concern?

19             A     I believe that HR had that concern.

20             Q     Anyone else?

21             A     I believe that within OFFM, we also had

22  that same observation about the multitude of requests.
```

1          Q    Who, if anyone, in -- who, if anyone,

2    in HR told you that they had a concern about

3    Ms. Pridgen having submitted multiple requests for a

4    reasonable accommodation?

5          A    I think in conversations with

6    Lauren Wright.

7          Q    Anyone else?

8          A    I believe that's where the primary

9    conversations were.

10          Q    You said we and OFFM also had concerns.

11              Can you explain who "we" is?

12          A    Ms. Lee had concerns about the

13    multitude of requests, as did I.

14          Q    What discussions, if any, did you have

15    with Ms. Lee about the -- about the multitude of

16    requests that Ms. Pridgen submitted for reasonable

17    accommodation?

18          A    I think we wanted to make sure at the

19    end of the day that we had given the employee every

20    opportunity to succeed, and that includes the physical

21    work environment.

22          Q    What conversations, if any, did you

1    have with Ms. Lee about the multitude of requests that

2    Ms. Pridgen had submitted?

3            A    I think there was -- again, just an

4    observation that there seemed to be so many requests

5    coming from one individual.  But at the end of the

6    day, we wanted to make sure that all of the employees,

7    including this individual, had a work environment

8    where they could succeed.

9            Q    What concerns, if any, did you have

10   about the number of requests of -- that Ms. Pridgen

11   had submitted for reasonable accommodation?

12           A    I guess what I observed was that the

13   Office of Management and Budget was going to great

14   lengths to accommodate these requests, and there

15   seemed to be more and more requests.

16           Q    And how, if at all, was it a problem

17   that there were more and more requests?

18           A    You would want to make sure that you

19   treat all of your employees the same way, and that all

20   of the employees have an opportunity to succeed.

21   These requests seemed to be excuses for not meeting

22   performance expectations.

1          Q    Which of Ms. Pridgen's requests for

2    reasonable accommodations seemed to be excuses for not

3    meeting performance expectations?

4          A    I would say the quietness of the work

5    space.  I know that that was identified as a reason

6    for not being able to perform.  I know that there were

7    issues related to Dragon Speak or the ability to type

8    as also hindering performance.  And again, what we

9    wanted to be able to do was, is if there were issues

10    being identified, we wanted to resolve those issues.

11                    THE WITNESS:  Can we take a break?

12                    MR. FAMUYIWA:  Sure.

13                    MS. BOLLINI:  That's fine.

14              (A brief recess was taken.)

15              BY MS. BOLLINI:

16          Q    At any time during your tenure at OMB,

17    did you discuss with anyone any concerns that

18    Ms. Pridgen may harm any agency employees?

19                    MR. FAMUYIWA:  Can you repeat

20    that?  Agency harm?

21                    MS. BOLLINI:  Yes.

22                    MR. FAMUYIWA:  Objection.

```
 1                    THE WITNESS:  The conversation
 2   around threat focused on the original threats that
 3   were made and that were evaluated by the Secret
 4   Service.
 5                    BY MS. BOLLINI:
 6          Q     At any time after Ms. Pridgen returned
 7   from administrative leave, did you ever discuss with
 8   any agency employee any concerns that Ms. Pridgen may
 9   harm anyone at the agency?
10          A     No, I don't believe so.
11          Q     Okay.
12          A     But I do know that when we were
13   considering taking a personnel action, we wanted to
14   make sure that there was no potential for any
15   incident.
16          Q     And what personnel action are you
17   referring to?
18          A     I think after we had gone through the
19   performance period, after we had gone through the PIP
20   period, when it became clearer that there would be a
21   removal from the position, we wanted to make sure that
22   when the employee was notified, that there would be no
```

1    potential for incident.

2            Q    With whom did you discuss that

3    potential for an incident when notifying Ms. Pridgen

4    of her removal?

5            A    I don't think there was a lot of

6    conversation.  I think it would have been with HR.

7    And again, I think that is a standard issue that you

8    consider any time you take a personnel action.

9            Q    Had you ever discussed that issue at

10    any point in any of the federal positions that you've

11    held, potential that an employee may harm any agency

12    employee upon learning of a personnel action?

13            A    Yeah.  Again, in the course of HR, any

14    time you're taking a potential action, you want to

15    kind of consider the reaction of the employee.  And

16    again, it's something that often comes into the

17    conversation regardless of who the employee is.

18            Q    So you've had a similar conversation --

19            A    In the District of Columbia.

20            Q    -- at any other time?

21            A    For example, in the District of

22    Columbia.

1          Q    What was the substance of the

2    conversation with HR on potential that Ms. Pridgen may

3    harm an agency employee upon learning of a personnel

4    action?

5          A    Again, I don't want to characterize it

6    as that.  I think it's just part of a standard

7    conversation in terms of any employee, what would

8    their reaction be and how do you -- you know, how

9    would you react if there were an incident.  So it

10   really is more kind of just preparing for potential

11   reaction as opposed to assuming that there would be

12   one.

13         Q    What preparations, if any, did you

14   discuss with HR for a potential reaction for

15   Ms. Pridgen?

16         A    From what I recall, and I don't recall

17   a lot of specifics, I think it was just a notification

18   of security that there would be a discussion with the

19   employee.

20         Q    I'd like to go back to Ms. Pridgen's

21   request for a reasonable accommodation.

22              At any time during your tenure with

1    OMB, did you discuss with HR or any other managers

2    whether any request submitted by any other employees

3    for reasonable accommodation were legitimate?

4            A    I'm not sure that we saw a lot of other

5    requests.

6            Q    Do you recall -- without identifying

7    specifics, do you recall having considered any

8    requests from any employees other than Ms. Pridgen

9    while you were at OMB?

10           A    I don't remember a lot of other

11   requests.  I'm just racking my brain trying to think

12   of some examples.  And I know that there was a person

13   on detail who brought a special chair, for example.

14   I'm trying to think if there were others beyond that.

15           Q    When, if ever, did you have to provide

16   any information to the agency's EEO office in relation

17   to any of Ms. Pridgen's EEO complaints?

18           A    Whether I had to personally?

19           Q    Yes.

20           A    I don't believe I ever handled that

21   directly.

22           Q    Other than the discussions you had with

1    the -- Lauren Wright prior to Ms. Pridgen returning to

2    the agency after administrative -- or yeah, returning

3    from administrative leave to the agency.  So other

4    than any discussions you had with Ms. Wright about

5    Ms. Pridgen's EEO complaints, did you ever have any

6    other discussions with any agency employees about

7    Ms. Pridgen's EEO complaints?

8              A    I think it was largely with

9    Lauren Wright.  It may have come up in a conversation

10   with Karen Lee, but it was -- my conversations with

11   Karen Lee really were focused more in terms of the

12   current workload.  So I think those conversations

13   about prior EEO complaints came up in the context of

14   discussions with Lauren Wright.  And then, you know, I

15   believe that counsel was also involved in those

16   discussions or some of them.

17             Q    After Ms. Pridgen returned to the

18   agency from administrative leave, did you have any

19   conversations with Ms. Wright, or can you describe any

20   conversations you had with Ms. Wright about

21   Ms. Pridgen's EEO activity?  And again, without -- any

22   conversations without the involvement of counsel.

```
 1              A    I'm sorry say that -- go through that

 2    one again.

 3              Q    Okay.  So talking about the time

 4    period, of course after Ms. Pridgen's back from

 5    administrative leave.  You mentioned that you had some

 6    conversations with Ms. Wright about Ms. Pridgen's EEO

 7    activity?

 8              A    Prior EEO complaints, yes.

 9              Q    Prior EEO activity, okay.

10              And you said that some of those

11    counsel -- counsel was involved in some of those

12    conversations you had with Ms. Wright; is that

13    correct?

14              A    Yes.  I just want to make sure I

15    understand your question in terms of -- the

16    conversations went beyond just -- in those

17    conversations where Lauren was sharing information on

18    EEO complaints, it was a broader conversation.  It

19    wasn't just, okay, let's talk about this EEO thing.  I

20    think it was part of a broader conversation.

21              Q    I'd like to talk to you about those

22    broader conversations you had, if any, without
```

1    counsel.

2              A    Without counsel?

3              Q    Right.

4              A    Most of them had counsel in them.

5              Q    Do you recall if any did not?

6              A    About the EEO complaint or about other

7    stuff?

8              Q    I'd like to focus first on any that --

9    in which the EEO complaint was discussed.

10             A    I don't think there were a lot of

11   conversations about the EEO complaint.  Again, I think

12   part of it was just kind of reading me into what had

13   taken place before I took the position.  But beyond

14   that, I don't think there were a lot of conversations.

15             Q    Are you aware of whether Ms. Pridgen

16   requested a telework arrangement as a reasonable

17   accommodation?

18             A    When would that have been?

19             Q    I can't give you a date.  I just don't

20   know.

21                  Were you aware of any request?

22                      MR. FAMUYIWA:  Objection.  Vague.

1    Maybe you can clarify the time frame.

2                    THE WITNESS:  Can you clarify the

3    time?

4                BY MS. BOLLINI:

5        Q    I can't.  I just want to know if you're

6    aware of Ms. Pridgen having requested any during your

7    tenure.

8        A    She may have.

9        Q    Are you aware of whether Ms. Pridgen

10   requested a flexible work schedule or alternative work

11   schedule at any time during your tenure?

12       A    Again, she may have.

13       Q    Just to clarify, were you involved --

14   do you recall having been involved in any way in

15   responding to a request from Ms. Pridgen for a

16   flexible work schedule as a reasonable accommodation?

17       A    Can you repeat the question?

18       Q    Sure.

19                    MS. BOLLINI:  Could you read that

20   back, please.

21                    (The record was read as requested.).

22                    THE WITNESS:  She may have.  She

1    may have requested it.

2                      In terms of my involvement, I

3    would, first and foremost, defer to a recommendation

4    from the supervisor.  And again, I'm not recalling a

5    lot of the conversation around this, but it would be

6    based on what the supervisor would be recommending,

7    and then the conversation would go from there.

8                      BY MS. BOLLINI:

9            Q    Are you familiar with FAPIIS?  That's

10   F-A-P-I-I-S.

11           A    Yes.  I have some recollection of

12   FAPIIS.

13           Q    Are you aware of Ms. Pridgen having

14   voiced concerns at any time about OMB failing to

15   implement the FAPIIS rule as statutorily required by

16   the National Defense Authorization Act?

17           A    I remember conversations with Karen Lee

18   about the need to implement FAPIIS.

19           Q    When did you have those conversations

20   with Ms. Lee about the need to implement FAPIIS?

21           A    It was sometime during my tenure.  I

22   can't remember the exact month or day.

1          Q    Are you aware of whether OMB

2    implemented the FAPIIS fraud disclosure rule prior to

3    the end of your tenure?

4          A    I'm not sure it was implemented.  I

5    know that there was a movement afoot to implement

6    it.  I know that Ms. Lee wanted to see it implemented.

7          Q    Did Ms. Lee ever discuss with you

8    Ms. Pridgen having voiced concerns to her that OMB had

9    not yet implemented FAPIIS?

10          A    No.  I think the conversation that I

11    had with Ms. Lee was about Ms. Pridgen's lack of

12    coordination with other employees in order to

13    implement FAPIIS.

14          Q    Did Ms. Lee ever tell you that

15    Ms. Pridgen had reported to any outside agencies any

16    concerns that OMB had failed to implement FAPIIS?

17          A    I don't remember.  I don't recall that

18    discussion.  Again, the conversations that we had with

19    Karen Lee were about how Ms. Pridgen was not

20    coordinating with other parts of OMB on supporting the

21    implementation.

22          Q    Did Ms. -- did Ms. Lee ever discuss

1    with you Ms. Pridgen having reported to the IG that

2    the OMB had failed to implement FAPIIS?

3            A    I don't recall that conversation.

4            Q    During your tenure, did -- are you

5    aware of any pressure from any outside agencies or

6    entities for OMB to implement FAPIIS?

7            A    I think we understood that there was a

8    need to implement FAPIIS, and the question is, you

9    know, again it comes back to how well we were

10   coordinating or how well Ms. Pridgen was coordinating

11   with her colleagues within OMB.

12           Q    Are you aware of when the statutory

13   requirement for implementation of FAPIIS came into

14   effect?

15           A    I'm not aware of the specific statutory

16   deadline, but from what I understand, it was very time

17   sensitive, and there was a need to implement it sooner

18   rather than later.

19           Q    Are you aware that the statutory

20   requirement came into effect -- or the statutory

21   requirement to implement FAPIIS came into effect in

22   2010?

1            A    That seems to be from -- you know, that

2    would seem to be correct.

3            Q    When, if ever, did you discuss with --

4    or let me rephrase that.

5                What discussions, if any, did you have

6    with Ms. Lee as to why the OMB had not implemented

7    FAPIIS between 2010 and the end of your tenure?

8                    MR. FAMUYIWA:  Objection.  Lack of

9    foundation.

10                    BY MS. BOLLINI:

11           Q    You can answer.

12           A    Can you rephrase the question?

13           Q    Sure.

14               I just wanted to know if you and

15    Ms. Lee ever discussed why the agency had not

16    implemented FAPIIS.  Let me rephrase that.

17               Other than any discussions relating to

18    Ms. Pridgen's role in the implementation of FAPIIS,

19    did you have any discussions with Ms. Lee about other

20    reasons that the agency had not implemented FAPIIS?

21           A    I think there was less discussion about

22    what may have happened in the past and more discussion

1    about the need to implement now.

2            Q    Are you familiar with implement grants

3    reform?

4            A    Yes.

5            Q    When, if ever, did you learn that

6    Ms. Pridgen had contacted the GAO regarding OMB's

7    issues with implement grants reform?

8            A    I'm not sure that I knew until right

9    now.  I know that there was some discussion about

10   training in workforce development, but I did not know

11   that Ms. Pridgen had contacted GAO about the larger

12   grants management reform effort.

13           Q    Did Ms. Lee ever discuss with you any

14   concerns that Ms. Pridgen's communications with

15   outside agencies or entities were inappropriate in any

16   way?

17           A    I don't believe so.  I think there was

18   a concern about maybe a lack of communication with

19   outside entities, particularly as it related to the

20   workforce development effort and the spending

21   transparency effort.

22                   I don't recall conversations in terms

1    of a lot of inappropriate contact.

2              Q    Do you recall any discussions with

3    Ms. Pridgen having inappropriate contact with outside

4    agencies or entities?

5              A    I honestly don't recall.

6              Q    Are you aware of Ms. Pridgen having

7    objected to any aspect of the performance plan that

8    the agency established for her when she returned from

9    administrative leave?

10             A    I know that she did not sign it.

11             Q    What's your understanding as to why she

12   did not sign it?

13             A    I can't speculate in terms of what she

14   may have been thinking.

15             Q    Did Ms. Lee give you any information

16   about any objections Ms. Pridgen had to the 90-day

17   performance plan?

18             A    I think Ms. Lee may have characterized

19   some discussions with Ms. Pridgen about the nature of

20   the deliverables and the timing.

21             Q    What do you mean by characterized

22   discussions?

1          A      She may have shared some concerns that

2     Marguerite may have shared with her.

3          Q      And what were those concerns?

4          A      I think as I said before, it really is

5     the nature of the deliverables and the timing.

6     Perhaps, in Marguerite's eyes, being unreasonable, but

7     in OMB's eyes and having gone through review with HR,

8     being deemed reasonable given what you would expect in

9     other GS-15 employees.

10         Q      Did you play any part in determining

11    whether or not the nature of deliverables and the

12    timing for those deliverables in Ms. Pridgen's 90-day

13    performance plan were reasonable?

14         A      My focus was on maintaining making sure

15    that Karen was engaging with HR on this to make sure

16    that we're being consistent across all of the

17    employees, and to make sure that the performance

18    expectations being set were reasonable for someone

19    working at the GS-15 level.

20         Q      How, if at all, did you determine

21    whether performance expectations that were set were

22    reasonable for someone performing at the GS-15 level?

1        A     That's where you rely upon HR to help

2   provide counsel and guidance on this.

3        Q     Did you provide input into any

4   discussions on whether the performance expectations

5   set for Ms. Pridgen were reasonable for a GS-15?

6        A     I would rely largely upon others to do

7   that, folks that have a far more understanding in

8   terms of what you would expect of a GS-15.  Again,

9   that's where you rely upon HR.  So I would rely upon

10  the branch chief, rely upon HR.  The branch chief

11  makes a determination of workload relative to other

12  employees working at that level, and then HR also

13  weighs in on that discussion.

14       Q     Do you know who in HR was involved in

15  that discussion?

16       A     Probably Lauren Wright and Felica -- I

17  forget her -- Peoples.  I know that they were involved

18  in working with Karen on this.

19       Q     When was the first time that you

20  discussed with Karen Lee Ms. Pridgen's performance?

21       A     I think it was during the course of the

22  initial performance plan that had been set and how

1    Ms. Pridgen was doing in terms of executing against

2    that plan.

3              Q    What did Ms. Lee tell you about how

4    Ms. Pridgen was doing?

5              A    I think it was a fairly unfavorable

6    assessment based on what she was seeing along the way.

7              Q    What, in particular, did Ms. Lee assess

8    unfavorably with respect to Ms. Pridgen's performance

9    during the initial performance plan?

10             A    I think there was some concern about

11   timeliness of work product; I think there was some

12   concern about participation in meetings or lack of

13   participation in meetings; and I think there may have

14   been some concern about quality of the work product.

15   And whether that was during the initial period or

16   during the subsequent period, I'm not sure exactly

17   when, but I think in general those were the concerns

18   that were being shared with me.

19             Q    Did you solicit Ms. Lee's assessment of

20   Ms. Pridgen's work the first time she talked to you

21   about these issues?

22             A    What do you mean by that?

1            Q    Sure.

2                 I'm just trying to understand, you

3    know, why Ms. Lee came to you or why Ms. Lee shared

4    with you her assessment.

5            A    If you've got an employee who's not

6    performing, I think it's incumbent upon the supervisor

7    to say something.

8            Q    And how, if at all, did you get

9    involved in addressing any of Ms. Lee's concerns about

10   Ms. Pridgen's performance during that initial 90-day

11   performance planning period?

12           A    Can you repeat the question?  I'm not

13   sure I'm following.

14           Q    Sure.

15                How, if at all, were you involved in

16   addressing any of Ms. Lee's concerns about

17   Ms. Pridgen's performance?

18           A    What do you mean by "addressing"?

19           Q    Did you do anything in any way in

20   response to Ms. Lee's stated concerns?

21           A    I think the first piece of guidance was

22   to work with HR on this.  If Karen were seeing issues

1   in terms of Ms. Pridgen's performance, what guidance

2   and counsel would HR have on this question.

3           Q    And did you directly provide Ms. Lee

4   with any guidance as to how to address any concerns

5   she had about Ms. Pridgen's performance during that

6   initial performance plan?

7           A    I think the larger guidance I had was

8   to make sure that we're following proper HR policy and

9   protocol and procedure.

10          Q    Were you aware of Ms. Lee and

11  Ms. Pridgen having had any difficulties in

12  communicating?

13          A    Yes.  And I understand that we had

14  asked Felica from HR to participate in the weekly

15  meetings in order to help facilitate communication.

16          Q    When did it first come to your

17  attention that Ms. Lee and Ms. Pridgen were having

18  difficulties communicating?

19          A    I think a couple months after

20  Ms. Pridgen came back to OMB.  I don't recall the

21  exact timing, but ...

22          Q    And how did it come to your attention?

```
    1              A    I think there were differences in terms

    2    of what was being said or that were being reported

    3    that were coming to my attention.  And in

    4    conversations with HR, it seemed that the best

    5    approach would be to have a third party in the

    6    discussions and -- the regular discussions between

    7    Ms. Lee and Ms. Pridgen.

    8              Q    Can you explain what you mean by

    9    differences in what was being said?

   10              A    I think Ms. Pridgen would have

   11    characterized situations one way, and Ms. Lee would

   12    have characterized them another way.

   13              Q    What types of situations are you

   14    referring to?

   15              A    I think conversations about

   16    expectations and the plan ahead and next steps and the

   17    timing of what and when.

   18              Q    Just to clarify my earlier question.

   19                   How did it come to your attention that

   20    there were differences in what was being said?  What

   21    evidence -- did Ms. Lee complain to you?  Were you

   22    copied on communications?
```

1            A    I think I may have been copied on

2    communications.  Ms. Lee may have also shared some of

3    the discussions as well.

4            Q    I'd like to talk to you about your

5    interaction with Ms. Lee, your role as -- in any

6    position that you held.  I know that you changed from

7    deputy controller to interim and acting.

8                 How frequently did you meet with

9    Ms. Lee in the course of your work at OMB?

10           A    There were regular team meetings on

11   different issues, but then I would have one-on-ones

12   with each of my branch chiefs.  I tried to get onto a

13   weekly cadence.  Sometimes we didn't quite stick to

14   that.  And then we would have OFFM leadership meetings

15   where it would be myself, the two branch chiefs and

16   the senior advisor.

17           Q    You mentioned team meetings first.

18                Can you tell me who was part of the

19   team?

20           A    Like if there was a specific issue

21   we're talking about, whether it's grants reform or

22   improper payments or real property, we would have the

1    team who was working that issue sit down with me to

2    discuss the issue at hand or latest status on project

3    activity.

4             Q    Did Ms. Lee ever tell you that she was

5    angry about anything that Ms. Pridgen had done?

6             A    I think there was a sense of

7    frustration at times in terms of what she deemed --

8    what she saw as lack of performance.

9             Q    Did Ms. Lee ever voice any frustration

10   to you about Ms. Pridgen having submitted a request

11   for reasonable accommodation?

12            A    Can you repeat the question?

13            Q    Sure.

14            Did Ms. Lee ever voice to you any

15   frustration about Ms. Pridgen having submitted

16   requests for reasonable accommodation?

17            A    I think there was a concern that the

18   multitude of requests were being used as reasons not

19   to meet performance expectations.

20            Q    Did Ms. Lee ever voice to you any

21   concerns about Ms. Pridgen's conduct?

22            A    I think there was an HR process

1  question where a letter of reprimand was being

2  considered, and I wanted to make sure that we were

3  being clear in terms of performance versus conduct.

4  And from what I recall, there was no letter of

5  reprimand because we were not seeing any issues of

6  conduct that merited a letter of reprimand.

7         Q    Did Ms. Lee ever voice to you any

8  concerns about any issues of conduct?

9         A    I think there were -- there were

10  questions about attendance.  I'm not sure if that

11  falls into a conduct issue.  I know that there were

12  significant concerns about attendance and being on

13  time for meetings.

14         Q    Did Ms. Lee ever discuss with you

15  taking any action to address any concerns about Ms. --

16  any concerns she had about Ms. Pridgen's conduct?

17                MR. FAMUYIWA:  Objection.  Asked

18  and answered.

19                BY MS. BOLLINI:

20         Q    You may --

21         A    I don't think we were seeing any

22  conduct issues that merited management action.

1          Q    But did Ms. Lee ever bring to you a

2    question about whether to take any management action

3    based on Ms. Pridgen's conduct?

4                    MR. FAMUYIWA:  Objection.  Asked

5    and answered.

6                    THE WITNESS:  I'm with him on

7    this.  I've answered the question.

8                    BY MS. BOLLINI:

9          Q    No.  No.  I just -- I don't know

10   whether she ever asked you whether --

11         A    I explained before that there was a

12   question about a potential letter of reprimand, and I

13   wanted to make sure we were distinguishing between

14   conduct and performance.  And I think after that

15   clarification, Ms. Lee understood that we weren't

16   seeing conduct issues, we were seeing performance

17   issues that merited action.

18         Q    Sure.

19              And I'm just -- I mean, you talked

20   about conduct issues that merited action.  So I'm

21   wondering whether there were any other conduct issues

22   other than, you know, you mentioned be on time for

1    meetings.  Did you ever discuss whether anything

2    merited action?

3                    MR. FAMUYIWA:  Well, objection.

4    You said that he said that there was conduct issues

5    that merited action.  He never said that.  So I just

6    object on that point.

7                    MS. BOLLINI:  Sure.

8                    BY MS. BOLLINI:

9         Q    I'm wondering whether there were any

10   that you discussed.

11        A    Were there -- can you rephrase your

12   question?

13        Q    Sure.

14             Did you ever discuss whether any

15   conduct issues Ms. Lee identified merited any

16   management action?

17        A    How would you characterize conduct

18   action or issues?

19        Q    Let me ask you that question.  How

20   would you characterize a conduct action?

21        A    But what do you mean when you're posing

22   it?

```
 1                    MR. FAMUYIWA:  Objection.  You've

 2    mischaracterized the witness's statement, and it's

 3    already asked and answered.

 4                    MS. BOLLINI:  I'm not sure which

 5    question you're objecting to at this point.

 6                    MR. FAMUYIWA:  I can explain it.

 7                    You said that he said that -- you

 8    said that he said that Ms. Karen Lee said that there

 9    were conduct issues.  He did not say that.  So to that

10    extent, I'm objecting because you're mischaracterizing

11    what he said with respect to what Ms. Karen said.  And

12    the second part of the objection is asked and

13    answered.

14                    BY MS. BOLLINI:

15          Q    Just to clarify, did you, at any time,

16    consider whether Ms. Pridgen's attendance was a

17    conduct issue that warranted any management action?

18          A    We had concerns about her poor

19    attendance.  We did not feel that it warranted action.

20          Q    And just one more piece of that since

21    counsel has raised this objection.

22                    Did you consider Ms. -- the allegations
```

1    that Ms. Pridgen was not on time for meetings to be a

2    conduct issue?

3            A    Can you rephrase that?

4            Q    Sure.

5                 Is attendance a conduct issue based on

6    your understanding?

7            A    It's not my place to say.

8            Q    Okay.  Did you ever seek counsel from

9    anybody about whether Ms. Pridgen's attendance was a

10   conduct issue?

11           A    As I said before, we had concerns about

12   her attendance, but we didn't feel that it warranted

13   management action.

14           Q    And when you say "we," you are

15   referring to yourself and Ms. Lee; is that correct?

16           A    No.  I think HR was also involved in that

17   discussion.

18           Q    And did HR ever identify attendance as

19   a conduct issue?

20           A    I don't recall the specifics in terms

21   of what labels we were putting on everything.  But as

22   I said before, we didn't feel that it warranted

1  extreme management action.

2          Q    Did you feel that it warranted any

3  management action?

4                    MR. FAMUYIWA:  Objection.  Asked

5  and answered.

6                    THE WITNESS:  I think I've already

7  answered the question.

8                    BY MS. BOLLINI:

9          Q    You said "extreme management action,"

10  so I wanted to clarify whether there's some management

11  action.

12          A    Let's just say management action.

13          Q    Okay.  Did you ever review any of

14  Ms. Pridgen's work product?

15          A    I had an opportunity see the work

16  products of her as well as other employees within

17  OFFM.

18          Q    Did you find that any of -- any of

19  Ms. Pridgen's work product was acceptable?

20          A    Any of the work product?

21          Q    Yes.

22          A    Let me understand the question, because

1   I'm not sure I'm following the question.

2                   MR. FAMUYIWA:  Objection.  Vague.

3              BY MS. BOLLINI:

4        Q    Of the work product you saw that

5   Ms. Pridgen completed, did you find any of it to be

6   acceptable based on your standards?

7        A    I would say that in reviewing and

8   seeing Ms. Pridgen's work product relative to the work

9   product of other employees within OFFM, I had concerns

10  about the quality of what was being submitted.

11       Q    Did you find any of her work product to

12  be acceptable?

13                  MR. FAMUYIWA:  The agency will

14  object.  I think the -- I do understand the question.

15  I do think it's overly complex because you're

16  requiring him to take a work product that covers a

17  long period of time.  Maybe you could break it up.

18                  MS. BOLLINI:  I can't.

19                  MR. FAMUYIWA:  Okay.

20                  MS. BOLLINI:  I'm just asking to

21  identify.

22                  MR. FAMUYIWA:  Okay.  So objection

1    over the complex then.

2                        MS. BOLLINI:  Never heard of that

3    objection before.

4                        MR. FAMUYIWA:  There's a first

5    time for everything.

6                        THE WITNESS:  What's the question

7    on the table?

8                        BY MS. BOLLINI:

9            Q    Of the -- of Ms. Pridgen's work product

10    that you saw, did you find any of it acceptable?

11            A    I would say that with all employees,

12    there are examples of what would be considered good

13    work product.  With Ms. Pridgen, my concern was that

14    the work product was not at the level of a GS-15

15    employee.

16            Q    Is that -- did you see any of

17    Ms. Pridgen's work product that you believe -- or of

18    the work product of Ms. Pridgen that you did see, was

19    any of it at a GS-15 level?

20            A    I would say that there are probably

21    some examples where the work product was at a GS-15

22    level, and I think that's reflected in Ms. Lee's

1    year-end assessment of Ms. Pridgen's performance.  But

2    there were many more examples of work product that was

3    not acceptable at a GS-15 level.

4             Q    What, in particular, did you see that

5    made -- that led you to believe that Ms. Pridgen's

6    work was not at a GS-15 level?

7             A    I would say the work that she did in

8    terms of the grants training repository and the work

9    that she did within -- you know, the overall question

10   of grants workforce training and development, it did

11   not reflect a thoughtful and strategic approach.  It

12   seemed to be, in some instances, I would say scattered

13   and not very well focused or sequenced in terms of the

14   specific activities and what problems they were trying

15   to address.

16             So, for example, there was a need --

17   she had proposed a -- an approach where we would ask

18   each agency to identify the number of people it had

19   working in grants management.  And I had asked the

20   question in terms of what value comes from just having

21   a number or a count.  And I don't think there was a

22   good, coherent answers in terms of what the utility of

1    that information was.

2                    Q    Can you recall any other examples of --

3    that you believe showed Ms. Pridgen was not performing

4    work at a GS-15 level?

5                    A    I think there was an inability to

6    produce deliverables timely, and I think there was

7    some examples that Ms. Lee has articulated in

8    Ms. Pridgen's year-end evaluation.  I think it was the

9    quality of the work and the timeliness of the work or

10   the lack thereof.

11                   Q    Did you ever identify to Ms. Lee any

12   specific concerns that you had about Ms. Pridgen's

13   work?

14                   A    I think there was feedback what I

15   provided.  We talked about some of the team briefings

16   before.  I think I shared some feedback in terms of --

17   it may have been on the grants workforce development

18   strategy and my observations in terms of a lack of

19   cohesiveness among the different elements.

20                   Q    Do you know approximately when you

21   identified that concern to Ms. Lee?

22                   A    I don't remember the specifics in terms

1    of the date.

2              Q    Do you know when during the, let's call

3    it the life of that project, you identified those

4    concerns?  In other words, were you reviewing

5    something that had been identified to you as a final

6    draft, or was it --

7              A    I don't remember the state in terms of

8    draft or final draft.

9                   MS. BOLLINI:  Why don't we stop

10   right now.

11                  MR. FAMUYIWA:  Okay.

12                  (Signature having been waived, the

13   deposition of NORMAN DONG was adjourned at 5:17 p.m.)

14

15

16

17

18

19

20

21

22

```
 1              CERTIFICATE OF NOTARY PUBLIC

 2

 3              I, Stephanie M. Marks, the officer before

 4    whom the foregoing deposition was taken, do hereby

 5    certify that the witness whose testimony appears in

 6    the foregoing deposition was duly sworn by me; that

 7    the testimony of said witness was taken by me in

 8    stenotype and thereafter reduced to typewriting under

 9    my direction; that said deposition is a true record

10    of the testimony given by said witness; that I am

11    neither counsel for, related to, nor employed by any

12    of the parties to the action in which this deposition

13    was taken; and, further, that I am not a relative or

14    employee of any attorney or counsel employed by the

15    parties hereto, nor financially or otherwise interested

16    in the outcome of the action.

17

18    My commission expires May 31, 2019.

19

20    _____

21    Notary Public in and for

22    the District of Columbia
```

Exhibit A5
MSPB Final Decision on Remand

# UNITED STATES OF AMERICA
# MERIT SYSTEMS PROTECTION BOARD
# WASHINGTON REGIONAL OFFICE

MARGUERITE PRIDGEN,                    DOCKET NUMBER

             Appellant,          DC-0432-14-0557-B-1

     v.

OFFICE OF MANAGEMENT AND               DATE: May 14, 2025
     BUDGET,

             Agency.


     Marguerite Pridgen, Washington, D.C., pro se.

     Naomi Taransky, Washington, D.C., for the agency.


## BEFORE
Monique Binswanger
Administrative Judge

## INITIAL DECISION

     On September 12, 2022, the Board remanded the instant appeal for adjudication of the appellant's affirmative defenses to her removal based on unacceptable performance under 5 U.S.C. Chapter 43. *See* Remand Appeal File (RAF) 1, Tab 1. On April 5, 2024, the record closed following the parties' submissions of additional evidence and argument on those issues. *See* RAF, Tabs 26 and 28.

     For the following reasons, the appellant has failed to establish her affirmative defenses by preponderant evidence.

## ANALYSIS AND FINDINGS

Factual Background[1]

The appellant was a GS-15 Policy Analyst for the agency's (OMB) Office of Federal Financial Management (OFFM) Management Controls and Assistance Branch (MCAB). *See* Initial Appeal File (IAF), Tab 1 at 123, Tab 10 at 52, 377.[2] Her position involved a wide range of duties related to developing and implementing budgetary, legislative, and regulatory policy for the agency and the President. *See* IAF, Tab 10 at 378, Tab 38 at 3. During the relevant time period, the appellant's direct supervisor was Karen Lee, MCAB Chief, and her second level supervisor was Norman Dong, Acting Controller. The appellant was one of only two GS-15 Policy Analysts under Lee's supervision, the other being Gil Tran. She and Tran worked on different portfolios within the MCAB. However, The appellant and Tran both served on the "Grants Team" within the MCAB, along with Victoria Collin, a lower-graded Policy Analyst.

The agency's performance rating period ran from April 1 through March 31 of the following year. The appellant's performance evaluation consisted of an assessment divided into three parts: (1) OMB Core Competencies; (2) OMB Strategic Goals; and (3) Summary Rating. *See* AF, Tab 10 at 218. Performance standards and related elements are intended to be linked with Core Competencies and Strategic Goals. *See id*. Core Competencies outline the skills necessary for

---

[1] This decision explicitly incorporates by reference the factual findings set forth in the Initial Decision, dated June 10, 2016, and the Board's September 12, 2022, Remand Order. Specifically, I fully incorporate herein the former administrative judge's findings and credibility determinations regarding the merits of the appellant's performance-based removal and her affirmative defenses. Nonetheless, in adjudicating the appellant's affirmative defenses of race, color, and disability discrimination and whistleblower reprisal, I have considered the complete record, including evidence and argument the appellant submitted with her petition for review and on remand.

[2] Because documents in the initial appeal and the agency file have various page numbers in the record, I have referred to the page numbers assigned by the Board's e-Appeal Online System. *See* IAF, Tabs 1, 10. *Pridgen v. Office of Management and Budget*, 117 M.S.P.R. 665, ¶¶ 2, 4, 7-9 (2012).

employees to carry out Strategic Goals. *See id*. Employees are rated on each Core Competency on a numerical scale of 1-3. *See id*. A rating of 1 indicates that the employee does not perform or inconsistently performs at an acceptable level; a rating of 2 indicates that the employee consistently meets and may sometimes exceed all expectations; and a rating of 3 indicates that the employee consistently exceeds expectations. *See id.*

The appellant was rated on the following Core Competencies: (1) Contributes knowledge to EOP[3]/OMB Activities; (2) Quality of Employee's Contributions to EOP/OMB; (3) Effectiveness of Employee's Contributions to EOP/OMB; and (4) Personal and Professional Development to Enhance Contributions to EOP/OMB. *See* IAF, Tab 10 at 219. Under each standard, the agency identified between four and six specific rating elements. The appellant received a rating of 1-3 on each rating element and a summary rating for each standard. *Id.* at 217. Under Strategic Goals, the appellant's performance standards set forth performance goals in connection with certain OMB Strategic Plan Goals. For each performance goal, the agency identified a rating element and described how the appellant could meet and exceed expectations for each element. *Id.* at 219-224. The appellant received a summary rating based on the summary ratings she received under both Core Competencies and Strategic Goals. *Id.* at 217.

The events at issue in this appeal primarily began in late-2011. In October 2011, the appellant contacted the EEO office to initiate a complaint of discrimination. *See* IAF, Tab 38 at 4. Based on written statements she provided to the EEO office, on November 7, 2011, the agency placed her on administrative leave "until further notice." *See* IAF, Tab 1 at 7, 14, 26, 38, 44; Tab 10 at 11-12; Tab 38 at 4. Thereafter, in or around November 2011, the appellant reported to the Government Accountability Office (GAO) that the agency was delaying

---

[3] Executive Office of the President

4

implementing grant reform agenda, as required by the Federal Financial Assistance Management Improvement Act of 1999 (Pub. L. No. 106-107, 113 Stat. 1486). *See* IAF, Tab 54, Hearing Record (HR), Vol. 1 at 26:25-27:20 (testimony of the appellant). Specifically, she said she reported that "things were really delayed, and things were not getting done that should have gotten done and no one was really providing any answers." *Id.*

The appellant remained on a combination of administrative and other paid leave through May 7, 2012, when she returned to work. During her absence, Karen Lee was selected as the MCAB Chief and became the appellant's supervisor. On May 11, 2012, Lee had a one-on-one meeting with the appellant to discuss her portfolio of projects and assignments. *See* IAF, Tab 10 at 121; *see also* RAF, Tab 25 (HR Vol. 2, testimony of Lee). Thereafter, Lee sent the appellant a lengthy email summarizing their discussion. *See id.* She stated the appellant would remain a full member of the Grants Team and focus solely on grants management issues. *See id.* She suggested the appellant get up to speed on where the Branch is with grants management issues since November 2011 and to review the pertinent documents on the Branch's shared drive. *See id.* She also asked the appellant to give her a list of the grants-related projects she worked on in the 6-12 months prior to her leave period, as well as the things she is interested in working on going forward. *See id.*

On May 16, 2012, the appellant responded, stating that her grants portfolio was reassigned from her to both Lee and Victoria well prior to November 2011 and therefore had not worked in a lead role on those projects during that time. *See* IAF, Tab 10 at 122. She requested Lee "reinstate the portfolio I had before you and Victoria took over most of my work areas <u>prior to</u> November 2011" and listed the following tasks: (1) Grant Governance/COFAR[4]; (2) Grant Reform; (3) Single

---

[4] Council on Financial Assistance Reform

grant portal (aka, Grants.gov); (4) Recipient integrity (ISDC, FAPIIS,[5] EPLS, Tax Delinquency, lobbying, fraud, DNP branch liaison); and (5) Grants Management Qualification Standards, Training, and Certification. *See id*.

On June 8, 2012, Lee issued the appellant a 90-day performance plan with the intent to extend the appellant's 2011-2012 performance cycle and provide her with a performance appraisal for that rating period.[6] *See* IAF, Tab 10 at 229-33. Subsequently, Lee shifted to incorporate the goals from the 90-day plan into a 2012-2013 performance plan rather than extending the prior performance year. *See id.* at 53-54, 130. That plan was ultimately issued on August 29, 2012, and ended on March 31, 2013, consistent with the agency's regular performance rating period. *See* IAF, Tab 1 at 23 and Tab 10 at 13, 217-27. The plan contained the standard Core Competencies stated above and three Strategic Goals: (1) Improve the effectiveness and efficiency of government rules and mandates; (2) Improve the effectiveness of government programs; and (3) Ensure agencies develop, express and implement policies in accordance with the President's priorities. *See* IAF, Tab 10 at 220-227. Each Strategic Goal contained one or more Performance Goals and Elements, which identified projects or assignments through which the appellant was to demonstrate acceptable performance. *Id.* For each Performance Goal, the standard for "Meets" performance further described the tasks required, to include deliverables and deadlines. *Id.*

Strategic Goals 1 and 2 are at issue in this appeal. For Strategic Goal 1, the first Performance Goal was related to the FAPIIS final rule and draft grants fraud rule. The performance element of this Goal required the appellant to "Lea[d] review and issuance of policy recommendations to improve oversight and accountability of grants through reporting of information relating to past

---

[5] Federal Awardee Performance and Integrity Information System

[6] The appellant had missed much of the 2011-2012 performance cycle due to her extended leave. *See* IAF, Tab 1 at 10, 22.

performance and integrity of awards." "Meets" performance standard was described as:

> Develops through project plans with appropriate milestones for internal and external coordination, review, and issuance of policies related to grants fraud and accountability (e.g., proposed grants fraud rule and FAPIIS final rule). Identifies strategy and guidance, as necessary, to bring together efforts under DNP with FAPIIS to reduce any duplication of efforts. Proposed fraud rule issued by December 2012. Final FAPIIS rule issued by December 2012.

The second Performance Goal for Strategic Goal 1 was related to OMB's response to GAO and Congressional inquiries regarding agencies' undisbursed grant balances. The performance element required the appellant to "Identif[y] policy options to address undisbursed grant balances and develops OMB response to GAO report." *Id.* "Meets" standard was described as:

> Develops thorough project plan with appropriate milestones for internal and external coordination, review, and issuance of policies related to addressing GAO recommendations on undisbursed grant balances by August 2012. Drafts accurate, complete, coordinated, appropriate, and high-quality OMB response and ensures timely transmittal of OMB responses to GAO recommendations. Drafts Controller's alert. 70% of all grant-making agencies have developed internal controls and processes to reduce the amount of undisbursed grant balances in expired grant accounts.

The third Performance Goal for Strategic Goal 1 was as follows:

> Improve the reliability, timeliness, accuracy, and completeness of information to USASpending.gov and ensure that Federal agencies and the recipient community have clear guidance on requirements pursuant to the Federal Funding Accountability and Transparency Act.

The "Meets" performance standard was described as:

> Based on clear and cogent analysis, draft effective data quality guidance that enhances the timeliness, accuracy, and completeness of USASpending.gov data while balancing agency resource constraints in coordination with Federal agencies through the Council on Financial Assistance Reform (COFAR) and relevant OMB offices (e.g., OFFM, 3-Gov, OPM) by September 2012. Provides accurate, thorough, and high-quality analysis and recommendations to inform

senior management on proposed legislation, policy, and
Congressional and other inquiries. Identifies any inconsistencies or
needs for clarification in current policies and drafts
recommendations to address these areas. Identifies timeframe for
review of documents for OMB clearance and manages process to
ensure efficient and timely review and clearance. Guidance is issued
by December 2012.

Under Strategic Goal 2 (Improve the effectiveness and efficiency of Government
Programs), the appellant had corresponding performance goals aligned to these
projects. Specifically, the appellant's goals were to "Oversee agency progress to
improving data reliability of financial assistance awards on USAspending.gov"
and "Strengthen Federal grants management cadre by developing a framework for
grants training and professionalization of job category." For the former, the
appellant will have met the "Meets" by "develop[ing] thorough project plans with
appropriate milestones for oversight. By May 2013, 100% of agencies have
identified a process to certify data reliability." Regarding the second goal, the
performance element was to "Analyze and develop policies to improve grants
management professionalization across the Federal government through creation
of a standard body of knowledge for grants officers or other appropriate
mechanisms or policies." "Meets" performance standard was described as:

Develops through project plan with appropriate milestones for
internal and external coordination, review regarding grants training
and professionalization by October 2012. Provides accurate,
thorough, and high-quality analysis, using cost-benefit analysis and
any other appropriate analytical methods of recommended options
and provides other viable options for improving grants management
policies abased on identified objectives by September 2012.
Develops and recommends thorough and comprehensive strategy
integrated and coordinated with existing efforts, to improve grants
management professionalization across the Federal government to
ensure consistent and rigorous programmatic and financial oversight
and management of grant awards within agency programs by
December 2012.

In summary, the appellant's main projects at issue in her 2012-2013 performance
plan were (1) FAPIIS and proposed fraud rule; (2) response to the GAO report on

undisbursed grant funds; (3) USAspending.gov data quality guidance and agency data certification; and (4) grants workforce training. The appellant received both the draft 90-day plan and also the final year-long plan. Ultimately, she refused to sign the final plan.

On June 26, 2012, Lee met with the appellant to discuss issues with her performance since her return to work. *See* IAF, Tab 10 at 125. Pursuant to her email summary the following day, Lee notified the appellant that she failed to meet the standards of a senior level analyst with respect to her response to the GAO report on undisbursed grant balances. *See id.* She stated the appellant failed to work independently and with minimal guidance, requiring Lee to have multiple discussions instructing the appellant how to gather information from agencies as to their undisbursed balances. *See id.* She further stated the appellant "failed to communicate clearly, effectively, accurately the concerns HHS[7] raised regarding the accuracy of the GAO report," which affected her ability to evaluate the appellant's recommendations. *Id.* She stated that, after learning of the concerns "by happenstance" from HHS directly, she determined the appellant's recommended response to GAO failed to address the potential overstatement of the undisbursed grant balances in the report. *Id.* She further stated the appellant's proposed solution, to have agencies submit more frequent reporting, was poorly thought out and "missed the mark" for addressing the potential issue with undisbursed balances. *Id.*

On a general note, Lee further notified the appellant that her repeated tardiness for meetings is "without notice and unacceptable." *Id.* She noted the appellant had been 10-20 minutes late for at least three meetings that occurred over the past month, without explanation. *See id.* She instructed the appellant to be reasonably on time for meetings and, if running late, to let Lee know. She further stated "I am always open to working with you to improve your

---

[7] The U.S. Department of Health and Human Services

performance. I am also happy to work with you to identify training opportunities that may improve these areas." *Id.* at 126.

The following day, the appellant responded to Lee and stated Lee had failed to give her clear instructions on what she wanted vis a vis the GAO report. *See* IAF, Tab 10 at 127. Rather, the appellant argued Lee simply asked for a recommendation on "how to move forward" on the undisbursed grant balance issue without telling her what she really wanted. *See id.* She also argued that she had informed Lee and others of HHS's concerns but noted that HHS did not provide documentation supporting its concerns or raise the concerns formally in its written response to GAO. *See id.* As a general matter, she also took issue with Lee's request that she provide "more background" when responding to Lee's specific questions. *Id.* She stated: "I expect that as a mid-level manager, you will have sufficient technical understanding of the areas within your purview to brief senior officials especially if you are the one who has the most recent visibility on that issue." *Id.* She also stated her tardiness at meetings was due to Lee's failure to provide her with a call-in number for all meetings. She stated she required a call-in number as an accommodation for her disability so that she could remain close to a bathroom. She also accused Lee of failing to accommodate her, though noted that "After making these requests, I typically get contacted by a human resources staff person who informs me that she is looking into solutions." *See id.* at 128. She concluded:

> I believe you are willfully disregarding my rights as an employee with a disability, and I am also concerned you may be retaliating against me because you were named as one of the offending managers in my 2011 EEO complaint. I intend to seek EEO consultation and/or other advocacy to remedy this situation.

*Id.*

On July 6, 2012, Lee responded to the appellant regarding her performance concerns as well as other issues the appellant raised. *See* IAF, Tab 10 at 130-132. She reminded the appellant that her responsibilities in recommending a response

to the GAO report were clearly laid out in her Performance Goals, which provided explicit details for how the appellant should craft the recommendations. *See id.* She further listed numerous instances over the past month in which she had to provide specific instruction or redirection to the appellant where her original work product on the GAO response was unacceptable. *See id.* Regarding the appellant's dispute as to providing "background" along with her responses to questions, Lee clarified that she had informed the appellant it was insufficient to provide one-worded answers to questions without explaining the basis for her position. *See id.* Regarding the appellant's tardiness, she noted the appellant had never stated she was late because she did not have a call-in number for the meetings, nor had she asked for a number for those meetings. *See id.* Rather, Lee stated she had provided a call-in number for every meeting the appellant notified her she could not attend in person. *See id.* However, she informed the appellant she would "consult with appropriate offices" regarding her request and get back to her shortly. *See id.*

Meanwhile, in June 2012, the appellant disclosed to the Offices of Inspector General (OIG) for various agencies, and to the Office of the Deputy Attorney General (DAG) at the Department of Justice (DOJ), that the agency "would not implement" its requirement to publish guidance on grant fraud disclosure under Section 872 of the Duncan Hunter National Defense Authorization Act for Fiscal Year 2009 (FY 2009 NDAA), Pub. L. No. 110-417, § 872, 122 Stat. 4356, 4555-57 (2008) (codified as amended at 41 U.S.C. § 2313). *See* IAF, Tab 1 at 16, 41; and RAF Tab 24, HR Vol. 1 at 27:51-30:04 (testimony of the appellant). She further alleged that she informed Lee of these disclosures on June 29, 2012, and, thereafter, Lee criticized her and directed her to set up phone calls with the offices so Lee could retract the allegations. *See* RAF, Tab 24, HR Vol. 1.

Lee and the appellant continued to have difficulties regarding work assignments and communication. On August 10, 2012, Lee and the appellant met

with Falisa Peoples-Tittle, an HR Specialist, to discuss this issue. *See* IAF, Tab 10 at 135. During the meeting, both Lee and the appellant stated their concerns with the other's communication styles and their expectations going forward to improve their communication. *See id.* at 135-36. Peoples-Tittle asked that the appellant provide she and Lee a written summary of one-on-one meetings going forward and that Peoples-Tittle would guide the parties on improving their communications. *See id.* Lee and the appellant copied Peoples-Tittle on her their emails summarizing or following up on their one-on-one meetings. *See, e.g.,* IAF, Tab 10 at 143-159.

On August 30, 2012, Lee sent a lengthy summary to the appellant with detailed instructions and deadlines for six outstanding deliverables, as well as a summary of four general matters discussed. *See id.* at 145. On September 10, 2012, the appellant sent Lee a summary of their meeting that day. *See id.* at 151-152. Pursuant to the summary, they discussed numerous directives and deliverables surrounding the grants training and certification effort, the FAPIIS FAQs and Fraud Rule, Data Quality and Transparency issues, and the appellant's requests for reasonable accommodation. *See id.* With respect to the latter, the appellant stated the workspace provided was substandard and interfered with her ability to do her job, and that the air purifier provided did not have a filter. *See id.* at 152. Lee also sent the appellant a summary from her notes of the meeting the following day, stating she had not seen the appellant's summary. *See id.* at 153-54. In this summary, Lee informed the appellant that she reserved funds to support the grants training and certification efforts. *See id.* She stated:

> Also – as you know, there is funding in FY12 funds from FMLOB to support training & certification system costs – if there are any. I wanted to make sure you had some funds available for this effort to start thinking of how we implement the recommendations – and where some IT may help with training, you have some funds for it (approximately 500K or so – but we can discuss the specific funds you may need as you identify them).

*Id.*

Separately, on August 31, 2012, the appellant emailed Lee regarding her untimely deliverables. *See* IAF, Tab 10 at 155-56. She stated her work area was substandard and failed to constitute a reasonable accommodation for her disability. *See id.* She also stated Lee restricted her access to resources and has not given her flexibility in her assignments similar to that of others in OFFM. *See id.* On September 12, 2012, Lee emailed the appellant and Peoples-Tittle to follow up on the appellant's allegation that her workspace, and therefore the previously granted accommodation, was substandard. *See* IAF, Tab 10 at 155. She stated the agency provided her with the workspace in response to her request that she be //within 50 feet of a bathroom and that, contrary to the appellant's complaints, "there is nothing extraordinary about the noise level in [her] workspace" relative to other shared workspace areas. *Id.* She also stated that the numerous performance deficiencies she had been informing the appellant of could not be attributed to the noise level of her workspace. *See id.* The following day, the appellant responded that her workspace indeed impedes her ability to perform her duties. She also argued that Lee "repeatedly changed the assignment or given me direction and guidance that was inconsistent with the direction and guidance from other OFFM senior managers, ultimately, causing me to redo the work." *Id.*

On September 20, 2012, during her one-on-one meeting with the appellant, Lee set deadlines for various deliverables going forward. *See* IAF, Tab 10 at 172. Specifically, by September 27, 2012, the appellant was to produce a comprehensive paper identifying issues to be addressed or may require further discussion with respect to the grants workforce training project. *See id.* By that same date, Lee also required the appellant to provide a project plan for issuing guidance on the USAspending data quality initiative in December 2012. *See id.* By October 8, 2012, the appellant was to provide the draft data quality guidance itself, inclusive of internal stakeholder review, and ultimately ensure issuance of the final guidance by December 2012. *See id.* Finally, she directed the appellant

to provide, by the end of the performance cycle (March 31, 2013), a final strategy document for the grants workforce training project. *See id.*

On September 28, 2012, Lee notified the appellant that she had failed to produce the training and certification paper and directed her to submit it. *See* IAF, Tab 10 at 175. She further informed the appellant that her data quality guidance draft did not comport with previously identified policies and directed her to provide a rewritten draft by October 2, 2012. *See id.* The appellant timely provided a new data quality draft. *See id.* at 174. However, on October 5, 2012, Lee notified the appellant of her concern that the guidance as drafted would be overly burdensome for agencies and questioned the appellant's choice to deviate from the current procurement model. *See id.* at 173-74.

Throughout the month of October, Lee continually provided feedback to the appellant regarding deficiencies in her deliverables on the FAPIIS, data quality guidance, and grants workforce training deliverables. *See* IAF, Tab 10 at 113-19. The appellant missed numerous deadlines and her written work products required substantial redrafting during this time. *See id.*

On October 25, 2012, Lee and the appellant exchanged summaries from their one-on-one meeting that day. *See* IAF, Tab 10 at 186-87. Lee provided the appellant with her comments and suggestions to the FAPIIS draft rule and invited comments back. *See id.* She further requested the appellant check with Julie Miller on whether the draft needed additional clearance review given her edits. *See id.* Regarding the data quality project, Lee noted the appellant had a deliverable due the following day and that it should reflect input from the COFAR. *See id.* She also directed her to consult with colleagues regarding the USAspending.gov and grants workforce training projects. *See id.* The appellant responded with updates on various projects. *See id.* at 186. Regarding the FAPIIS edits, she stated she did not agree with Collin's proposed terminology changes or deletion of a proposed section. *See id.* at 186. She further notified Lee that, per

Miller, the FAPIIS rule would require formal re-clearance due to the substantive edits. *See* IAF, Tab 10 at 186.

On October 31, 2012, Lee sent the appellant a summary of their meeting that day, which included guidance on getting the FAPIIS rule into the agency's clearance process for issuance. *See* IAF, Tab 10 at 186. She directed the appellant to produce a "clearance memo" identifying the changes for inclusion in the package. *See id.* She further directed the appellant to finalize the rule by Friday, November 2, 2012 so it could be "put into clearance" by Monday, November 5, 2012. *See id.* She further invited the appellant to "Let me know if you have any concerns with this timing." *Id.* Lee further summarized that the appellant was to provide draft data quality guidance by close of business that day, as well as a log of questions she had received regarding USAspending.gov along with her analysis and recommendations by the following day. *See id.*

On Friday, November 2, 2012, Lee and the appellant again exchanged summaries of their meeting that day. *See* IAF, Tab 10 at 188-90. Lee summarized that the appellant was, by the end of the day, to provide a "full data quality guidance document (in memorandum format, as all OMB guidance documents are)" reflecting the feedback discussed at the meeting. *See id.* at 189. She stated this deliverable was the appellant's highest priority and necessary to "give us a better chance of hitting the December deadline for issuance of this guidance." *Id.* She further noted that she "pushed back the due dates for other deliverables (e.g., the FAPIIS revisions and USAspending.gov questions and analysis deliverable)." *Id.* Lee summarized her feedback regarding the data quality guidance in the form of eight bullet points, with the following headers:

> The outline does not pull together the broader policy objectives to the new agency requirements to assess the accuracy and completeness of USAspending.gov data.

> The outline does not inform agencies how they are to assess accuracy and completeness.

> The scope of the document is not internally consistent.

15

The Schedule of Spending discussion is confusing.

The deliverable you submitted needs to be in guidance format.

The deliverable was not coordinated with OFFM and other OMB staff.

The draft document should be agency pressure tested, if not already.

Miscellaneous (some smaller items I did not mention this morning).

*Id.* at 189-90. The appellant timely provided a revised draft to various entities for review, and also responded to Lee with respect to each of her identified concerns. *See id.* at 188-89. Lee responded that the appellant should plan on sending her the final draft on November 5, 2012 reflecting the feedback she receives. *See id.* at 188. She further arranged to meet with the appellant the following Monday morning to follow up on the FAPIIS deliverable. *See id.*

On November 9, 2012, the appellant sent Lee a summary of their meeting that day. *See* IAF, Tab 10 at 191-192. Therein, she stated Lee informed her the data quality guidance draft was "on hold until after the COFAR principals meeting on November 14." *Id.* She also summarized the status and upcoming deadlines of the FAPIIS, USAspending.gov, GAO Duplication Report, and grant workforce training projects. *See id.* Lee responded that the appellant had reported "no significant concerns raised" by the COFAR agencies following circulation of the draft guidance outline, so they should be able to circulate the full data quality guidance to COFAR agencies for "pressure testing" after the meeting November 14th. *See id.* at 191. She further directed the appellant to stop by her office at 2:30 p.m. that day to discuss the appellant's upcoming meeting with Collin to resolve outstanding FAPIIS comments. *See id.*

On or about November 10, 2012, the appellant filed a complaint with OSC alleging the agency retaliated against her for her prior EEO and OSC complaints. *See* IAF, Tab 1 at 8, 17, 44; Tab 30 at 10; and Tab 38 at 10.

On December 11, 2012, Lee issued the appellant a Performance Counseling memorandum. *See* IAF, Tab 10 at 113. The memorandum set forth the appellant's

performance plan goals with respect to the grants workforce training initiative, data quality guidance, and FAPIIS rule clearance. *See id.* Lee then detailed numerous examples of the appellant's failure to timely or sufficiently produce deliverables with respect to these projects and the impact on the agency as a result. *See id.* In particular, she stated the appellant failed to coordinate internal review of her August 14, 2012 draft final FAPIIS rule, which resulted in the rule being pulled from the agency's clearance process and requiring substantial revisions. *See id.* at 118-19. She stated the appellant had still not completed those revisions and the document has thus not been submitted for final clearance. *See id.* She stated "publication of the final rule will be delayed, resulting in continued non-compliance with statutory requirements to collect and use certain information about grant recipients." *Id.*

On or about April 22, 2013, OSC informed the appellant that it had closed its investigation into her complaint. *See* IAF, Tab 1 at 8. On June 19, 2013, the appellant filed a second complaint with OSC alleging the agency retaliated against her for her disclosures about section 872 of the FY 2009 NDAA. *See* IAF, Tab 1 at 8; and Remand File (RF), Tab 24 (HR Vol. 1). She also alleged that the complaint included a separate disclosure that erroneous guidance from the agency's Controller in 2011 resulted in billions of dollars in undisbursed balances not being returned to the Department of the Treasury, and that her first-line supervisor tried to have her cover up, including through congressional testimony, the fact that the guidance was the result of an agency error. *See* IAF, Tab 1 at 8.

On June 26, 2013, Lee issued the appellant a summary performance rating of unsatisfactory for the 2012-2013 performance cycle. *See* IAF, Tab 44 at 54 and IAF, Tab 38 at 4. Lee identified the three critical performance expectations and elements of the appellants plan as: (1) USAspending.gov data quality; (2) Grants workforce training; and (3) Improving sub-award reporting on USAspending.gov. *See* IAF, Tab 44 at 54. She found the appellant performed unsatisfactorily in each element and provided examples thereof. *See id.*

Regarding grants workforce training, Lee stated the appellant failed to "provide clear analysis, options, and recommendations" related to the workforce development initiative resulting in OFFM's inability "to issue policy direction and improve the competencies and skills of the grants workforce." *Id.* at 55. Regarding USAspending.gov, Lee stated the appellant failed to draft guidance consistent with policy objectives, provide thorough analysis, and provide timely deliverables. *See id.* She stated the appellant's unsatisfactory performance "jeopardized our ability to ensure that this data is correct" and caused the agency to continue to be "subject to public criticism that this spending data is inaccurate and incomplete." *Id.* Regarding sub-award reporting policies, Lee stated the appellant "failed to address this issue strategically and lacked an ability to lead to identify and drive sustainable, institutional solutions." *Id.* at 56.

Lee further stated that the appellant failed to properly coordinate review of the FAPIIS guidance, which resulted in the draft being pulled from the OMB clearance process after senior management determined the draft exceeded statutory requirements and conflicted with grant reform guidance also going through clearance at that time. *See id.* at 56. She stated the appellant's unsatisfactory performance led to "continued delay in implementing this statutory requirement for all federal grants programs." *Id.* Lee stated, in summary:

> Ms. Pridgen continues to be challenged in her ability to tackle technically difficult or complex issues without previous experience with the issue. She requires constant guidance in order to conceptualize, plan and execute highly complex efforts. She has not demonstrated work product that meets the expectations of a GS -15 senior analyst.

*Id.* at 56.

On June 28, 2013, Lee issued the appellant a 90-day performance improvement plan (PIP), to run from July 1, 2013 to September 30, 2013. *See* IAF, Tab 10 at 77-91, 107. In the PIP, Lee notified her that her performance was deficient with respect to the following two elements: (1) Analyze and develop

policies to improve grants management professionalization across the Federal government through creation of a standard body of knowledge for grants officers or other appropriate mechanisms or policies; and (2) Require agencies to implement a process that would require agencies to certify how the data that is posted to USAspending.gov can be reconciled back to their audited financial statements. *See* IAF, Tab 10 at 79. Lee provided specific examples of the appellant's unsatisfactory performance in those two elements and informed her of what she needed to do during the PIP period in order to improve her performance to at least the Meets Expectations level for each. *See id*. at 80-89. The PIP included the following interim milestones and deadlines:

A. Grants Workforce Development Initiative

*By July 31, 2013:* Begin Red building (NEOB) clearance of grants workforce development guidance.

*By August 1, 2013:* Finalize inter-agency agreement with OPM to build "grants 101" training course.

*By September 30, 2013:*

- Issue final grants workforce development guidance.
- Deliver final repository ("go live date") with a quality assurance framework for the content established.
- Incorporate final audit body of knowledge and include in final repository, delivered on the same day.
- Finalize "grants 101" training course design (finalize content areas, scope of course, course objectives, method of delivery, and metrics to measure success).

B. Grants Reform and Final Guidance

*By August 1, 2013:* review comments with COFAR and develop final guidance recommendations in assigned issue areas that reflect a firsthand understanding of the current problems FAPIIS and DNP seeks to address and the needs for alignment and the spirit and intent of the grants reform effort.

C. USAspending.gov Data Quality Guidance Implementation

*By September 30, 2013:* identify and ensure that all agencies subject to the OMB memorandum comply with the spirit and intent of the June 12, 2013 [guidance].

*By September 30, 2013*: adjudicate all agency requests for deviation from OMB guidance and submit analysis and recommendation for OMB approval that balances a first-hand understanding of the problems and/or challenges agencies raise with the need to ensure agency compliance with the spirit and intent of the guidance. Oversee and provide assistance to agencies through implementation of their efforts to ensure agency compliance accordingly.

*Id.* at 87-89. The PIP also set forth how Lee would assist the appellant during the PIP period, including weekly meetings to discuss the quality of her work. *See id*. at 89-90. In her assessment of the appellant's performance during the PIP period, Lee detailed her regular interactions with the appellant throughout that period regarding the quality of her work. *See id*. at 63-74. The appellant acknowledged these regular meetings during her hearing testimony and testified that those meetings sometimes occurred several times a day. *See* RF, Tab 24 (HR Vol. 1).

On January 10, 2014, Lee notified the appellant that she failed to demonstrate acceptable performance during the PIP. *See* IAF, Tab 10 at 57-75. Lee found that the appellant failed to meet the August 1 deadline set forth in the PIP regarding Grants Reform and Final Guidance, but that her overall performance under that element was satisfactory. *Id*. at 59, 61. However, Lee found that the appellant's failure to meet the deadlines regarding both Grants Workforce Development Initiative and USAspending.gov Data Quality Guidance Implementation made her performance during the PIP period under those elements unsatisfactory. *Id*. at 59-62. Accordingly, on January 10, 2014, Lee proposed the appellant's removal for Unacceptable Performance. *See* IAF, Tab 10 at 52-75. After the appellant responded to the proposal, Dong issued a decision removing her, effective March 7, 2014. *Id.* at 37-50.

Procedural History

On February 18, 2015, the appellant filed the instant Board appeal challenging the merits of her removal and raising affirmative defenses of discrimination based on race, color, national origin, age, and disability, as well as retaliation for her prior EEO activity, Board appeals, OSC complaints, and disclosures to other entities and OIGs. *See* IAF, Tab 1; Tab 30 at 4-12; and Tab 38 at 2, 5-14. Following a March 2015 hearing on the merits of the appeal, on June 10, 2016, Administrative Judge (AJ) Zamora issued an Initial Decision affirming the agency's removal of the appellant for unacceptable performance. *See* IAF, Tab 56. AJ Zamora further determined that the appellant failed to meet her burden of proving her affirmative defenses of race, color, sex, and disability discrimination, and of retaliation for protected EEO and whistleblower activity. *See id.* The appellant filed a Petition for Review (PFR) of the AJ's Initial Decision. *See* PFR File, Tab 1.

On September 12, 2022, the Board issued an Opinion and Order reversing the appellant's removal and ordering the agency to return her to duty with all appropriate back pay and relief. *See* PFR File, Tab 9. Specifically, the Board determined that the agency incorrectly treated the Strategic Goals set forth in the appellant's performance plan as Critical Elements of the plan. The Board therefore determined the appellant's removal was improper because the agency failed to prove that she performed unacceptably in one or more Critical Elements of her performance plan. The Board also determined the AJ had applied incorrect legal standards in assessing the appellant's affirmative defenses of race, color, and disability discrimination, as well as her whistleblower reprisal claim. *Id.* The Board therefore remanded the appeal to this office for adjudication of those affirmative defenses consistent with its Opinion. *Id.*

On January 30, 2024, I issued a "Summary of Status Conference and Order Closing the Record" wherein I identified the issues to be determined on remand and notifying the parties that they may submit evidence and argument regarding

those issues, no later than March 1, 2024.[8] *See* RF, Tab 20. At the agency's subsequent request, I extended the close of record deadline to April 1, 2024. The parties filed briefs prior to the close of the record and rebuttals thereafter. The record is now closed and ripe for adjudication.

<u>The appellant has failed to meet her burden of proving her affirmative defenses of race, color, and disability discrimination</u>

The appellant's claims of discrimination based on her race, color, and disability are governed by the revised standards set forth in the Board's Remand Order. *See Pridgen v. Office of Management and Budget*, 2022 MSPB 31, ¶ 35. As set forth in therein*,* an appellant may prove discrimination by various methods. *Id*., ¶¶ 23, 42. No one method is the exclusive path to a finding of liability. *See id*. An appellant may prove a claim of disparate treatment through direct evidence, circumstantial evidence, or a combination of the two. *See id.* at 24, 42. Circumstantial evidence may include evidence of "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn," also known as "convincing mosaic"; comparator evidence, consisting of evidence that employees similarly situated to the appellant with different protected classifications received systematically better treatment;[9] or evidence that the agency's stated reason for

---

[8] Upon remand of the appeal, the parties entered the Board's Mediation Appeals Program (MAP) in an effort to resolve the remaining issues. *See* Remand Appeal File (RAF), Tabs 7 and 8. On January 3, 2024, mediation concluded without resolution of the appeals. *See* RAF, Tab 14. While in mediation, adjudication of the appeal had been reassigned to me. *See* RAF, Tab 13. Following conclusion of the MAP process, on January 9, 2024, I held a status conference with the parties to further discuss potential settlement of the remanded appeal and related motion for attorney fees. *See* AF, Tab 3. During that conference, the parties waived *ex parte* communications for settlement only and I caucused with the parties regarding settlement thereafter. On or about January 19, 2024, the parties again reached impasse on settlement.

[9] To be similarly situated, comparators must have reported to the same supervisor, been subjected to the same standards governing discipline, and engaged in conduct similar to

its action is "unworthy of belief, a mere pretext for discrimination" (i.e., the burden-shifting standard under *McDonnell Douglas Corp. Green*, 411 U.S. 792, 802-04 (1973)). *See id.* at ¶¶ 24, 42. Not all of the above types of evidence, i.e., direct, "convincing mosaic," comparator, or pretext, will be needed in every case. *Id.* Each type of evidence is sufficient by itself to support a judgment for the employee, or they can be used together. *Id.*

Whatever theory of discrimination the appellant pursues and whatever evidence they introduce to support it, all the evidence must be examined as a whole to determine if the appellant has shown by a preponderance of the evidence that the prohibited consideration was either a motivating factor in or a but-for cause of the contested personnel action. An appellant may receive injunctive, forward-looking relief if they show that discrimination based on one or more of the identified bases was a "motivating factor" in their removal. *See Pridgen*, 2022 MSPB 31, ¶ 42. In order to obtain the full relief, including status quo ante relief, compensatory damages, or other forms of relief related to the end result of an employment decision, they must show that such discrimination was a "but-for" cause of the employment outcome. *Id.* The "but-for" causation standard does not require discrimination to be the sole cause of the contested action, only a necessary one. *Id.*, ¶¶ 22, 42. There may be more than one but-for cause of a single employment action. *Id.*

Beginning in March 2010, the appellant requested several accommodations for her chronic colitis and chronic rhinitis. *See* IAF, Tab 31 at 16-18, 28-31, 39-40, Tab 38 at 3. After communicating with the appellant regarding her needs, the agency provided her with an air purifier and constructed a new office space to meet her medical requirements. *See* IAF, Tab 31 at 16-17, 28-41. These accommodations were completed and made available to the appellant in

---

the appellant's without differentiating or mitigating circumstances. *See Fox v. Department of the Army*, 120 M.S.P.R. 529, ¶ 37 (2014) (discussing the use of comparator evidence in connection with a disability discrimination claim).

November 2010. *See id.* at 16-41. In March 2013, the appellant asked for dictation software to accommodate her carpal tunnel syndrome, which Lee provided. *Id.* at 9.¶ 12. Furthermore, throughout 2013, the appellant continued to communicate with Lee regarding the adequacy of the office space accommodation previously provided. Accordingly, I find the appellant established that Lee was aware of the appellant's disabilities during the relevant time period.

In its Remand Order, the Board determined that Tran is a similarly situated employee of a different race and color, and without a disability, to which the appellant may compare her treatment in similar circumstances. *See Pridgen*, 2022 MSPB 31 at ¶¶ 26-29, 41. The Board thus directed that I determine whether the appellant has met her burden of proving discrimination based on her race, color, or disability in light of the revised legal standards set forth in its Remand Order, and taking into consideration Tran as a proper comparator to the appellant. *See id.* The Board also directed that I consider whether the appellant established that her pre-PIP assignments reflected discrimination on these bases. *See id.*; *see also Santos v. National Aeronautical and Space Administration*, 990 F.3d 1355 (2021).

The appellant alleged that Lee, Dong, and Tran were members of the Asian American and Pacific Islander (AAPI) community and treated Tran more favorably as a result. *See* RAF, Tab 26 at 14. In support of her claims, the appellant alleged that, following Executive Order 13515, dated October 14, 2009, regarding AAPI employees who were "to receive special consideration in career and employment activities." *See id.* at 13. Specifically, she alleged the agency "used the list in implementing race-conscious policies and practices that unfairly booster opportunities for [AAPI employees] to ascend [to] higher-graded positions while negatively impacting African-American employees." *Id.* at 13-14. She further alleged, in a footnote, that she "had seen a version of the [list] with Tran's name" but did not submit a copy of that list for the record. *See id.* at 143, n. 2. I find the appellant's allegations regarding this list are self-serving in nature and that she failed to present any corroborating evidence thereof. *See Hillen*

*v. Department of the Army*, 35 M.S.P.R. 453, 458-62 (1987). I therefore give little weight to these assertions. *See id.*

The appellant also alleged Tran was treated more favorably than she with respect to his performance standards, project deadlines, and contractor support. Specifically, she claimed Lee crafted Tran's performance plan to include "lax generic requirements...allowing him to make mistakes, miss or self-extend deadlines, and still meet his performance goals." *See* RF, Tab 26 at 14. Conversely, she argued, Lee included in her performance plan "very specific and rigid deliverables and deadlines...leaving little slack for the appellant to make a mistake or miss a deadline and still meet her goals." *Id.* She also alleged that her performance requirements were "highly dependent on processes and timing of activities not within her control" whereas Tran's requirements included "mostly broadly stated self-directed work assignments with loose standards involving collaboration, making recommendations, and identifying progress within unspecified deadlines." *Id.* at 14-15. She also alleged the agency "regularly gave Tran timely contract resources to complete routine work but "refused" to grant the appellant's request for special project funding "until late in the PIP period." *Id.* at 16. She also alleged the agency allowed Tran to "maintain his core assignments and choose additional work assignments but denied the appellant the opportunity to do so." *Id.*

I find the appellant's allegations unsupported by the record. It is clear the appellant was unhappy with her portfolio of projects upon her return from leave in May 2012. However, it appears her discontent stems from a reallocation of work that occurred in or around 2011 under her prior supervisor, Dana James, well before the performance period at issue here. There is no indication that Lee had any role in James's reallocation of work several years earlier or that Lee subsequently assigned the appellant projects in a discriminatory fashion upon her return to duty. In fact, the appellant specifically requested that her former

portfolio be returned to her, to include "(1) Grant Governance/COFAR[10]; (2) Grant Reform; (3) Single grant portal (aka, Grants.gov); (4) Recipient integrity (ISDC, FAPIIS, EPLS, Tax Delinquency, lobbying, fraud, DNP branch liaison); and (5) Grants Management Qualification Standards, Training, and Certification." *See* IAF, Tab 10 at 122. These are the very projects the appellant was assigned upon her return and that were at issue in the PIP.

Notwithstanding the appellant's general dissatisfaction with her assignments, she failed to present evidence of other assignments available or that should have been reassigned to her upon her return to work. Specifically regarding Tran's portfolio, Lee testified that Tran was OFFM's expert on grants management and single-audit findings, and that his performance goals were directly aligned with that expertise. *See* RF, Tab 25 (HR Vol. 2). The appellant did not rebut this testimony or otherwise present evidence that she had recognized expertise in this area or performed these tasks with any regularity prior to her return. Nor do I otherwise find evidence of record supporting the appellant's assertion that Tran was provided with "better" or more "choice" assignments than she because of age, race, or disability.

I further find the appellant failed to support her allegation that her project deadlines or collaborative requirements evidence discriminatory animus against her. The appellant points to the deadlines set forth in her performance plan, and the lack of similar deadlines in Tran's plan, as evidence that she was treated less favorably. She alleges that she would not have been placed on a PIP or terminated were it not for that disparity. I find little support in the record for her assertions. The appellant failed to identify with any specificity the work Tran performed in relation to his performance goals. While the wording of Tran's plan on its face evidences fewer specific deadlines, the appellant failed to put into context the nature of his work and whether shorter or stricter deadlines were feasible in

---

[10] Council on Financial Assistance Reform

relation to those assignments. Furthermore, the deadlines in the appellant's performance plan are consistent with Lee's explanation that the appellant's plan morphed from the original 90-day extension of the 2011-2012 plan, due to the appellant's extended leave period, into the full 2012-2013 performance plan ultimately implemented. The documentation between Lee and the appellant regarding the plans fully supports that explanation as well. Accordingly, to the extent such deadlines are not usually present in her performance plan, the manner in which they came to be included in her 2012-2013 plan do not evidence disparate treatment.

I also find unsupported the appellant's allegations that her own deadlines were not feasible. I note that the summaries of Lee and the appellant's one-on-one meetings both prior to and during the PIP indicate that Lee consistently extended deadlines of the appellant's deliverables in response to the appellant's constant failure to meet the original deadlines. The emails further establish that Lee had to give the appellant frequent, extensive feedback at every stage of her assignments in order to obtain deliverables from her. The record also reflects that Lee pushed back some of the PIP deadlines in response to the appellant's feedback while drafting the PIP. Lee testified that she believed the appellant was substantially finished with the proposed fraud rule and final FAPIIS rule, and that the December 2012 deadlines were therefore reasonable. In rebuttal, the appellant alleged that Lee was continually unhappy with her work or that other individuals were to blame for her missed deliverables. She alleged generally that Lee continually returned her drafts for further editing but failed to rebut Lee's assertion that the earlier drafts were inadequate. That the appellant did produce drafts within the required timeframes, albeit insufficient, indicates that the deadlines were feasible. Despite the appellant's general assertions, she presented no evidence indicating the work assigned could not have been performed in the time provided.

Likewise, I find unavailing the appellant's assertion that Lee discriminatorily required her to rely on the performance of others to meet her deliverables. As a general matter, it is reasonable that the appellant was required to work within internal and external processes given her high grade level and the government-wide implications of her work. I further find that the appellant's performance plan goals and PIP deadlines on their face incorporated these processes and the appellant's responsibility in relation thereto. For example, during the PIP, the appellant was required to produce a final draft and begin "Red Building" clearance of the grants workforce development guidance by July 31, 2013, but the final guidance was not required to be issued until September 30, 2013. The PIP itself therefore explicitly built in time for the appellant to shepherd the document through the clearance process, which was otherwise out of her control. Additionally, emails between Lee and the appellant establish that, even though the appellant missed the July 31 deadline for starting the clearance process, Lee still encouraged the appellant to continue working on getting the draft into clearance as late as August 23, 2013 so they could still meet the September 30 issuance deadline. *See* IAF, Tab 34 at 93. It is therefore clear that Lee built a certain amount of buffer into the PIP deadlines and that she was willing to consider the appellant's performance satisfactory had she taken the necessary steps to ensure a timely final deliverable despite some deliverables depending on performance of others.

As discussed in more detail in my analysis of the appellant's whistleblower reprisal claim, I find the record reflects that the appellant failed to act prudently to ensure the portions of her tasks that she was independently responsible for were done in a timely fashion. For example, regarding agency data quality plans, the appellant failed to follow up with nonresponsive agencies until far too late in the PIP. Though the agencies were ultimately responsible for submitting their plans to the appellant, I find she did not take reasonable steps to ensure they did so or to establish that she had done all that was prudent in achieving that goal.

Nor did she present a plausible explanation for not timely adjudicating agency requests to use alternative methodologies for ensuring data quality by the September 30, 2013 deadline. She also failed to rebut Lee's testimony explaining why those requests were not detailed enough to approve the alternative plans and what additional information the appellant should have obtained sooner from the requesting agencies in order to do so.

I find the record amply establishes that the appellant and Tran's portfolios and areas of expertise were very different and their performance goals differed accordingly. However, I find the difficulty or rigidity of those goals did not differ with any measurability such that I could find the appellant's assignments during the FY 2013 performance year were the result of discrimination based on her race, color, or disability. Nor do I find a preponderance of any other probative evidence creating such an inference. Accordingly, I find the appellant failed to establish that Lee was motivated by her race, color, or disability with respect to her pre-PIP or PIP assignments. I further fully adopt AJ Zamora's analysis with respect to these affirmative defenses and therefore conclude the appellant failed to meet her burden of proof regarding these claims.

<u>Whistleblower Reprisal</u>

To establish a *prima facie* case of whistleblower reprisal, an appellant must prove by a preponderance of the evidence that (1) he engaged in whistleblower activity protected by 5 U.S.C. §§ 2302(b)(8) and (b)(9)(A)(i), (B), (C), or (D); and (2) the protected disclosures or activity was a contributing factor in the agency's decision to take or fail to take a "personnel action" as defined by statute. *See* 5 U.S.C. § 1221(a). A preponderance of the evidence is the degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue. *See* 5 C.F.R. § 1201.4(q).

Where the appellant establishes a *prima facie* case of whistleblower reprisal, the Board must order corrective action unless the agency can establish by clear and convincing evidence that it would have taken the same personnel actions even in the absence of the protected disclosure or activity. *See Carr v. Social Security Administration*, 185 F.3d 1318, 1322-23 (Fed. Cir. 1999); *see also Miller v. Department of Justice*, 842 F.3d 1242, 1258-62 (Fed. Cir. 2016). Clear and convincing evidence is defined as that measure or degree of proof that produces in the mind of the trier of fact a firm belief as to the allegations sought to be established. *See* 5 C.F.R. § 1209.4(e). It is a higher standard of proof than preponderant evidence. *Id*.

The Board determined the appellant made protected disclosures under 5 U.S.C. § 2302(b)(8) by virtue of her November 2011 report to the General Accountability Office (GAO); her June 2012 disclosures to the Deputy Assistant General Counsel (DAGC); her June 2012 disclosures to various Offices of the Inspector General (OIGs); and her June 2013 OSC disclosure. The Board further determined the appellant's November 2012 OSC complaint constitutes protected activity under 5 U.S.C. § 2302(b)(9)(C), as did her June 2012 OIG disclosures.

The Board's Remand Order upheld AJ Zamora's finding that Lee and Dong were aware of the appellant's June 2012 OIG disclosures and that these disclosures were a contributing factor to the appellant's removal. The Remand Order directed that I determine whether each of the remaining disclosures and activities were a contributing factor to the appellant's removal.

November 2011 GAO disclosure

The appellant does not allege notifying Lee or Dong herself of her November 2011 disclosure. However, she alleges that a copy of her disclosures to GAO were included in the Report of Investigation (ROI) produced following her 2012 EEO complaint. *See* RF, Tab 26 at 21-22. She therefore concludes that "this is evidence that the agency was aware of the appellant's protected disclosures to

GAO." *Id.* However, the appellant fails to provide any context for that conclusion or otherwise describe any procedures indicating the likelihood that the appellant's EEO ROI was disseminated in whole or part to Lee or Dong prior to her removal. Rather, she argued:

> The argument of whether the appellant's supervisors (Lee and Dong) were aware of all the appellant's disclosures would be irrelevant because the agency collective was aware, and the agency collective was involved with the decision to remove the appellant.

*Id.* at 21-22. I find the appellant's argument unavailing. The Board has long held that management officials may be charged with constructive knowledge of protected disclosures or activities where an individual with actual knowledge of the disclosure influenced the official accused of taking the retaliatory action, known as the "cat's paw" theory. *See, e.g., Aquino v. Department of Homeland Security*, 121 M.S.P.R. 35, ¶19 (2014), citing *Weed v. Social Security Administration*, 113 M.S.P.R. 221, ¶ 22 (2010). However, the Board has not recognized a "collective" knowledge of the "agency" as a means of establishing the knowledge-timing test. Here, the appellant has failed to present any credible evidence that any of the individuals involved in her removal were provided a full copy of the ROI or the GAO disclosures included therein. Given the appellant's lack of reasonable evidence inferring a relevant official's knowledge of the GAO disclosure, I find she has failed to meet the knowledge-timing test.

I further find the appellant failed to present preponderant evidence otherwise indicating that her GAO disclosure was a contributing factor to her removal. Where an appellant fails to meet the "knowledge/timing test," the Board will consider any relevant evidence on the contributing factor question, including the strength or weakness of the agency's reasons for taking the personnel action, whether the whistleblowing or activity was personally directed at the responsible officials, and whether those individuals had a desire or motive to retaliate against the appellant. *See Powers v. Department of the Navy*, 69 M.S.P.R. 150, 156 (1995).

I find the agency's reasons for removing the appellant were strong. As discussed in more detail below, the agency presented significant evidence that the appellant failed to successfully perform the majority of tasks assigned during the PIP. I further find, as discussed in more detail below, that significant evidence supports that the assignments were a fair and appropriate opportunity to demonstrate acceptable performance. The appellant does not dispute that she failed to meet the deliverables required. Rather, she claims the assignments were discriminatory and unfair. As discussed above, I find no evidence that her assignments were discriminatory. I further adopt AJ Zamora's finding that the PIP provided the appellant with a reasonable opportunity to improve in her performance and, therefore, that the assignments were not unfair. *See* IAF, Tab 56 at 10. I note that the appellant herself testified that she had direct input on the deliverable deadlines of the PIP assignments. *See* RF, Tab 25 (HR Vol. 2).

I further find the appellant's GAO disclosure was not directed towards either Lee or Dong, as Lee was not the appellant's supervisor at the time and Dong did not join the agency until 2012. *See* RF, Tab 25 (HR Vol. 2). However, in the event either were aware of the disclosure, it is reasonable to assume that they would have had some motive to retaliate against the appellant given that the disclosure reflects poorly upon the agency and specifically the OFFM. *See Chavez v. Department of Veterans Affairs,* 120 M.S.P.R. 285, ¶ 33 (2013). Nevertheless, I find the weakness of that motive alone, and particularly given the strong evidence supporting Lee's assessment of the appellant's PIP performance, does not constitute preponderant evidence that the GAO disclosure contributed to the appellant's removal. *See Powers*, 69 M.S.P.R. at 156.

June 2012 DAGC and OIG disclosure

The appellant testified that she informed Lee about her disclosures to the DAGC and OIGs on or about June 29, 2012 and that, in response, Lee directed her to convene a conference call with the offices so she could retract the

appellant's statements. *See* IAF, Tab 24 (HR Vol. 1). I adopt AJ Zamora's finding that Lee did not specifically dispute the appellant's testimony and, therefore, found Lee was aware of these disclosures.[11] *See* IAF, Tab 56 at 26. Furthermore, as these disclosures occurred within two years of the appellant's removal, I find the appellant has met her burden of establishing these disclosures were a contributing factor to her removal. *See Agoranos v. Department of Justice,* 119 M.S.P.R. 498, ¶ 20 (2013); *Schnell v. Department of the Army*, 114 M.S.P.R. 83, ¶¶ 20-22 (2010).

November 2012 OSC Complaint

Regarding the November 2012 OSC Complaint, the Board upheld the prior AJ's determination that Lee and Dong were unaware of the complaint and, therefore, failed to establish contributing factor through the knowledge-timing test. *See Pridgen*, 2022 MSPB 31 at ¶ 64. However, the Board directed I consider whether the appellant otherwise established contributing factor through other relevant evidence. *Id.* at ¶ 65. I find the appellant has failed to do so. Lee and Dong likely had motive to retaliate against the appellant for her November 2012 OSC Complaint because implicated them both directly and indirectly. However, as discussed in more detail below regarding *Carr* Factor 1, I find the agency had strong reasons for placing the appellant on a PIP, determining she failed to raise her performance to an acceptable level, and removing her accordingly. I further find, as discussed in more detail below, that the strength of those reasons significantly outweigh the agency's motivation to retaliate against her for whistleblowing. I therefore find the appellant failed to meet her burden of establishing preponderant evidence that her November 2012 OSC Complaint was a contributing factor to her removal. *See Powers*, 69 M.S.P.R. at 156.

---

[11] Though AJ Zamora addressed only the appellant's contact with the various agency IGs, I find the appellant consistently described this disclosure as being made to both various IGs as well as various agencies' DAGCs. Accordingly, I find the record supports a finding that Lee was aware of the appellant's disclosures to both groups.

June 19, 2013 OSC Disclosure

The appellant failed to argue that Lee, Dong, or other relevant management officials were personally aware of her June 2013 OSC Disclosure. Rather, as discussed above, the appellant argued the agency was "collectively" aware of all of her protected activities. *See* RF, Tab 26 at 21-22. However, the appellant failed to support this allegation with any credible evidence of record. Furthermore, as discussed above, I find the strength of the agency's evidence supporting its actions significantly outweighs its motive to retaliate against the appellant for her whistleblowing. Accordingly, I find the appellant failed to meet her burden of establishing preponderant evidence that her June 2013 OSC Disclosure was a contributing factor to her removal. *See Powers*, 69 M.S.P.R. at 156

The agency would have removed the appellant even absent her whistleblowing

As stated above, where an appellant establishes a *prima facie* case of whistleblower reprisal, the Board must order corrective action unless the agency can establish by clear and convincing evidence that it would have taken the same personnel actions even in the absence of the protected disclosure or activity. *See Carr*, 185 F.3d at 1322-23. In determining whether the agency has met this burden of proof, the Board considers the following factors: (1) the strength of the agency's evidence in support of the action; (2) the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and (3) any evidence that the agency takes similar actions against employees who are not whistleblowers, but who are otherwise similarly situated. *Id.* The Board must consider all the pertinent record evidence in making this determination. *See Miller*, 842 F.3d at 1258-62; *Whitmore v. Department of Labor*, 680 F.3d 1353, 1368 (Fed. Cir. 2012); *Mattil v. Department of State*, 118 M.S.P.R. 662, ¶ 25 (2012). The Board does not view these factors as discrete elements, each of which the agency must prove by clear and convincing evidence, but rather weighs them together to determine whether the evidence is clear and

convincing as a whole. *See Alarid v. Department of the Army*, 122 M.S.P.R. 600, ¶ 14 (2015).

*Carr* Factor 1

I find the agency has presented strong evidence to support the appellant's removal. The Board declined to make findings regarding AJ Zamora's factual findings regarding the appellant's performance under the PIP. Upon careful review of the record below and the parties' evidence and argument on remand, I find AJ Zamora's factual findings and credibility determinations as to the appellant's unacceptable performance are fully supported by the record and I incorporate them fully herein.

As AJ Zamora found, the appellant did not successfully complete two of the three tasks required under the PIP. To show acceptable performance, Lee required the appellant satisfactorily complete tasks associated with three main projects: (1) Grants Workforce Development Initiative ("Workforce Development"); (2) Grants Reform and Financial Guidance ("Grants Reform"); and (3) USAspending.gov Data Quality Guidance Implementation ("USAspending"). Per the PIP, Lee and the appellant met at least weekly throughout the PIP period and Lee provided the appellant with summaries of the meetings via email thereafter. *See* IAF, Tab 10 at 63-74. The PIP period ran through September 30, 2013. AF, Tab 10 at 77. On January 10, 2014, Lee gave the appellant an assessment of her performance during the PIP period. *Id.* at 57-75. Lee found that the appellant failed to meet the August 1 deadline regarding Grants Reform, but that her overall performance under that critical element was satisfactory. *Id.* at 59, 61. However, she found that the appellant's failure to meet the deadlines regarding both Workforce Development and USAspending made her performance during the PIP period unsatisfactory. *Id.* at 59-62.

As to Workforce Development, Lee found the appellant failed to meet five of the six specific deadlines set forth in the PIP.[12] AF, Tab 10 at 60-61. The appellant disputes that finding. For example, she testified that she did deliver the final repository by September 30, 2013, as required. *See* IAF, Tab 24 (HR, Vol. 1). However, in an email to Lee on October 18, 2013, the appellant acknowledged that the repository had not yet been finalized. IAF, Tab 34 at 148. Lee testified that the repository still was not finalized as of November 2013. *See* HCD, Day 2, Part 1. With respect to the other Workforce Development deadlines, the appellant generally asserts that her failure to meet the deadlines was due to either Lee's failure to approve her drafts, a lack of available funding, or the failures of other agency employees and/or other agencies. *See generally,* IAF, Tabs 24 and 25 (HR, Vols. 1 and 2). However, Lee explained during her hearing testimony how the appellant could have completed each of the tasks and how she could have been more proactive in seeking help with any difficulties she encountered. Lee also explained why some of the drafts submitted by the appellant were unacceptable. AJ Zamora found Lee's explanations were credible, well-reasoned, and sound. *See* IAF, Tab 56 at 12. The record fully supports that conclusion and I adopt it herein. I therefore find Lee's conclusion that the appellant did not perform acceptably during the PIP with respect to the Workforce Development assignment is well supported by the record.

As to USAspending, the PIP required the appellant to, by September 30, 2013, ensure that all agencies subject to OMB's June 12, 2013 guidance be in compliance with the spirit and intent of the guidance and to adjudicate all agency requests for deviation from the guidance. *See* IAF, Tab 10 at 88-89. In the June 12, 2013 guidance, OMB set forth several new requirements for agencies to ensure the quality of financial data on USAspending.gov. Specifically, OMB

---

[12] Although the appellant also did not meet the sixth deadline ("Incorporate final audit body of knowledge and include in final repository, delivered on the same day," by September 30, 2013), Lee determined that the appellant should not be held responsible for that failure because Tran did not provide the materials she needed in order to complete that assignment. *See* IAF, Tab 10 at 60.

required that, beginning in October 2013, each agency assign a Federal Award Identification Number (FAIN) to each financial assistance award. *See* IAF, Tab 32 at 15. OMB further required that, by October 1, 2013, each Federal agency develop and implement procedures to validate the data on USAspending.gov with data maintained in the agency's financial system, and that, for each quarter beginning after October 1, 2013, each agency report to OMB the accuracy rate of USAspending.gov data based on its validation process, *Id.* In the guidance itself, OMB set forth two authorized methods for validating USAspending.gov data. *Id.* at 16. However, OMB also gave agencies the option to request to use an alternative methodology. Such requests were to be submitted to OMB by August 31, 2013, and in their requests, agencies were required to describe the alternative methodology, identify how it would assure the accuracy of USAspending.gov data, and justify why neither of the two authorized methods was viable. *Id.* at 16-17.

On September 10, 2013, Lee asked the appellant to provide an update on the status of compliance with the June 12, 2013 guidance and to identify which agencies OMB was concerned about and why. *See* IAF, Tab 32 at 63-64. The appellant responded, "I can send you what I have so far as some agencies have still not provided their plans." *Id.* at 63. In response to a follow-up email from Lee, the appellant wrote,

> I didn't call out any agencies we are concerned about because I haven't come across agencies that are not trying to comply with the memo. I think they just need additional clarification and assistance/guidance in some of the areas raised during the calls.

*Id.* On September 27, 2013, the last business day before the September 30 deadline, the appellant sent an email indicating that four agencies had indicated they would be submitting a plan but had failed to do so and identifying three other agencies with outstanding issues regarding their plans. AF, Tab 45 at 8. On September 30, 2013, the appellant sent an email indicating that at least two

agencies still had not submitted any response to the guidance and that further follow-up was required as to several other agencies. *See* IAF, Tab 32 at 69.

In assessing the appellant's performance during the PIP, Lee determined that, of the 24 agencies subject to the June 12, 2013 guidance, three agencies had not provided any information to OMB indicating how they intended to comply with the guidance, while four other agencies had submitted requests to use alternative methodologies that were not adjudicated by September 30 2013. *See* IAF, Tab 10 at 61-62. In her hearing testimony, Lee discussed each of the four requests to use alternative methodologies and explained why the appellant did not have sufficient information in each case to adjudicate the request by September 30, 2013. *See* IAF, Tab 25 (HR Vol. 2).

The appellant testified that she raised issues regarding agency compliance with the guidance in her discussions with Lee well before the deadline and that Lee did not provide the assistance she requested. *See* IAF, Tabs 24 and 25 (HR Vols. 1 and 2). She also testified that she did not receive the assistance she requested from another agency employee, Mike Wetklow. *Id.* She testified that Wetklow told her not to contact the Office of Personnel Management (OPM) or the Department of the Treasury (Treasury) regarding their compliance with the guidance. *Id.* Both Lee and Wetklow disputed the appellant's version of events.

As to the agencies that did not submit any response to the guidance prior to the deadline, Lee testified that the appellant only requested assistance with those agencies very late in September, shortly before the deadline. *See* IAF, Tab 25 (HR Vol. 2). Wetklow, the Branch Chief of the Office of Federal Procurement Policy, was asked to provide technical support and assistance to the appellant and Lee on the USAspending project. *See id.* Wetklow was not part of the appellant's chain of command and he did not know that the appellant was on a PIP. *Id.* Wetklow testified that he worked with the appellant to get agencies to respond to the guidance. *Id.* Wetklow testified that the September 27, 2013 email in which

the appellant asked him for assistance was the first time she had requested such assistance, and that he would have helped her earlier had she asked. *Id.*

Considering all of the relevant *Hillen* factors, AJ Zamora credited the testimony of Lee and Wetklow over that of the appellant and found the appellant did not request assistance until a few days before the September 30, 2013 deadline. *See* IAF, Tab 56 at 15-16. Furthermore, AJ Zamora did not credit the appellant's testimony that Wetklow told her not to contact OPM or Treasury regarding the guidance. *See id.* After a thorough review of the record, I concur with AJ Zamora's findings. The documentary record reflects that the appellant and Lee had regular email communications regarding the status of her various assignments during the PIP. However, the first record of the appellant requesting assistance was her September 27, 2013 email. *See* IAF, Tab 45 at 8. Lee later indicated in an email that the appellant had requested assistance a few days earlier on September 23, 2013, *see* IAF, Tab 32 at 74, but even that request came only a week before a deadline of which the appellant had been aware for several months. The appellant's September 10, 2013, email to Lee, in which she wrote, "I haven't come across agencies that are not trying to comply with the memo," *see* IAF, Tab 32 at 63, is also inconsistent with her assertion that she requested assistance well ahead of the deadline. Similarly, though the appellant claimed that Wetklow told her not to contact OPM or Treasury about the guidance, the appellant did not raise that issue in her October 18, 2013 email to Lee discussing the status of the USAspending assignment, despite discussing both agencies in that email. *See* IAF, Tab 32 at 74-75. Given the appellant's failure to meet the PIP deadlines and her failure to act reasonably toward achieving those deadlines, I find Lee's conclusion that the appellant's performance during the PIP as to USAspending assignment was unacceptable is well supported by the record.

In its Remand Order, the Board directed that I reassess AJ Zamora's finding that the agency met its burden of proof under *Carr,* "particularly as to the first *Carr* factor," given that the Board "revers[ed] the sole charge of

unacceptable performance." *Pridgen,* 2022 MSPB 31 at ¶ 68. I find the Board's reversal of the unacceptable performance charge does not materially alter my or AJ Zamora's findings with respect to the agency's burden of proof under *Carr.*

The Board reversed the agency's removal action on the grounds that the performance tasks against which the appellant was rated were not aligned with "critical elements" of her performance plan. It stated the Grants Workforce and USAspending tasks were associated with the Strategic Goals rather than the Core Competencies of the appellant's performance plan. *See Pridgen*, 2022 MSPB 31 at ¶¶ 16-17. The Board determined the "Core Competencies" equated to critical elements and the strategic goals did not. In making that determination, the Board noted that OPM regulations define "critical element" as "a work assignment or responsibility of such importance that unacceptable performance on the element would result in a determination that an employee's overall performance is unacceptable." *Id.,* quoting 5 C.F.R. § 430.203. The Board determined that, per the appellant's performance plan, unacceptable performance in any one Core Competency required an overall unacceptable rating for the performance year, whereas an employee must be unacceptable in three or more performance goals to require an unsatisfactory rating. *See id.* The Board found the agency based the appellant's PIP and subsequent performance assessment on tasks listed as strategic goals rather than Core Competencies. Accordingly, the Board determined the agency failed to prove the appellant's performance remained unacceptable in at least one critical element. *Id.* at ¶ 18.

In assessing the strength of the agency's reasons for its actions, I find more probative the significant evidence of the appellant's unacceptable performance leading to her removal and Lee's clear intent to comply with the law rather than the technical basis for its reversal. Lee consistently treated the appellant's performance goals as critical elements throughout the 2012-2013 rating period and the PIP. Her consistent behavior is indicative of her attempt, albeit failed, to properly follow required performance management principles and, accordingly,

lends strength to her reasons for proposing the appellant's removal. Lee rated the appellant unacceptable in three of the four Core Competencies of her 2012-2013 performance plan and unacceptable overall as a result. *See* IAF, Tab 10 at 97-98. Lee's narrative explanation of the unacceptable rating discussed the appellant's unacceptable performance in light of her failure to produce satisfactory work towards the identified Performance Goals and broader Strategic Goals. *See* IAF, Tab 30 at 55-57. This is consistent with the plan's requirement that the elements in an employee's Performance Goals be "linked with" the Core Competencies and Strategic Goals. *See* IAF, Tab 10 at 95. Similarly, the PIP refers to the Performance Goals as "critical elements" the appellant must complete successfully, *see id.* at 60, 66-67, and Lee's assessment of the appellant's performance of those tasks likewise refers to the tasks as critical elements. *See id.* at 59. Consistent with all of these references, Lee refers to the performance tasks as critical elements in her proposed removal letter as well. *See id.* at 52.

It appears, therefore, that Lee erred by identifying the Performance Goals to be completed during the PIP without also identifying the Core Competency(ies) to which her performance of those goals corresponded. This error was then perpetuated throughout the PIP and removal process. However, Lee testified that she and the appellant drafted the PIP requirements together and that the PIP was reviewed by the agency's legal counsel. *See* IAF, Tab 25 (HR Vol. 2). She further testified that HR assisted her in drafting the proposed removal letter based on her assessment of the appellant's PIP performance. *See id.* The record contains no indication that Lee or Dong were advised by legal counsel or HR that the PIP or subsequent removal was improper because they were not based on critical elements of the appellant's performance plan. Nor does the record reflect that the appellant raised that concern during the PIP, in her response to the proposed removal, or during the hearing of this appeal. *See generally*, IAF, Tab 1; IAF, Tab 10 at 43-47; and IAF Tabs 24 and 15 (HR). I therefore find reasonable that the agency proposed and sustained the appellant's

removal based on her failure to successfully perform the PIP tasks. I therefore find the agency's assessment of the appellant's PIP performance constitutes strong evidence supporting her removal regardless of the Board's reversal of the unacceptable performance charge.

*Carr* Factor 2

As discussed above, Lee was aware of the appellant's June 2012 disclosures to the DAGC and OIGs and I find the record supports that the disclosures in part implicated Lee herself. Furthermore, the appellant alleged Lee directed her to schedule conference calls with these offices in order to retract her disclosures. Lee did not rebut this testimony. I therefore find evidence that Lee had strong motive to retaliate against the appellant. I further find that motive could be attributed to Dong as the Deciding Official in the removal given that Lee proposed the removal.

*Carr* Factor 3

The Federal Circuit has explained that "*Carr* does not impose an affirmative burden on the agency to produce evidence with respect to each and every one of the three *Carr* factors to weigh them each individually in the agency's favor." *See Whitmore*, 680 F.3d at 1374. The Board has further held that the third *Carr* factor may be insignificant where there is no evidence that the agency had taken similar actions against non-whistleblowers. *See Runstrom v. Department of Veterans Affairs,* 123 M.S.P.R. 169, ¶ 18 (2016) (finding the third *Carr* factor insignificant due to the lack of evidence that there were any similarly situated employees to the appellant); *McCarthy v. International Boundary and Water Commission: U.S. & Mexico*, 116 M.S.P.R. 594, 626 (2011), *Sutton v. Department of Justice*, 94 M.S.P.R. 4, 13-14 (2003). However, the Federal Circuit has warned that an agency's failure to present such evidence of this factor may be perilous to its case. *See Whitmore*, 680 F.3d at 1374-75, *Siler v. Environmental Protection Agency*, 908 F.3d 1291 (Fed. Cir. 2018); s*ee also*

*Soto v. Department of Veterans Affairs,* 2022 MSPB 6, ¶18 (2022). Likewise, in *Miller v. Department of Justice*, 842 F.3d 1252 (Fed. Cir. 2016), the court found the third *Carr* factor "add[ed] little to the overall analysis" of the case "but, if anything, cut slightly against the Government" due to the absence of evidence pertaining to that factor. *Id.* at 1262.

I find the agency failed to present evidence that it has taken similar actions against non-whistleblowers under similar circumstances. It is undisputed that Tran was the only other GS-13 Policy Analyst under Lee's supervision during the relevant time period. *See* IAF, Tab 25 (HR Vol. 2). However, I find no evidence that Tran similarly failed to perform successfully in any Core Competency or Performance Goal in his FY 2012-2013 performance plan, or that he was ever placed on a PIP. Rather, Lee testified that Tran had a "really great" performance year in 2012-2013. *See* IAF, Tab 25 (HR Vol. 2). The appellant does not dispute this testimony. She testified that she is aware of only one deliverable Tran failed to meet that year – the audit body of knowledge for the grants workforce repository – which, Lee testified, was not a prioritized element of Tran's performance plan that year. *See* IAF, Tabs 24 and 25 (HR Vols. 1 and 2). Accordingly, I find Tran's circumstances were not similar to the appellant's such that he could be considered a proper comparator for this analysis. Furthermore, given the lack of any other potential comparators, I find reasonable the agency's inability to present evidence that it took similar actions against non-whistleblowers in similar situations. This factor is therefore neutral in my assessment of the agency's actions.

Weighing all of the evidence of record relevant to the *Carr* factors, I find the agency has established by clear and convincing evidence that it would have demoted the appellant even absent her whistleblowing. The agency had strong motive to retaliate against the appellant during this time period. However, the weight of that motive is eclipsed by the overwhelming strength of the evidence supporting Lee and Dong's reasons for removing the appellant. As such, I find the

agency has established by clear and convincing evidence that the agency would have taken the same action regardless of the appellant's whistleblowing. Accordingly, no corrective action may be ordered.  *Carr*, 185 F.3d at 1322-23

## DECISION

The agency's action is AFFIRMED.


FOR THE BOARD:                    _____

*Monique Binswanger*

Monique Binswanger
Administrative Judge

## NOTICE TO APPELLANT

This initial decision will become final on **June 18, 2025**, unless a petition for review is filed by that date.  This is an important date because it is usually the last day on which you can file a petition for review with the Board.  Any petition for review must be filed within 35 days after the date of issuance of the initial decision or, if the petitioner shows that the initial decision was received more than 5 days after the date of issuance, within 30 days after the date the petitioner received the initial decision. The date that the petitioner receives the initial decision is determined according to the standard set forth at § 1201.22(b)(3), pertaining to an appellant's receipt of an agency decision. If the petitioner is represented, the 30-day time begins to run upon receipt of the initial decision by either the representative or the petitioner, whichever comes first.  The date on which the initial decision becomes final also controls when you can file a petition for review with one of the authorities discussed in the "Notice of Appeal Rights" section, below. The paragraphs that follow tell you how and when to file with the Board or one of those authorities. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review.

Your petition must state your objections to the initial decision, including all of your legal and factual arguments, and must be supported by references to applicable laws or regulations and by specific references to the record. You must file it with:

<div align="center">

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.
Washington, DC 20419

</div>

A petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov/).

### Criteria for Granting a Petition for Review

Pursuant to 5 C.F.R. § 1201.115, the Board normally will consider only issues raised in a timely filed petition for review. Situations in which the Board may grant a petition for review include, but are not limited to, a showing that:

(a) The initial decision contains erroneous findings of material fact. (1) Any alleged factual error must be material, meaning of sufficient weight to warrant an outcome different from that of the initial decision. (2) A petitioner who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific evidence in the record that demonstrates the error. In reviewing a claim of an erroneous finding of fact, the Board will give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing.

(b) The initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case. The petitioner must explain how the error affected the outcome of the case.

(c) The judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case.

(d) New and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. To constitute new evidence, the information contained in the documents, not just the documents themselves, must have been unavailable despite due diligence when the record closed.

As stated in 5 C.F.R. § 1201.114(h), petition for review, or a response to a petition for review, whether computer generated, typed, or handwritten, is limited to 30 pages or 7500 words. A reply to a response to a petition for review is limited to 15 pages or 3750 words. A party relying on word count to adhere to the length limitation must include certification of the word count with their pleading. Argument formatted such that the length of the pleading cannot be determined may be rejected. Computer generated and typed pleadings must use no less than 12-point typeface and 1-inch margins and must be double spaced and only use one side of a page. The length limitation is exclusive of any table of contents, table of authorities, attachments, and certificate of service. Length limitations may not be circumvented by including argument in attachments. Failure to comply with length limitations, after sufficient opportunity to comply, may lead to dismissal of the petition for review. A request for leave to file a pleading that exceeds the limitations must be received by the Clerk of the Board at least 3 days before the filing deadline. Such requests must give the reasons for a waiver as well as the desired length of the pleading and are granted only in exceptional circumstances. The page and word limits set forth above are maximum limits. Parties are not expected or required to submit pleadings of the maximum length.

If you file a petition for review, you should not include documents that were part of the record below, as the entire administrative record will be available to the Board. Any petition for review must be filed within 35 days after the date of issuance of the initial decision or, if the petitioner shows that the initial decision was received more than 5 days after the date of issuance, within 30 days after the date the petitioner received the initial decision. The date that the petitioner receives the initial decision is determined according to the standard set forth at § 1201.22(b)(3), pertaining to an appellant's receipt of an agency decision. If the petitioner is represented, the 30-day time period begins to run upon receipt of the initial decision by either the representative or the petitioner, whichever comes first.

Any response to a petition for review must be filed within 25 days after the date of service of the petition. Any reply to a response to a petition for review must be filed within 10 days after the date of service of the response to the petition for review. The Board's regulation at 5 C.F.R. § 1201.23 governs the computation of time.

### NOTICE TO AGENCY/INTERVENOR

Any party to the proceeding, the Director of the Office of Personnel Management (OPM), or the Special Counsel (under 5 U.S.C. 1212(c)) may file a petition for review. Each party is limited to filing a single petition for review, response to a petition for review, and reply to a response to a petition for review. A petition for review filed by an agency should address the agency's compliance with any interim relief requirements and should contain a certification, as set forth at 5 C.F.R. § 1201.116(a).

### NOTICE OF APPEAL RIGHTS

You may obtain review of this initial decision only after it becomes final, as explained in the "Notice to Appellant" section above. 5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such

review and the appropriate forum with which to file.  5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction.  If you wish to seek review of this decision when it becomes final, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements.  Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case.  If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

(1) **Judicial review in general.**  As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be received by the court within **60 calendar days** of the date this decision becomes final.  5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

<div style="text-align:center">

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

</div>

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular

relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2)**  **Judicial or EEOC review of cases involving a claim of discrimination**.  This option applies to you <u>only</u> if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination.  If so, you may obtain judicial review of this decision—<u>including a disposition of your discrimination claims</u>—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** <u>after this decision becomes final</u> under the rules set out in the Notice to Appellant section, above.  5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. 420 (2017). If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security.  *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of <u>your discrimination claims only, excluding all other issues</u>.  5 U.S.C. § 7702(b)(1).  You must file any such request with the

EEOC's Office of Federal Operations within **30 calendar days** <u>after this decision</u> <u>becomes final</u> as explained above.  5 U.S.C. § 7702(b)(1).

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

<div align="center">

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C.  20013

</div>

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

<div align="center">

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

</div>

**(3)** **<u>Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012</u>**.  This option applies to you <u>only</u> if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D).  If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8) or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.  The court of appeals must <u>receive</u> your petition for review within **60 days** of <u>the date this decision becomes final</u> under the rules set out in the Notice to Appellant section, above.  5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

<div align="center">

U.S. Court of Appeals

</div>

for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx

CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

Appellant

Electronic Service    Marguerite Pridgen
Served on email address registered with MSPB

Agency Representative

Electronic Service    Naomi Taransky
Served on email address registered with MSPB

*Kiecia Payne*

_____        _____
05/14/2025                               Kiecia Payne
(Date)                                Paralegal Specialist

A12

## Exhibit A6

Exhibit A02

## Paycheck withheld during PIP Period

Click the Reply button to create a response.

**Subject:** RE: Inquiry

**Received:** 11/30/2013 9:27:00 AM

Good morning,

Thank you for contacting NASA Federal. The credit union does not receive any notice if a change is made to a direct deposit since that process is controlled on the payroll provider's end. The credit union simply receives and deposits the funds to your account.

If you are not receiving your direct deposit, please contact your payroll office to have them research where your direct deposit is being sent. If they show it is being sent to the credit union, please have them note which account number and have them provide you with the 15-digit trace number for each missing deposit. Once you have this information, please contact the credit union so that we may research our system.

If they determine that the funds are not being sent to NASA Federal, then you and your payroll office will have to determine where the funds are being sent. The credit union cannot do this for you if the funds are not being sent here

Thank you,

Colleen L.
Member Services

**Message:**

-----Original Message-----
**From:** "****875@nasafcu.loca " <****875@nasafcu.local>
**Sent:** Saturday, November 30 2013 6:00 AM
**To:** "support@nasafcu.com" <support@nasafcu.com>
**Subject:** Inquiry {Contact Us General-39598452}

**From Name:** MARGUERITE PRIDGEN
**From Address:** MP2@⬛⬛⬛COM
**Pho**
**Account:**

**Comments:** My **pay**check hasn't been deposited to my account since June I never changed my Direct Deposit account. Is someone fraudulently diverting my **pay**check to another account?

     Reply     Delete     Archive     Cancel